## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **INNOVATION VENTURES, LLC f/d/b/a** | § | |
| **LIVING ESSENTIALS, a Michigan** | § | |
| **Limited Liability Company** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case No. 2:12-CV-13850-BAF-MJH** |
| | § | |
| **CUSTOM NUTRITION LABORATORIES** | § | |
| **LLC, A Texas Limited Liability** | § | |
| **Company, NUTRITION SCIENCE** | § | |
| **LABORATORIES, LLC, a Texas** | § | |
| **Limited Liability Company, and** | § | |
| **ALAN JONES** | § | |
| | § | |
| **Defendants.** | § | |

## NUTRITION SCIENCE LABORATORIES, LLC'S
## ORIGINAL ANSWER AND COUNTERCLAIM

Defendant Nutrition Science Laboratories, LLC ("NSL"), subject to its objection to this

Court's exercise of personal jurisdiction over it and subject to its objection to venue, files its

Original Answer to the Complaint of Innovation Ventures, LLC f/d/b/a Living Essentials

("Living Essentials"), and states:

### I. ANSWER TO COMPLAINT

### Jurisdiction and Venue

1. Upon information and belief, Defendant admits the allegations in Paragraph 1 of

the Complaint.

**ANSWER AND COUNTERCLAIM - Page 1**

2.      Defendant denies that CNL's principal place of business is located at 2055 Luna Road, Suite 100, Carrollton, Texas 75006, and is without information sufficient to allow it to either admit or deny the remaining allegations in Paragraph 2 of the Complaint.

3.      Defendant admits that it is a Texas limited liability company and denies the remaining allegations in Paragraph 3 of the Complaint.

4.      Defendant admits the allegations in Paragraph 4 of the Complaint.

5.      Defendant does not contest this court's subject matter jurisdiction.

6.      Defendant denies the allegations in Paragraph 6 of the Complaint.

7.      Defendant denies the allegations in Paragraph 7 of the Complaint.

## General Allegations

8.      Upon information and belief, Defendant admits the allegations in Paragraph 8 of the Complaint.

9.      Defendant is without information sufficient to allow it to either admit or deny the allegations in Paragraph 9 of the Complaint.

10.     Defendant is without information sufficient to allow it to either admit or deny the allegations in Paragraph 10 of the Complaint.

11.     Defendant is without information sufficient to allow it to either admit or deny the allegations in Paragraph 11 of the Complaint.

12.     Upon information and belief, Defendant admits the allegations in Paragraph 12 of the Complaint.

13.     Upon information and belief, Defendant admits the allegations in Paragraph 13 of the Complaint.

**ANSWER AND COUNTERCLAIM - Page 2**

14.     Defendant denies that it has a complete unredacted version of the Settlement Agreement in its possession.  Upon information and belief, Defendant admits the remaining allegations in Paragraph 14 of the Complaint.

15.     Defendant denies that it is bound by or a party to any settlement agreement with Living Essentials, denies that it breached any provision of any such settlement agreement, denies that Living Essentials has suffered any damage  and is without information sufficient to allow it to either admit or deny the remaining allegations in Paragraph 15 of the Complaint.

16.     Defendant denies the allegations in Paragraph 16 of the Complaint.

17.     Defendant denies the allegations in Paragraph 17 of the Complaint.

18.     Defendant denies the allegations in Paragraph 18 of the Complaint.

19.     Defendant denies the allegations in Paragraph 19 of the Complaint.

20.     Defendant denies the allegations in Paragraph 20 of the Complaint.

21.     Defendant denies the allegations in Paragraph 21 of the Complaint.

22.     Defendant denies the allegations in Paragraph 22 of the Complaint.

23.     Defendant is without information sufficient to allow it to either admit or deny the allegations in Paragraph 23 of the Complaint.

24.     Defendant admits that it is the manufacturer of the Rock On energy shot and denies the remaining allegations in Paragraph 24 of the Complaint.

25.     Defendant denies the allegations in Paragraph 25 of the Complaint.

26.     Defendant is without information sufficient to allow it to either admit or deny the allegations in Paragraph 26 of the Complaint.

27.     Defendant denies the allegations in Paragraph 27 of the Complaint.

<u>**ANSWER AND COUNTERCLAIM**</u> - Page 3

28.     NSL admits that it was formed on September 23, 2009, and is without information sufficient to allow it to either admit or deny the remaining allegations in Paragraph 28 of the Complaint.

29.     Defendant states that Alan Jones' LinkedIn page speaks for itself and otherwise denies the allegations in paragraph 29 of the Complaint.

30.     Defendant denies the allegations in Paragraph 30 of the Complaint.

31.     Defendant denies the allegations in Paragraph 31 of the Complaint.

32.     Defendant denies the allegations in Paragraph 32 of the Complaint.

33.     Defendant denies the allegations in Paragraph 33 of the Complaint.

34.     Defendant denies the allegations in Paragraph 34 of the Complaint.

35.     Defendant states that Alan Jones' LinkedIn page speaks for itself and otherwise denies the allegations in paragraph 35 of the Complaint.

### Count I - Breach of Contract
### (Breach of Covenant Not to Use Prohibited Ingredients)

36.     Defendant incorporates by reference its responses to the preceding paragraphs.

37.     Defendant denies the allegations in Paragraph 37 of the Complaint.

38.     Defendant denies the allegations in Paragraph 38 of the Complaint.

39.     Defendant denies the allegations in Paragraph 39 of the Complaint.

40.     Defendant denies the allegations in Paragraph 40 of the Complaint.

**Count II - Breach of Contract**
**(Breach of Covenant Not to Produce, Manufacture, Distribute, Sell or Offer to Sell the**
**Formula or Any Product Containing the Formula)**

41.     Defendant incorporates by reference its responses to the preceding paragraphs.

42.     Defendant denies the allegations in Paragraph 42 of the Complaint.

43.     Defendant denies the allegations in Paragraph 43 of the Complaint.

44.     Defendant denies the allegations in Paragraph 44 of the Complaint.

45.     Defendant denies the allegations in Paragraph 45 of the Complaint.

**Count III - Breach of Contract**
**(Breach of Jones' Affirmation That Living Essentials Owns the Formula)**

46.     Defendant incorporates by reference its responses to the preceding paragraphs.

47.     Defendant denies the allegations in Paragraph 47 of the Complaint.

48.     Defendant denies the allegations in Paragraph 48 of the Complaint.

49.     Defendant denies the allegations in Paragraph 49 of the Complaint.

**Count IV - Unfair Competition**

50.     Defendant incorporates by reference its responses to the preceding paragraphs.

51.     Defendant denies the allegations in Paragraph 51 of the Complaint.

52.     Defendant denies the allegations in Paragraph 52 of the Complaint.

**Count V - Unjust Enrichment**

53.     Defendant incorporates by reference its responses to the preceding paragraphs.

54.     Defendant denies the allegations in Paragraph 54 of the Complaint.

55.     Defendant denies the allegations in Paragraph 55 of the Complaint.

56.     Defendant denies the allegations in Paragraph 56 of the Complaint.

57.     Defendant denies the allegations in Paragraph 57 of the Complaint.

## PRAYER FOR RELIEF

Defendant denies that Living Essentials is entitled to any of the relief for which it prays.

## II.  AFFIRMATIVE DEFENSES

1.      This court lacks personal jurisdiction over this Defendant.

2.      The United States District Court for the Eastern District of Michigan is not a proper venue for this action.

3.      Living Essential's claims are barred, in whole or in part, by the applicable statute of limitations.

4.      Living Essential's claims are barred, in whole or in part, by laches.

5.      Living Essential's claims are barred, in whole or in part, by unclean hands.

6.      Living Essential's claims are barred, in whole or in part, by illegality.

7.      Living Essential's claims are barred, in whole or in part, because the restrictive covenants contained in the settlement agreement at issue herein constitute an unreasonable restraint on trade and/or competition.

8.      Living Essential's claims are barred, in whole or in part, because the restrictive covenants contained in the settlement agreement at issue herein constitute an illegal restraints on trade and/or competition.

9.      Living Essential's claims are barred, in whole or in part, by waiver.

10.     Living Essential's claims are barred, in whole or in part, by estoppel.

11.     Pursuant to the terms of the settlement agreement which is at issue herein, the formula for 5 Hour Energy entered the public domain through no fault of Defendants and,

therefore, any confidentiality related thereto is no longer required pursuant to the terms of the subject agreement.

12.     Living Essentials lacks standing to asert one or more of the claims asserted in the Complaint.

### III.  COUNTERCLAIMS

NSL, subject to its objection to this Court's exercise of personal jurisdiction over it and subject to its objection to venue, asserts the following claims against Living Essentials.

### Parties

1.     NSL is a Texas limited liability company with its principal place of business located at 1887 Geesling Road, Denton, Texas 76208.

2.     On information and belief, Living Essentials is a Michigan limited liability company with its principal place of business located in Farmington Hills, Michigan.

### Nature of the Action

3.     Custom Nutrition Laboratories, LLC ("CNL") was a formulator, designer, manufacturer and seller of dietary supplements.  Living Essentials contracted with CNL to purchase a dietary supplement formulated and manufactured by CNL.  CNL manufactured and shipped the product to Living Essentials.  Living Essentials markets the product under the product name "5 Hour Energy."  As a result of Living Essentials' conduct, CNL is now out of business.  However, prior to going out of business, CNL entered into a settlement agreement with Living Essentials.  The settlement agreement purports to preclude the "CNL Parties" from manufacturing any energy drinks with certain ingredients even though CNL had never manufactured any energy drinks for Living Essentials using those ingredients.  The settlement

agreement is but one in a long line of anti-competitive actions taken by Living Essentials in its efforts to illegally monopolize the energy shot market. The restrictive covenants in the settlement agreement constitute illegal restraints on trade and should be invailidated by this Court.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 exclusive of interest, costs, and fees, and by virtue of the diversity of citizenship of the parties.

5.      This Court has personal jurisdiction over Living Essentials because of its substantial, continuous, and systematic contacts with this judicial district.

6.      Venue is proper in this judicial district based on 28 U.S.C. § 1391(b), (c), and (d).

## Background

**A.      The Origin of the Relationship between CNL and Living Essentials.**

7.      CNL was a Texas limited liability company that designed, formulated, manufactured, packaged and sold dietary supplements in Carrollton, Texas. CNL manufactured "private label" nutritional supplements. CNL sold its "private label" products, as finished goods, at wholesale to companies that further distributed such products via further wholesale distribution or direct to retail.

8.      CNL first came in contact with Living Essentials at the National Association of Convenience Stores show in Chicago, Illinois in November 2003. It was at this show that Tom Morse ("Morse"), at the time Living Essentials' President, saw another product developed by CNL, a liquid nutritional supplement in a two ounce bottle sold under the product name

"Shotsz".  In February 2004, Living Essentials contacted CNL and indicated an interest in marketing a product similar in concept to the "Shotsz" product Morse had seen in Chicago.

9.      Based on Living Essentials' request to purchase and distribute a product similar in concept to the "Shotsz" product, CNL developed another formula for use as a two ounce liquid nutritional supplement (the "CNL Formula").  The CNL Formula was developed entirely by CNL in CNL's facilities in Dallas, Texas.  CNL had expended millions of dollars, over the years, to create a fully staffed and equipped development laboratory and production facility.  The development of the CNL Formula was only possible as a result of this substantial investment in time and money to develop the infrastructure and know how necessary for such a project.  Accordingly, the costs for the development of the CNL Formula were borne entirely by CNL and necessarily included this substantial investment in infrastructure and personnel.  The flavoring ingredients and the amounts of significant parts of the active ingredients were not disclosed on the product label and were proprietary trade secrets of CNL.  CNL was the owner of the CNL Formula which constituted a CNL trade secret.

10.     On May 12, 2004, CNL and Living Essentials entered into a Confidentiality Agreement (the "Confidentiality Agreement").  The Confidentiality Agreement required Living Essentials to maintain in confidence, and not use, any information disclosed by CNL during the relationship, including the CNL Formula.  Manoj Bhargava ("Bhargava"), Living Essentials' CEO, traveled to CNL's facilities in Dallas to execute the Confidentiality Agreement.

11.     On June 9, 2004, Living Essentials issued its first purchase order for the product which, by that time, was referred to by Living Essentials as "Chaser 5 Hour Energy" (the

**ANSWER AND COUNTERCLAIM - Page 9**

"Product").[1]  The Product was, at all times, sold to Living Essentials pursuant to CNL's Standard Terms and Conditions which, *inter alia*, included a confidentiality clause prohibiting Living Essentials' from disclosing or using any information supplied by CNL, including the CNL Formula.

**B.**     **Living Essentials Misappropriates the CNL Formula.**

12.     Living Essentials did not originally possess the CNL Formula or the knowledge and technology associated with the CNL Formula.  However, Living Essentials represented to CNL that it required the CNL Formula for insurance purposes.  In this regard, on June 29, 2004, Bhargava sent an email to CNL in Dallas requesting that CNL provide him with the CNL Formula in order to provide it to Living Essentials' insurance company.  CNL did not respond. Thereafter, on July 12, 2004, the earlier email was forwarded again by Bhargava to CNL requesting the CNL Formula.

13.     The CNL Formula existed in a computer software database (the "Genesis Software")  used by Alan Jones ("Jones") for the formulation of nutritional supplement products. Only Jones had access to the Genesis Software, which resided only on his laptop computer and not on any network servers or data storage devices.  As a result of the request from Living Essentials, Jones caused the Genesis Software to print out a copy of the CNL Formula (the "Genesis Printout").  On July 13, 2004, CNL faxed the Genesis Printout to Living Essentials. Before faxing the Genesis Printout, Jamie Gill ("Gill") called Morse and informed him that the CNL Formula was the proprietary property of CNL and that CNL owned the CNL Formula. Gill further informed Morse that CNL did not disclose it formulations.  However, Gill stated that

---

[1]Later, the Product's name was shortened to "5 Hour Energy."

CNL would accommodate Living Essentials' request for the disclosure of the Formula, pursuant to the Confidentiality Agreement, for the sole purpose of Living Essentials obtaining product liability insurance related to the Product with the understanding that the CNL Formula and the Genesis Printout were the proprietary property of CNL, would remain confidential and would not otherwise be disclosed or used.  Morse, as Living Essentials' president, agreed.  Both the facsimile cover sheet transmitting the Genesis Printout and the Genesis Printout itself were clearly stamped "CONFIDENTIAL." It was understood by Living Essentials' management that the Genesis Printout was to be treated as confidential and used only for the requested insurance purpose.  As is set forth below, Living Essentials did not seek to acquire the CNL Formula solely for the stated insurance reason.  Rather, Living Essentials intended to misappropriate the CNL Formula as evidenced by the almost immediate purported assignment of the CNL Formula to another company closely related to Living Essentials.

C.     **Living Essentials Assigns the Intellectual Property Associated with 5 Hour Energy.**

14.     On or about June 14, 2004, Living Essentials applied for a federal trademark on the product name "5 Hour Energy."  Sometime prior to September 15, 2004, Living Essentials assigned, by written assignment, all the intellectual property associated with the Product, including purported ownership of the CNL Formula, trademark and trade dress rights, to another company, Bio Clinical Development, Inc. ("Bio Clinical").  Bio Clinical is controlled exclusively by Bhargava.  Bhargava set up Bio Clinical in order to facilitate Living Essentials' theft and misappropriations of CNL's trade secrets.  Thereafter, Bio Clinical entered into an "Intellectual Property & Trade Name Licensing Agreement" wherein Bio Clinical granted Living Essentials a non-exclusive license (the "Licensing Agreement") to use the intellectual

property associated with the Product, including the CNL Formula, the product name "5 Hour Energy" and the trade dress associated with the Product.  Living Essentials has paid Bio Clinical royalties pursuant to the Licensing Agreement.

15.     Importantly, the Licensing Agreement provides no control over the quality or consistency of any products marketed by Living Essentials and precludes Living Essentials from bringing an action for infringement.

**D.     Living Essentials Misappropriates CNL's Manufacturing Processes.**

16.     By the summer of 2006, Living Essentials decided to sever its relationship with CNL.  This would require Living Essentials to obtain another source for the manufacturing of the Product.  However, Living Essentials knew that CNL would not consent to the disclosure of its confidential information to another manufacturer.  Accordingly, Living Essentials secretly entered into a relationship with another contract manufacturer.  Living Essentials, with the knowledge and consent of Bio Clinical, provided the manufacturer with the CNL Formula and CNL's other proprietary information.  In fact, Living Essentials provided the other manufacturer with an actual copy of the Genesis Printout which CNL had provided to Living Essentials. Living Essentials engaged in all such conduct on behalf of and with the consent and complicity of Bio Clinical.

17.     Still, neither Living Essentials, Bio Clinical, nor their new manufacturer, actually knew how to manufacture the Product, even with the CNL Formula.  As a result, Scott Henderson ("Henderson"), Living Essentials new President, with Living Essentials' and Bio Clinical's full knowledge and consent, made a trip to CNL's facilities to observe CNL's confidential and proprietary manufacturing process (the "Manufacturing Processes").  Henderson

**ANSWER AND COUNTERCLAIM - Page 12**

affirmatively represented to Jones during his trip to Dallas that he was simply interested in understanding the Manufacturing Processes out of curiosity.  During the trip, Henderson observed the details of CNL's Manufacturing Processes for two days.  Henderson asked specific questions of CNL to determine how the Manufacturing Processes were performed.  Henderson was gathering this information because Living Essentials' new manufacturer had no experience manufacturing nutritional supplements and did not understand how the Manufacturing Processes needed to be performed.  Living Essentials' new manufacturer was actually a manufacturer of salad dressing and barbeque sauce and had never before manufactured a dietary supplement. Henderson did not disclose to CNL that he was gathering such information for purposes of supplying the information to another manufacturer.  Living Essentials, with the full knowledge and consent of Bio Clinical, then passed this knowledge to its new manufacturer.

18.     Additionally, during the summer of 2006, Living Essentials induced CNL to move its facilities, at great expense to CNL, by representing that sales were soon to explode and CNL would need to greatly increase its manufacturing capacity.  CNL's current facilities were approximately 32,000 square feet and there was no physical room available to add a second liquid manufacturing line.  Accordingly, CNL negotiated to lease a new 80,000 square foot facility.  CNL also investigated the purchase of a new liquid manufacturing line.  In approximately August 2006, CNL executed a ten year lease on the new facility.  CNL also ordered a new liquid production line to be installed in the new facility.  Bhargava and Henderson were fully aware that CNL was leasing a new facility and acquiring a new manufacturing line. In fact, Bhargava and Henderson insisted that CNL take these steps to increase its manufacturing capacity.

**ANSWER AND COUNTERCLAIM - Page 13**

19.     Bhargava made numerous representations, via telephone calls, to Gill and Jones, during the summer and fall of 2006, that CNL must expand its manufacturing capacity because sales were going to explode due to an ongoing national advertising campaign and CNL would be required to meet that increased demand.  Bhargava even consulted with CNL during the summer of 2006 about the purchase of new equipment for the new plant to be constructed by CNL. Likewise, Henderson also made numerous representations, via telephone calls, to Gill and Jones, during the summer and fall of 2006, that CNL must expand its manufacturing capacity because sales were going to explode and CNL would be required to meet that increased demand. Additionally, Henderson made the same representations to Alan Jones during his two day trip to CNL's facilities in May 2006.

20.     In reliance on Bhargava's and Henderson's representations that CNL would be called on to meet this greatly increased demand, CNL leased and built out a new production facility in Carrollton, Texas nearly tripling its over all square footage.  CNL incurred costs associated with the build out of the new facility of approximately $750,000.  In reliance on Bhargava's and Henderson's representations that CNL would be called on to meet this greatly increased demand, CNL also ordered a new liquid production line.

21.     However, unknown to CNL, at the same time Living Essentials was insisting that CNL increase its production capacity, Living Essentials was bringing a new manufacturer on line for the express purposes of replacing CNL and ending the relationship with CNL.  In fact, Bhargava and Henderson's statements to CNL, that CNL would be called upon to meet significantly increased demand for the Product were false when they were made as Living Essentials fully intended to terminate its relationship with CNL at the first available opportunity.

ANSWER AND COUNTERCLAIM - Page 14

Living Essentials believed that, by terminating the relationship with CNL, and sticking CNL with a large receivable and increased expenses related to its expansion, it could effectively drive CNL out of business thereby eliminating it as a competitor in the energy shot market.

**E.    Living Essentials Drops the Bomb.**

22.    In December of 2006, after CNL was financially committed to move to its new expanded facilities and had actually ordered a new liquid manufacturing line, Living Essentials demanded that CNL enter into a written agreement wherein CNL would agree to manufacture and package the Product at a substantially reduced price.  At a meeting that occurred in Michigan in December, 2006, Henderson informed CNL that Living Essentials had signed a contract with another manufacturer to manufacture the Product at greatly reduced prices and presented a signed contract with the manufacturer, Royal Foods ("Royal"),  dated in July 2006 to Jones.

23.    Henderson stated that if CNL wanted any more orders from Living Essentials, it would have to sign a contract, including a non-compete agreement and with prices consistent with the prices in the Royal contract.  Bhargava, on the other hand, attempted to alleviate CNL's concerns and represented that, due to the increased volume of production, CNL should concede to a price reduction and that if CNL signed the agreement, it would ensure the long term survival of the relationship between the parties and CNL would get all the production volume it could handle for years to come.

24.    However, unknown to CNL, Living Essentials had already decided to "get rid of" CNL even if CNL signed a new agreement.  In fact, Living Essentials was only offering to enter into a new agreement in order to cover Living Essentials' short term production needs due to a

large order from a national pharmacy chain and in order to get CNL to sign a non-competition agreement.  At the time Living Essentials proffered the new agreement, it had no intention to honor its contractual obligations and fully intended to terminate the relationship with CNL as soon as it could get another manufacturer up and running.   In essence, Living Essentials extorted CNL into entering into a new agreement by threatening to stop placing orders with CNL and, instead, use another manufacturer to supply Living Essentials' needs for the Product.  Because of the increased expenses incurred or committed to by CNL as a result of Living Essentials' insistence that it expand its facilities, had Living Essentials stopped placing orders for the Product at that time, CNL would likely have gone out of business.

   25. At the time Living Essentials executed the Manufacturing Agreement between the parties (the "Manufacturing Agreement"), it did so with the intent of reducing CNL's margins and driving up CNL's receivables.  Living Essentials intended to breach the Manufacturing Agreement and attempt to force CNL out of the energy shot market, if not completely out of business.  Living Essentials insisted that the Manufacturing Agreement include a non-compete provision even though CNL had created and owned the CNL Formula and the Manufacturing Processes.  CNL sourced its own raw ingredients.  Living Essentials took direct delivery of the Product, so CNL had no knowledge of CNL's distribution network.  The non-competition provision of the Manufacturing Agreement served no legitimate business interest of Living Essentials.  Rather, it was included in the Manufacturing Agreement simply to reduce competition in the energy shot market.  In order to induce CNL into entering into the Manufacturing Agreement including a non-competition provision, Living Essentials promised CNL guaranteed minimum orders for over two years.  Without the guarantee of over two years

of minimum production volume, CNL would not have entered into an agreement which included a non-compete provision.

26.     Of course, CNL did not know at the time it executed the Manufacturing Agreement that Living Essentials intended to terminate the relationship, claim rights in the CNL Formula and thereafter attempt to drive CNL out of business.  The Manufacturing Agreement was largely negotiated over the phone and via electronic mail.

27.     Without using the CNL Formula, the Genesis Printout and/or the Manufacturing Processes, Living Essentials would not be able to manufacture the Product itself or obtain the manufacturing of the Product by others than CNL.

**F.     Living Essentials Breaches the Manufacturing Agreement.**

28.     Living Essentials wrongfully terminated the Manufacturing Agreement.  In this regard, Henderson informed CNL orally on October 19, 2007, that Living Essentials was ending its relationship with CNL.  Specifically, Henderson told Jones that, "we're done with you guys, OK, so now we just got to figure out how to get it done in an amicable or litigious manner." Living Essentials provided no written notice of breach, no opportunity to cure and no written notice of termination, all required by the Manufacturing Agreement.

29.     On November 1, 2007, CNL made demand on Living Essentials to (1) pay its outstanding invoices (2) comply with the minimum purchase requirements under the Manufacturing Agreement and (3) return all confidential information to CNL, including the CNL Formula.  However, Living Essentials continued to refuse to pay CNL for Product which had already been manufactured by CNL, failed to provide CNL with labels and packaging materials to allow CNL to continue to manufacture the Product, failed to comply with the minimum order

requirements under the Manufacturing Agreement, failed to pay CNL for the remaining raw materials in CNL's inventory which CNL acquired on behalf of Living Essentials and continued to use the CNL Formula and Manufacturing Processes in clear violation of the Confidentiality Agreement and CNL's Standard Terms and Conditions of Sale.

30.     Living Essentials engaged in the foregoing conduct in order to drive CNL out of business, thereby eliminating it as a competitor in the energy shot market.

**G.     Living Essentials Discloses the Formula in a Patent Application.**

31.     During the course of litigation between CNL and Living Essentials, Bio Clinical disclosed a derivative of the CNL Formula to the USPTO in multiple patent applications, including an application that resulted in the issued U.S. Patent No. 8,187,647 (the "'647 Patent"). As a result, the CNL Formula has been published to the public and has entered the public domain as a result of Living Essentials' and Bio Clinical's wrongful conduct.

32.     Bhargava claims to be the inventor of the subject matter of the '647 Patent.  The '647 Patent discloses an Edible Energy Composition.  The '647 Patent makes the following claims:

> 1. An edible energy composition consisting of: a methylated xanthine in an amount from about 0.0005 g/ml to about 0.005 g/ml; a choline derivative in an amount from about 0.00005 g/ml to about 0.0009 g/ml; vitamin B6; vitamin B12; folic acid; niacinamide; glucuronolactone; N-acetyl L-tyrosine; L-phenylalanine; and taurine and at least one flavorant and, at least one preservative.
>
> 2. The energy composition of claim 1 wherein the methylated xanthine is present in an amount from about 0.0036 g/ml to about 0.0045 g/ml.
>
> 3. The energy composition of claim 1 wherein the methylated xanthine is present in an amount from about 0.0037 g/ml to about 0.0039 g/ml.
>
> 4. The energy composition of claim 1 wherein the choline derivative is present in an amount from about 0.0003 g/ml to about 0.0007 g/ml.

5. The energy composition of claim 1 wherein the choline derivative is present in an amount from about 0.0004 g/ml to about 0.0006 g/ml.

6. The energy composition of claim 1 wherein the methylated xanthine is caffeine.

7. The energy composition of claim 1 wherein the choline derivative is citicoline.

8. The energy composition of claim 1 consisting of: vitamin B6 in an amount from about 0.0001 g/ml to about 0.003 g/ml; said vitamin B12 in an amount from about 0.0001 g/ml to about 0.003 g/ml; said folic acid in an amount from about 0.000005 g/ml to about 0.0002 g/ml; and said niacinamide in an amount from about 0.0001 g/ml to about 0.003 g/ml.

9. An edible energy composition consisting of: caffeine in an amount from about 0.0037 g/ml to about 0.0039 g/ml; citicoline in an amount from about 0.0004 g/ml to about 0.0006 g/ml; N-acetyl L-tyrosine, L-phenylalanine, and taurine each in an amount from about 0.01 to about 0.03 g/ml; vitamins vitamin B6, vitamin B12, folic acid, each in an amount from about 0.0010 to about 0.0025 g/ml; glucuronolactone in an amount from about 0.005 to about 0.007 g/ml; and at least one flavorant.

10. An edible energy composition consisting of: caffeine in an amount from about 0.0032 g/ml to about 0.0034 g/ml; citicoline in an amount from about 0.00015 g/ml to about 0.00019 g/ml; N-acetyl L-tyrosine, L-phenylalanine, and taurine each in an amount from about 0.01 to about 0.03 g/ml; vitamin B6, vitamin B12, folic acid, each in an amount from about 0.0010 to about 0.0025 g/ml; glucuronolactone in an amount from about 0.005 to about 0.007 g/ml; and at least one flavorant.

33.     Although not identified in the application itself, the 5 Hour Energy product is the subject matter of the '647 Patent.  During the prosecution of the application for the '647 Patent, Bio Clinical submitted the Declaration of Amy E. Rinaldo.

34.     Ms. Rinaldo's declaration avers that she was the attorney of record in connection with the '647 Patent application and that the 5 Hour Energy product was the subject of a study to establish the efficacy of the product.

35. The results of the study on 5 Hour Energy were submitted to the USPTO in support of the application for the '647 Patent.

36. Ms. Rinaldo's affidavit further provided that "the Five Hour Energy dietary supplement product contains the same ingredients as those disclosed in the presently pending application."

37. Bio Clinical also submitted the Declaration of Manoj Bhargava in support of the application for the '647 Patent.

38. Bhargava's declaration avers that "the formula for the Edible Energy Composition as disclosed in the presently pending application is different than the formula that was originally sold under the trademark 5 Hour Energy.  In fact, the modified formula was not offered for sale prior to November 15, 2007."

39. The Bhargava declaration was submitted to overcome a rejection by the USPTO that the application for the '647 Patent was barred by 35 U.S.C §102(b) as having been offered for sale more than one year prior to the date of the patent application.

40. Living Essentials never disclosed to CNL that the formula for 5 Hour Energy had been altered to include citicoline or a choline derivative.

41. CNL never manufactured any 5 Hour Energy for Living Essentials which contained citicoline or any choline derivative.

42. Upon information and belief, CNL never manufactured any 5 Hour Energy for Living Essentials which did not include Vitamin C.

43. Upon information and belief, CNL never manufactured any 5 Hour Energy for Living Essentials which did not include enzymes.

44.     Upon information and belief, the formula for 5 Hour Energy now includes citicoline and does not include either Vitamin C or enzymes.

45.     Upon information and belief, the current formulation for the 5 Hour Energy product is considered the best mode of the invention disclosed in the '647 Patent.

46.     Upon information and belief, the current formula for 5 Hour Energy is disclosed in the '647 Patent.

47.     Upon information and belief, Living Essentials manufactured and sold the 5 Hour Energy product under a non-exclusive license from Bio Clinical.  Bio Clinical is the purported owner of any and all intellectual property related to the formula for the 5 Hour Energy product. Accordingly, upon information and belief, Living Essentials has no exclusive rights to the manufacture of the 5 Hour Energy product and no standing to pursue claims related thereto.

## Count I

### (Declaration of that Formula for 5 Hour Energy is in the Public Domain)

48.     NSL repeats and alleges paragraphs 1 through 47 of the counterclaim.

49.     The formula for 5 Hour Energy is fully disclosed in the '647 patent.

50.     Subject to Bio Clinical's patent rights, if any, the subject matter of the '647 patent has entered the public domain.

51.     Living Essentials and NSL have adverse legal interests, and there is a substantial controversy between Living Essentials and NSL of sufficient immediacy and reality to warrant the issuance of a declaratory judgment regarding the viability of any claim of trade secret protection related to the formula for 5 Hour Energy.

ANSWER AND COUNTERCLAIM - Page 21

52.     NSL is entitled to a judicial declaration that the formula for 5 Hour Energy is in the public domain subject only to Bio Clinical's patent rights, if any.

### Count II

### (Declaration of that Formula for 5 Hour Energy is in Not

### Confidential Information Pursuant to the Temrs ofthe Settlement Agreement)

53.     NSL repeats and alleges paragraphs 1 through 52 of the counterclaim.

54.     The formula for 5 Hour Energy entered the public domain through no fault of the "CNL Parties" as that term is defined in the settlement agreement.

55.     Pursuant to the terms of the settlement agreement, information which enters the public domain through no fault of any of the CNL Parties is excluded from the definition of "Confidential Information."

56.     Living Essentials and NSL have adverse legal interests, and there is a substantial controversy between Living Essentials and NSL of sufficient immediacy and reality to warrant the issuance of a declaratory judgment regarding the status of the formula for 5 Hour Energy as "Confidential Information" under the settlement agreement.

57.     NSL is entitled to a judicial declaration that the formula for 5 Hour Energy does not constitute "Confidential Information" under the settlement agreement.

### Count III

### (Declaration that Settlement Agreement is an Illegal Restraint on Trade)

58.     NSL repeats and alleges paragraphs 1 through 57 of the counterclaim.

59.     Living Essentials seeks to prohibit, by agreement, a competitor from manufacturing an energy shot with a particular class of ingredients referred to as the "Choline

Family."  However, the "CNL Parties" never manufactured an energy shot for Living Essentials with any ingredients from the Choline Family and, therefore, would not possess any "Confidential Information" related thereto.  Further, the formula for 5 Hour Energy is not confidential at all and is, as set forth above, in the public domain.

60.     The terms of the settlement agreement restricting the "CNL Parties" from manufacturing energy shots with ingredients from the "Choline Family" is nothing more than an agreement to limit competition and, therefore, is illegal and/or unenforceable.  It does not protect any legitimate interest of Living Essentials.

61.     Living Essentials and NSL have adverse legal interests, and there is a substantial controversy between Living Essentials and NSL of sufficient immediacy and reality to warrant the issuance of a declaratory judgment regarding the legality and/or enforceability of the restrictive covenants in the settlement agreement.

62.     NSL is entitled to a judicial declaration that the provisions of the settlement agreement precluding the "CNL Parties" from manufacturing energy shots with ingredients from the "Choline Family" constitute an illegal and/or unenforceable restraint on trade.

## Prayer for Relief

WHEREFORE, NSL demands judgment in its favor and against plaintiff as follow:

A.     Dismiss the Complaint with prejudice and denying each request for relief made therein.

B.     Declaring the formula for 5 Hour Energy in the public domain;

C.     Declaring the formula for 5 Hour Energy not "Confidential Information" under the settlement agreement;

ANSWER AND COUNTERCLAIM - Page 23

D.      Declaring the restrictive covenants in the settlement agreement an illegal and/or

unenforceable restraint on trade;

E.      Awarding NSL its costs and expenses; and

F.      Awarding NSL such other and further relief as the Court deems just and proper.

Respectfully submitted,

BANOWSKY & LEVINE, P.C.

/s/ Baxter W. Banowsky
Baxter W. Banowsky
Texas State Bar No. 00783593

12801 N. Central Expressway
Suite 1700
Dallas, Texas  75243
Telephone:  (214) 871-1300
Facsimile: (214) 871-0038
bwb@banowsky.com

PIERCE, FARRELL & TAFELSKI, PLC
Mark C. Pierce, Esq.

2525 S. Telegraph Road, Suite 100
Bloomfield Hills, MI  48302
(248) 451-2200
(248) 456-8470 (fax)
mpierce@pierce-law.net

ATTORNEYS FOR DEFENDANTS
NUTRITION SCIENCE LABORATORIES, LLC
AND ALAN JONES

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served, via the

Court's ECF system, contemporaneously with its filing.


<u>/s/ Baxter W. Banowsky</u>
Baxter W. Banowsky