UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, L.L.C. f/d/b/a
LIVING ESSENTIALS, a Michigan
limited liability company,

        Plaintiff/Counter-Defendant,

                                      Case No. 12-13850
   v.                                    Hon. Terrence G. Berg

CUSTOM NUTRITION LABORATORIES, L.L.C.,
a Texas limited liability company,

        Defendant,

   and

NUTRITION SCIENCE LABORATORIES, L.L.C., a
Texas limited liability company,
and ALAN JONES,

        Defendants/Counter-Plaintiffs.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART NUTRITION SCIENCE'S MOTION FOR SUMMARY JUDGMENT AND DENYING JONES'S MOTION FOR SUMMARY JUDGMENT(DKT. 199)

Before the Court is Defendants', Alan Jones's ("Jones,") and Nutrition Science Laboratories' ("Nutrition Science,") joint motion for summary judgment on the bifurcated issues filed on January 26, 2015.  (Dkt. 199.)  The matter has been fully briefed and the Court heard oral argument on September 14, 2015.  For the reasons explained below, Nutrition Science's motion for summary judgment is **GRANTED** as to Counts IV, VI, and **DENIED WITHOUT PREJUDICE** as to Count VIII.

Nutrition Science's motion for summary judgment is **DENIED** as to Counts I and VII. Jones's motion for summary judgment is **DENIED** as to Counts I and IV.

## I.   INTRODUCTION

At its root, this is a breach of contract case. In 2004, Plaintiff Innovation Ventures, L.L.C., f/d/b/a Living Essentials ("Living Essentials"), a Michigan corporation, contracted with Defendant Custom Nutrition Laboratories ("Custom Nutrition"), a Texas L.L.C., to create a liquid energy drink. Through this collaboration, Living Essentials developed the market-leading energy drink "5-hour Energy." Three years later, the relationship soured and the former business partners became adversaries in litigation in state and federal court.

In August 2009, the parties reached a settlement agreement (the "Settlement Agreement"). Under the Settlement Agreement, in exchange for a $1.85 million payment to Custom Nutrition, the "CNL Parties"—defined to include Custom Nutrition and its CEO Alan Jones—agreed to a number of restrictive covenants. These covenants include what the Court will call "the Choline Family restrictions," provisions which prohibited the CNL Parties from using any ingredients in the Choline Family in their energy drink formulas. Living Essentials insisted upon these covenants because it had recently introduced a new choline-based ingredient, citicoline, into 5-hour Energy and it wanted to prevent the CNL Parties from using that ingredient, citicoline or its derivatives or equivalents, as well as several other ingredients.

2

Just two months after signing the Settlement Agreement, Custom Nutrition developed serious financial problems, and so it agreed to sell substantially all of its assets to Defendant Nutrition Science in October 2009. This transaction was also memorialized in a contract (the "Asset Purchase Agreement"). Nutrition Science, with Jones's help, then began to produce energy liquids in a manner that Plaintiff alleges violated the Choline Family restrictions.

Claiming violations of the Settlement Agreement, Living Essentials brought this suit against Custom Nutrition, Nutrition Science, and Jones in his individual capacity.

## II.   FACTUAL BACKGROUND

### A. The Beginning and the End of Living Essentials' Business Relationship with Custom Nutrition and Jones

Living Essentials is the maker and distributor of the popular liquid dietary supplement 5-hour Energy. (Plaintiff's Second Amended Complaint, Dkt. 187, p. 3.) In 2004, Living Essentials contracted with Custom Nutrition to develop, produce, and package 5-hour Energy. (*Id.* at p. 4.) Custom Nutrition had experience developing liquid dietary supplements and had previously created its own two-ounce energy drink called "Shotz." (Declaration of Alan Jones, Oct. 12, 2012, Dkt. 202, Ex. 5, p. 2.) Jones, a Texas resident, was the President and CEO of Custom Nutrition at the time of the contract. (Dkt. 187, p. 4.)

3

In October 2007, Custom Nutrition and Living Essentials terminated their relationship and filed lawsuits against each other.[1]  (Dkt. 187, p. 4.)  On or about August 17, 2009, they resolved these suits by negotiating and signing the Settlement Agreement.  (Settlement Agreement, Dkt. 187, Ex. A.)[2]  The parties also stipulated to the entry of a consent judgment in the Eastern District of Texas enjoining Custom Nutrition and Jones from ever again manufacturing, producing, selling, or marketing 5-hour Energy.  (*Id.*)

## B. The Settlement Agreement Bars the CNL Parties from Using Choline Family Ingredients.

Living Essentials seeks to enforce the Settlement Agreement, particularly its restrictive covenants, against Nutrition Science and Jones.  The Settlement Agreement was entered into by the "CNL Parties,"[3] the "UL Parties,"[4] and the "LE Parties."[5]  Jones is expressly named as one of the CNL Parties.

---

[1] Custom Nutrition brought suit in Texas state court while Living Essentials brought suit in the Eastern District of Texas (collectively the "Texas Litigation.")  (*Id.*)

[2] All subsequent citations to the Settlement Agreement refer to Dkt. 187, Ex. A.

[3] The term "CNL Parties" includes "Custom Nutrition Laboratories . . . and its present and former members, managers, managing members, officers (including, without limitation, Alan Jones and Paul Stewart), employees of all such entities, and each of them."  (*Id.*)

[4] The term "UL Parties" includes "Ultimate Lifestyles…and its present and former members, managers, managing members, officers (including, without limitation, Mike Norwood), employees of all such entities, and each of them."  (*Id.*)

[5] The term "LE Parties" includes "Innovation Ventures…and its present and former members (including, without limitation, Manoj Bhargava, Scott Henderson, Tom Morse, Ravinder Sajwan, Edward Snyder, Harry Wheat, Indu Rawat, Innovation Ventures Acquisition Company, LLC, and Nevada 5 Inc.), managing members, officers, employees of all such entities, and each of them."  (*Id.*)

The parties had different reasons for negotiating the restrictive covenants. The CNL Parties agreed to the restrictive covenants in exchange for a $1.85 million payment from Living Essentials to Custom Nutrition.  (§ 5.)  Custom Nutrition had a strong financial interest in securing this payment because it faced the prospect of bankruptcy if it did not reach a settlement with Living Essentials.  (Declaration of Alan Jones, Oct. 12, 2012, Dkt. 202, Ex. 5, p. 3.)

In contrast, Living Essentials sought to protect what it considered an important innovation in 5-hour Energy's formula.  In 2007, Living Essentials changed its 5-hour Energy formula by including a new ingredient:  citicoline. (Plaintiff's Response Brief, Dkt. 201, p. 7.)  This ingredient distinguished 5-hour Energy from its competitors because it was one of the first energy drinks to contain citicoline.  (Deposition of Living Essentials' Matthew Dolmage, Dec. 15, 2014, Dkt. 201, Ex. 3, pp. 37-38.)  According to Living Essentials, citicoline improves concentration and focus.  (*Id.* at p. 37.)  Living Essentials thus sought to prevent the CNL Parties from capitalizing on their prior knowledge of Living Essential's formula by producing a "knock off" 5-hour Energy with citicoline.  (*Id.* at p. 90.)

Against this backdrop, the CNL Parties agreed not to produce, manufacture, or distribute any "energy liquid"[6] containing an ingredient in the "Choline Family."[7]

---

[6] Section 5(b) broadly defines the term "energy liquid" as "any energy shot, drink or other liquid (whether such liquid says it provides energy or not) of every kind, including without limitation gel caps . . . ."  The term does not include dry pills, powders and liquid meal replacements larger than six-ounces which contain at least 16 grams of protein.

5

(§ 5(c).)  The CNL Parties also agreed that they would not assist third-parties in the production, manufacturing, distribution, or sale of energy liquids containing a Choline Family ingredient.[8]  (*Id.*)  This restriction was to last "the same length of time that an issued patent would provide protection as if such patent were filed on the date of this Agreement . . . ." (*Id.*)

Section 5(c) provides a comprehensive framework designed to prevent the CNL Parties from using Choline Family ingredients in any way.  Although under § 5(c)(ii) the restrictions only apply to "new products" and not to "existing products,"[9] they effectively constitute a complete prohibition because Custom Nutrition did not utilize any Choline Family ingredients prior to the execution of the Settlement Agreement.  (*See* Defendants' Motion for Summary Judgment, Dkt. 199, p. 6.)  Nor did the CNL Parties possess Living Essentials' new formula containing citicoline during their business relationship with Living Essentials.  (*Id.*)  Thus, any product

---

[7] Under § 5(c)(i), ingredients in the "Choline Family" include "citicoline, choline bitartrate, bilineurine, Beta-hydroxyethyl trimethylammonium hydroxide, choline chloride, choline citrate, cytidine 5-diphosphocholine (CPD-choline), intrachol, lipotropic factor, PhosCholxAE, phosphatidylcholine, TRI, tricholine citrate (TRI), trimenthylethanolamine or their equivalents in all forms, derivatives, constituents, and synthetic equivalents or substitutes; Taurine is excluded . . . ."

[8] "For purposes of this Subsection 5.c., [sic] the restrictions also apply to the activities of any person or entity wherein any of the CNL Parties manage, control or invest in such person or entity, unless passively investing in a publicly traded company . . . The CNL Parties, individually, collectively, or in concert with others, shall not directly or indirectly, manufacture, formulate or assist in the formulation thereof, distribute, warehouse, formulate or assist in the formulation thereof . . . or offer to sell any Energy liquid in violation of any of the restrictive covenants below . . . ."  (§ 5(c).)

[9] "Existing products" are "only those products specifically identified by the CNL Parties in Exhibit D, and which between January 23, 2009 and July 24, 2009, the CNL Parties have actually sold to customers . . . New Products' means everything else."  (§ 5(c)(ii).)

containing a Choline Family ingredient would constitute a new product and hence be prohibited.[10]

Living Essentials also seeks to rely on §16 to bind Nutrition Science to the Settlement Agreement.  Section 16 states that the restrictive covenants "shall be binding upon . . . any person or entity that acquires substantially all of their [the parties'] assets" and "shall survive any merger, acquisition, restructuring and/or reorganization, and the surviving entity shall be fully bound hereby."

As for Jones, Living Essentials argues that Jones is personally bound as a signatory to the Settlement Agreement.  Jones unquestionably signed that agreement, but the parties dispute whether his signature in his capacity as President and CEO of Custom Nutrition, in a signature block for Custom Nutrition and the CNL parties, is sufficient to bind Jones in his individual capacity.  The Settlement Agreement only contains one signature line—for both the entity Custom Nutrition and for all of the CNL Parties.[11]  Similarly, the Settlement Agreement contains only one signature line purporting to bind Living Essentials and a number

---

[10] In addition to the Choline Family Restrictions, Living Essentials seeks to enforce the restrictive covenants found in § 5(a).  These covenants relate to the enforceability of the Settlement Agreement.

[11] In contrast, the Assignment of Intellectual Property Rights, Dkt. 187, Ex. A, Sub. Ex. C1, incorporated by reference into the Settlement Agreement, contains separate individual signature lines for the entity Custom Nutrition and for the individual Alan Jones.

of other parties[12], including real persons and corporate entities, signed only by Scott Henderson as the President of Living Essentials.

## C. Custom Nutrition and Jones Seek New Business with Lovelace.

Months before the execution of the Settlement Agreement, in late February or early March 2009, Jones met Don Lovelace ("Lovelace") at an industry trade show in California. (Dkt. 199, p. 4.) Lovelace is the owner of Lily of the Desert, a company that produces liquid drinks. (*Id.*) Lily of the Desert had developed a powder-based energy drink, but lacked the capacity to manufacture it. (*Id.*) Because Custom Nutrition had this capacity, Jones and Lovelace entered into contract negotiations for Custom Nutrition to produce Lily of the Desert's new product. (Declaration of Don Lovelace, Jan. 26, 2015, Dkt. 200, Ex. 2, p. 1.) Although they engaged in a series of negotiations, Jones and Lovelace failed to consummate a manufacturing agreement through the end of August 2009. (Dkt. 199, p. 5.)

Custom Nutrition was eager to reach an agreement with Lovelace because the company was in a precarious financial condition. (*See id.* at p. 5.) Although it had recently received $1.85 million from Living Essentials, this cash infusion had not been sufficient to enable the company to regain its financial footing. According to Jones, after paying for attorneys' fees and costs, Custom Nutrition only received

---

[12] Apart from Henderson and Living Essentials, the parties purportedly bound include real persons Manoj Bhargava, Tom Morse, Ravinder Sajwan, Edward Snyder, Harry Wheat, Indu Rawat, and the corporate entities Innovation Ventures Acquisition Company, L.L.C., and Nevada 5 Inc.

8

$970,000 of the $1.85 million settlement proceeds from Living Essentials. (Supplemental Declaration of Alan Jones, Mar. 5, 2015, Dkt. 204, Ex. A, p. 1.) Jones also alleges that Custom Nutrition could only dispose of $565,000 from the $970,000 it received because its co-owner Paul Stewart forced the company to pay $405,000 to a third-party.[13]  (*Id.* at p. 2.)  Jones claims that Custom Nutrition used the remaining $565,000 to pay creditors and vendors in an attempt to continue operations.  (*Id.*)

Apart from its liquidity problems, Custom Nutrition's financial woes stemmed from large debts, totaling $958,682.27, which it owed to City Bank of Texas as of October 2009.  (Declaration of Alan Jones, Jan. 23, 2015, Dkt. 200, Ex. 1, p. 3.)  City Bank also held liens on Custom Nutrition's assets along with personal guaranties from Custom Nutrition's two major owners, Jones and Paul Stewart.[14] (*Id.* at p. 3.)  Facing increasing difficulties in continuing Custom Nutrition's operations, Jones raised the possibility of selling Custom Nutrition to Lovelace in lieu of reaching a manufacturing agreement.  (*Id.* at p. 2.)

After performing due diligence on Custom Nutrition's assets and liabilities, Lovelace decided against purchasing Custom Nutrition.  (*Id.* at p. 3.)  Since an outright sale was no longer possible, Jones asked Lovelace to speak to City Bank

---

[13] This transaction was later found to be improper and a judgment was issued against the third-party.  (*Id.* at Sub. Ex. 11, p. 1.)

[14] Nutritional Holdings, L.L.C., was the sole owner of Custom Nutrition.  (*Id.* at p. 3.)  Jones and Stewart were the major owners of Nutritional Holdings, and consequently of Custom Nutrition.  (*Id.*)

about acquiring Custom Nutrition's assets. (Dkt. 199, p. 6.) Lovelace agreed. (*Id.*) Defendants allege that Custom Nutrition did not participate in Lovelace's negotiations with City Bank. (*Id.*)

## D. Nutrition Science Acquires Custom Nutrition's Assets.

On October 14, 2009, Lovelace acquired Custom Nutrition's debts from City Bank as part of the Asset Purchase Agreement. (*Id.*) To acquire the debt, Lovelace formed two new Texas limited liability entities, EDL Holdings, L.L.C., and Nutrition Science Laboratories, L.L.C., ("Nutrition Science.")[15] (*Id.*) According to Defendants, Lovelace, his wife, and his son are the owners of Nutrition Science.[16] (Declaration of Don Lovelace, Jan. 26, 2015, Dkt. 200, Ex. 2, p. 3.)

As part of the transaction, EDL Holdings paid City Bank $900,000[17] to purchase Custom Nutrition's debt and to acquire City Bank's liens on Custom Nutrition's assets. (Dkt. 199, p. 6.) Nutrition Science then acquired Custom Nutrition's assets in exchange for assuming Custom Nutrition's debts, debts now owed to EDL Holdings. (*Id.*) Nutrition Science also released Jones's and Stewart's personal guaranties on the notes. (*See* Asset Purchase Agreement, Dk. 200, Ex. 1.1,

---

[15] Lovelace formed Nutrition Science on or about September 23, 2009. (Dkt. 187, p. 8.)

[16] Living Essentials contests Lovelace's account of the ownership of Nutrition Science. Lovelace previously declared that he was "the sole member and 100% owner of Nutrition Science Laboratories, L.L.C…" (Declaration of Don Lovelace, Oct. 12, 2012, Dkt. 202, Ex. 9, p. 1.)

[17] City Bank's receipt of $900,000 was in excess of its own valuation of Custom Nutrition's assets, which City Bank appraised at only $707,534 as of May 28, 2009. (*Id.*)

§ 1.6.) [18]  Following the execution of the Asset Purchase Agreement, Custom

Nutrition ceased all operations on October 14, 2009.  (Deposition of Alan Jones,

January 15, 2015, Dkt. 201, Ex. 6, p. 20.)

### E. The Asset Purchase Agreement

Nutrition Science acquired Custom Nutrition's assets through the Asset

Purchase Agreement.  Under § 1.1, titled "Purchase and Sale of Assets", Nutrition

Science acquired all of Custom Nutrition's assets "[u]pon the terms and subject to

the conditions set forth" in the agreement.[19]  Living Essentials alleges that the

Asset Purchase Agreement under § 4.2(r) provides that Nutrition Science acquired

Custom Nutrition's assets subject to the Settlement Agreement's restrictive

covenants.  Section 4.2(r) states that Custom Nutrition's formulas and related

copyrights "are limited by the settlement agreement between Seller and Living

Essentials" as contained in Schedule 4.2(h).[20]

Nutrition Science denies that § 4.2(r) incorporates the restrictions of the

Settlement Agreement and instead directs the Court's attention to § 1.2 of the Asset

---

[18] All subsequent citations to the Asset Purchase Agreement refer to Dkt. 200, Ex. 1.1.

[19] Schedule 1.1, which lists the assets Nutrition Science acquired from Custom Nutrition, includes two Living Essentials flavor additives.  Defendants explain that these flavor additives were not actually conveyed and that the entries "were apparently not updated."  (Dkt. 199, p. 8.)  Living Essentials contends that at the very least, there is a question of fact as to whether these assets were transferred in violation of § 15 of the Settlement Agreement, which required the CNL Parties to return all materials and documents related to Living Essentials.

[20] Schedule 4.2(h) lists, and purports to include, all litigation in which Custom Nutrition was a party including the Settlement Agreement and the Consent Judgment between Living Essentials and Custom Nutrition.  Despite this representation, Nutrition Science claims that it did not receive a copy of the Settlement Agreement at the time it executed the Asset Purchase Agreement.

Purchase Agreement. Section 1.2, titled "No Assumption of Liabilities," states that Nutrition Science is not responsible for "any liabilities, liens, security interests, claims or encumbrances of Seller" except as provided in § 1.3. In turn, § 1.3 limits Nutrition Science's assumed obligations to those listed in Schedule 1.3, principally Custom Nutrition's debt to City Bank.

In addition to these provisions, the Asset Purchase Agreement contains a Texas choice of law provision under § 10.7, and also purports to limit the expansion of third-party rights under § 1.4, titled "No Expansion of Third Party Rights."

**F. Following the Asset Purchase Agreement, Nutrition Science Produced Energy Liquids that Allegedly Violate the Settlement Agreement.**

Living Essentials alleges that after Nutrition Science acquired Custom Nutrition's assets, Nutrition Science began creating, distributing, and selling energy liquids that were prohibited under the terms of the Settlement Agreement. (Dkt. 187, p. 10.) Some of Nutrition Science's energy liquids contained choline bitartrate and choline citrate, ingredients specifically listed as members of the Choline Family under § 5(c)(i) of the Settlement Agreement. (*Id.*)

Other energy liquids contained the ingredient betaine. (*Id.* at p. 11.) According to Living Essentials, betaine is a prohibited member of the Choline Family under § 5(c)(i)'s "catch-all" clause. The "catch-all" clause provides that any "equivalents in all forms, derivatives, constituents, and synthetic equivalents or substitutes" of the specifically listed ingredients are also part of the Choline Family.

12

(*Id.*)  Living Essentials alleges that betaine is a derivative, equivalent, and substitute of the expressly listed ingredients under § 5(c)(i).  (*Id.* at pp. 11-12.)

In addition, Nutrition Science produced energy liquids that contained the ingredient alpha glycerylphosphorylcholine ("Alpha GPC.")  (*Id.* at pp. 13-14; Order Resolving Pending Motions, Dkt. 180, p. 6.)  Living Essentials also alleges that Alpha GPC is a derivative, constituent, equivalent and substitute of the expressly listed ingredients under § 5(c)(i).

### G. Jones's Relationship with Lovelace and his Companies Following the Execution of the Asset Purchase Agreement.

While it is undisputed that, *prior to* the execution of the Asset Purchase Agreement, Jones was not employed by Nutrition Science, Lily of the Desert or Lovelace, the parties fiercely contest what Jones's role with Lovelace and his companies became *after* the execution of the agreement.  Living Essentials contends that Jones breached the Settlement Agreement by working for Nutrition Science.

Defendants assert that Jones had no business dealings with Lovelace, Nutrition Science or Lily of the Desert "other than" negotiating the Asset Purchase Agreement.  (Dkt. 199, p. 6; Declaration of Don Lovelace, Jan. 26, 2015, Dkt. 200, Ex. 2, p. 2.)  Jones denies that he was ever a "member, employee, officer or manager" of Nutrition Science.  (Declaration of Alan Jones, Oct. 12, 2012, Dkt. 202, Ex. 5, pp. 1.)  Instead, Jones states that he was only the President of Lily of the Desert's Nutritional Division.  (*Id.*)  Jones "spent a little over four years" at Lily of

the Desert before leaving in early January 2014.  (Deposition of Alan Jones, Jan. 15, 2015, Dkt 201, Ex. 6, p. 34.)

Despite Jones's testimony that he never worked for Nutrition Science, there is ample evidence in the record showing that he held himself out as someone working for Nutrition Science.  Jones possessed a Nutrition Science email address, ajones@teamnsl.com, from which he sent emails to Nutrition Science's customers. (Sep. 19, 2011 email from Alan Jones, Dkt 201, Ex. 4.)  For example, the record shows that Jones emailed Nutrition Science's client, RBC Life Sciences Inc., and signed it on behalf of "Nutrition Science Labs."  (*Id.*)

Jones also made multiple representations that he was the President of Nutrition Science.  Some examples:  Jones's email (from his Nutrition Science email account) to RBC Life Sciences attached a contract titled "Quality Assurance Agreement" that Jones signed as the "President of Nutrition Science Laboratories"; he also signed a confidentiality agreement with Weider Global Nutrition as Nutrition Science's President.  (*Id.*; Mutual Confidentiality Agreement, Dkt. 212, Ex. 15.)  Jones has further conceded that he had sales responsibilities for Nutrition Science's products[21] and that he managed a number of Nutrition Science's employees.[22]  (Deposition of Alan Jones, Jan. 15, 2015, Dkt 201, Ex. 6, pp. 36, 58.)

---

[21] Jones states that he was responsible for a number of client accounts, including Walgreens. (Deposition of Alan Jones, Jan. 15, 2015, Dkt 201, Ex. 6, p. 51.)

[22] Living Essentials accuses Jones of making intentional misrepresentations to the Court about his true role at Nutrition Science.  These allegations will be carefully examined, and the Court will

14

**H. Nutrition Science's Links to Custom Nutrition and 5-Hour Energy**

In addition to Jones's work for Nutrition Science, the record also establishes that Nutrition Science's operations appear to be a continuation of Custom Nutrition's previous operations.  Nutrition Science continued producing Custom Nutrition's former products, including the energy drink "Rock On," and also retained Custom Nutrition's former chief formulator.  (Deposition of David Henzler, Aug. 27, 2013, Dkt 201, Ex. 27, p. 14; Dkt. 201, p. 20.)  And, in dealing with customers, Nutrition Science would refer to Custom Nutrition's past business experience as if it were its own.  (Nutrition Science email to RBC Life Sciences Inc., Jan. 26, 2010, Dkt. 201, Ex. 28) (stating "NSL fills millions of 2 fl. oz. bottles per year, and we didn't have a single complaint relating to product spillage in 2009.")  In addition, under Schedule 1.3 of the Asset Purchase Agreement, Nutrition Science assumed five of Custom Nutrition's manufacturing agreements.

Further, Nutrition Science utilized Custom Nutrition's former equipment in its manufacturing process, retained Custom Nutrition's former website, and even conducted operations from Custom Nutrition's former manufacturing facility.  (*See* Asset Purchase Agreement §§ 1.1, 4.2, and 6.3.)  Moreover, Custom Nutrition ceased operations immediately following the execution of the Asset Purchase Agreement. (Deposition of Alan Jones, Jan. 15, 2015, Dkt. 201, Ex. 6, p. 20.)

---

address them, as well as Living Essentials' contention that sanctions should be imposed, at a later date.

Living Essentials also contends that Nutrition Science and Jones breached the Settlement Agreement by implying to third-parties that they were connected to 5-hour Energy. In emails from Weider Global Nutrition to Nutrition Science, Weider refers to Nutrition Science as the "supplier of 5 hour energy" and praises Jones and Nutrition Science for their success with their "Private Label Sam's Club 5-Hr Energy." (Email Chain, Oct. 16, 2010, Dkt. 212, Exs. 4, 5.) In addition, Nutrition Science represented in another email that its bottle caps were "exactly the same as what 5HE uses on their product." (Email Chain, Mar. 28, 2013, Dkt. 211, Ex. 12.)

## III. PROCEDURAL HISTORY

Based on these actions, Living Essentials brought suit against Custom Nutrition,[23] Nutrition Science, and Jones on August 30, 2012. (Dkt. 1.) The case was originally assigned to the Honorable Bernard A. Friedman, a member of this Court. On December 7, 2012, Judge Friedman denied Defendants' motion to dismiss for lack of personal jurisdiction. (Dkt. 44.) The Court held that Jones is subject to Michigan jurisdiction "because he is a party to the SA, which contains a provision indicating all parties' consent to jurisdiction in Michigan in the event of an enforcement action." (*Id.* at p. 2.) The Court rejected Jones's contention that he was not a party to the agreement because he only signed it in his representative capacity, stating "[w]hile Jones argues he signed the SA only in his capacity as

---

[23] On June 6, 2013, the Clerk of Court entered default as to defunct Custom Nutrition for failure to plead or otherwise defend the action. (Dkt. 120.)

16

president and CEO of CNL, in fact he signed for CNL 'and all of the CNL Parties.' The SA defined the 'CNL Parties' as meaning CNL, its successors and assigns, its managers and officers (including Jones by name) and its employees." (*Id.* at n.1.)

On March 11, 2013, the case was reassigned to this Court. (Dkt. 87.) On May 20, 2013, the Court granted Defendants' motion to bifurcate pursuant to Federal Rule of Civil Procedure 42(b). (Dkt. 111.) The bifurcated issue centered on whether any of Nutrition Science's products "contain an allegedly prohibited ingredient from the Choline Family." (*Id.* at p. 5.) As noted previously, the definition of the Choline Family includes specifically-listed ingredients and a "catch-all" clause. The bifurcation order narrowed the inquiry at issue to whether the "catch-all" clause includes the ingredients betaine or Alpha GPC. The parties concurred that a "conclusive answer to that question" would largely resolve their dispute. (*Id.* at pp. 4-6.)

On September 29, 2014, following cross-motions for summary judgment, the Court held that the "catch-all" clause in § 5(c)(i) of the Settlement Agreement is "ambiguous as a matter of law."[24] (Dkt. 180, p. 5.) The Court also granted Plaintiff's motion for summary judgment in part because Defendants admitted to producing energy liquids containing choline bitartrate and choline citrate, "substances expressly prohibited by name" under the Settlement Agreement. (*Id.* at p. 6.) The Court then granted Nutrition Science leave to file a motion for summary

---

[24] Citing newly-obtained evidence, Living Essentials filed a motion for reconsideration of the Court's Order Resolving Pending Motions on August 21, 2015. (Dkt. 209.) This motion is pending.

judgment on the bifurcated liability issues, namely whether the Settlement Agreement is binding upon it.  (*Id.* at pp. 6-7.)

On October 29, 2014, Living Essentials filed its Second Amended Complaint seeking relief on eight counts.  (Dkt. 187.)  On January 26, 2015, Defendants filed their motion for summary judgment on the bifurcated liability issues.  (Dkt. 199.) Accordingly, the motion only concerns the following counts:  (I) breach of contract against all Defendants for violating the Settlement Agreement by using prohibited ingredients in their products; (IV) an alternative count against all Defendants for other breaches of §§ 8, 16 and 5 of the Settlement Agreement; (VI) alternatively, in case Nutrition Science is held to not be a successor of Custom Nutrition, that Nutrition Science breached Living Essential's third-party rights under the Asset Purchase Agreement; (VII) alternatively, tortious interference with a contract against Nutrition Science; (VIII) alternatively, tortious interference with a business expectancy by Nutrition Science.  (Dkt. 190.)

The motion has been fully briefed and the Court heard oral argument on September 14, 2015.

## IV.  ANALYSIS

### A. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to

a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009)).

## B. Discussion

### 1. Nutrition Science's Liability under the Settlement Agreement.

Living Essentials contends that Nutrition Science is bound to the terms of the Settlement Agreement. The Settlement Agreement contains a choice of law section providing that it should be interpreted according to the law of the Michigan.

19

Under the Michigan Statute of Frauds, in order to enforce a contract or promise that by its own terms cannot be performed within one year from the date of the agreement, the contract must be in writing and signed by the party to be charged. Mich. Comp. Laws § 566.132(a).

The Settlement Agreement's Choline Family restrictions fall within the Statute of Frauds.  Under § 5(c)(i), the Choline Family restrictions are for "the same length of time that an issued patent would provide protection as if such patent were filed on the date of this Agreement . . . ."  Under the relevant provision of the patent statute, 35 U.S.C. § 154(a)(2), these restrictions would extend until August 17, 2029, some 20 years from the date of the execution of the Settlement Agreement.[25] While Jones's signature is on the Settlement Agreement, as President and CEO of Custom Nutrition and for "the CNL Parties," Nutrition Science was not incorporated until September 23, 2009, approximately one month after the Settlement Agreement was executed.  Therefore, Living Essentials must establish that an exception to the Statute of Frauds applies in order to enforce the Settlement Agreement against Nutrition Science.

Living Essentials raises various grounds for holding Nutrition Science liable, including that (1) Nutrition Science is the successor of Custom Nutrition; (2) Nutrition Science is bound through an agent with imputed knowledge; and (3)

---

[25] 35 U.S.C. § 154(a)(2) provides that a patent's duration "shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States . . . ."

Nutrition Science incorporated the limitations of the Settlement Agreement by reference in the Asset Purchase Agreement. Only the last of these arguments has merit, but the Court will discuss each of these theories separately and explain its reasoning.

### a. Successor Liability

Living Essentials claims that Nutrition Science is a successor of Custom Nutrition. Determining whether Nutrition Science incurred successor liability when it acquired Custom Nutrition's assets requires analyzing the terms of the Asset Purchase Agreement. In order to construe the terms of this agreement, as a threshold matter, the Court must answer the question of which law applies to the Asset Purchase Agreement.

### i. Texas Law Governs the Asset Purchase Agreement.

Section 10.7 of the Asset Purchase Agreement contains a Texas choice of law provision. The Court must determine whether this contractual choice of law provision governs. "In a diversity case, federal courts apply the conflict of law rules of the forum state." *Hardy v. Reynolds & Reynolds Co.*, 311 Fed. App'x 759, 761 (6th Cir. 2009). Here, Michigan's choice of law rules apply because Living Essentials filed suit in Michigan. "Michigan has adopted the approach set forth in the Restatement (Second) of Conflict of Laws." *Johnson v. Ventra Group Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). Under this approach, "a contractual choice of law provision will be binding unless" the exceptions of Restatement (Second) of Conflict

of Laws § 187(2)(a) or (2)(b) apply.  *Id.* at 739.  Importantly, "under Restatement § 187 the parties' choice of  . . . law should be respected generally."  *Kipin Indus., Inc., v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 494 (6th Cir. 1994); *see also Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006) ("It is undisputed that Michigan's public policy favors the enforcement of contractual forum-selection clauses and choice-of-law provisions.").  Thus, unless one of the two exceptions applies, the parties' contractual choice of Texas law will govern.[26]

Under the first exception, § 187(2)(a), the parties' chosen law will not be applied where "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice . . . ."  This exception is inapplicable because Texas has a substantial relationship to the Asset Purchase Agreement's parties and to the transaction.  A substantial relationship to a chosen forum exists where the forum is the place of incorporation of the parties, where contractual negotiations are undertaken and where assets are held.  *See Johnson*, 191 F.3d at 739-40.

Here, the forum of Texas has a substantial relationship to the parties and the transaction at issue.  Custom Nutrition and Nutrition Science were both incorporated in Texas.  The parties conducted their negotiations in Texas and finalized the asset purchase in Texas.  Nutrition Science purchased the assets of Custom Nutrition, assets located in Texas, in order to conduct operations in Texas.

---

[26] Living Essentials has failed to address the applicability of these exceptions.  Although the Court could construe this omission as waiver of this argument, the Court instead holds that the exceptions are inapplicable on their merits.

Consequently, because the record demonstrates that Texas has a "substantial relation to the parties or the transaction," the exception found in § 187(2)(a) is clearly inapplicable.

The second exception, § 187(2)(b), also does not apply.  Under § 187(2)(b), the parties' chosen law is not applied where the application of the chosen state's law would be:

> [1] contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and
>
> [2] which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Applying Texas law here would not run afoul of § 187(2)(b) for various reasons.  First, although successor liability is broader under Michigan law, Living Essentials has failed to establish, or even address, why Michigan's successor liability law constitutes a fundamental policy of the state.  "To be fundamental, a policy must in any event be a substantial one."  Restatement (Second) of Conflict of Laws, Comment (g).

Second, even if Living Essentials had shown that Michigan's successor liability doctrine constitutes a fundamental policy, it has not shown that Michigan has a materially greater interest in the determination of this issue than Texas.  Although Michigan has an interest in protecting the rights of Michigan corporations like Living Essentials, on balance this interest weighs less than Texas' interest in

23

an asset acquisition that occurred in Texas, involving two Texan incorporated entities, all of whose assets are located in Texas.

Third, Living Essentials has also failed to show that Michigan law would govern in the absence of a choice of law provision under Restatement (Second) § 188(2).  Under § 188(2), courts review a host of factors in determining which law to apply.[27]  Because all of these factors favor the application of Texas law, § 187(2)(b) is inapplicable.

The Court also notes that Living Essentials' main argument for applying Michigan law relies on authority inapplicable to contractual choice of law disputes. Living Essentials cites *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 463 (6th Cir. 2001), for the proposition that there is a presumption in favor of applying Michigan law in the absence of a "rational reason to displace it."  Unlike the case at bar, *Ruffin-Steinback* involved a tort—defamation—and not a contractual choice of law provision.[28]  As such, its holding and reasoning are inapposite.

Living Essentials also relies on the terms of the Settlement Agreement as the basis for applying Michigan law.  Section 16 of the Settlement Agreement provides

---

[27] These factors include:

  (a)  the place of contracting,
  (b)  the place of negotiation of the contract,
  (c)  the place of performance,
  (d)  the location of the subject matter of the contract, and
  (e)  the domicil, residence, nationality, place of incorporation and place of business of the parties.

[28] Living Essentials' reliance on *Burney v. P V Holding Corp.*, 533 N.W.2d 657 (Mich. Ct. App. 1996) is also misplaced because *Burney* involved the tort of wrongful death.

that all successors and assigns are bound to the agreement, including its Michigan choice of law provision, irrespective of "any merger, acquisition, restructuring and/or reorganization . . . ." However, as explained above, Nutrition Science is not a signatory to the agreement and is not bound by its terms unless an exception to the Statute of Frauds applies. Furthermore, Living Essentials has failed to cite a single case where a non-signatory has been held to be a successor in interest solely on the basis of a contract it did not sign.

Finally, Living Essentials claims that it would be unfair to subject it to the Asset Purchase Agreement's choice of law provision because it did not sign this agreement or know about it. This argument might have some appeal if Nutrition Science were trying to bind Living Essentials to the Asset Purchase Agreement; but it is Living Essentials who seeks to bind Nutrition Science to the terms of the Settlement Agreement—an agreement Nutrition Science did not sign.

Thus, for the reasons explained above, the Court holds that Texas law governs the Asset Purchase Agreement.

### ii. Nutrition Science Is Not a Successor of Custom Nutrition under Texas Law because It Did Not Expressly Assume the Settlement Agreement's Obligations.

"Texas strongly embraces a nonliability rule for corporate successors." *E-Quest Mgmt., L.L.C. v. Shaw*, 433 S.W.3d 18, 23 (Tex. App. 2013). Under Texas Business Organizations Code § 10.254(b):

> Except as otherwise expressly provided by another statute, a
> person acquiring property described by this section may not be

> held responsible or liable for a liability or obligation of the transferring domestic entity that is not expressly assumed by the person.

Under the statute, "Texas law authorizes a successor to acquire the assets of a corporation without incurring any of the grantor corporation's liabilities unless the successor expressly assumes those liabilities." *E-Quest,* 433 S.W.3d at 24; *see also Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 234 (S.D. Tex. 2011) (collecting cases). This is because in Texas, the term "successor has a specialized meaning beyond simple acquisition." *Id.* (internal quotation marks omitted).

Thus, absent an express assumption of liability, an entity that acquires another's assets is not a successor even where it retains the prior corporation's employees, and operates in the same line of business. In *E-Quest*, the defendant RLM sold its assets to two newly-formed entities after a former employee obtained a judgment against it. 433 S.W.3d at 19. The two acquiring entities, E-Quest and Odyssey, largely continued RLM's former operations. E-Quest's offices were located in the same building as RLM's former office, and it retained several of RLM's previous employees, while RLM's prior president became the President of Odyssey. *Id.* at 19-20. Further, Odyssey and E-Quest signed an agreement to operate as "co-employers" and offered the same services that RLM had offered. *Id.* Despite these links, the court held that the plaintiff could not enforce her judgment against E-Quest or Odyssey because it was undisputed that neither E-Quest nor Odyssey had expressly assumed RLM's liabilities. *Id.* at 24-25.

Living Essentials highlights the strong links between Nutrition Science's operations and Custom Nutrition's former operations. These links include that Nutrition Science utilized Custom Nutrition's former manufacturing facility, continued producing Custom Nutrition's former products, and retained a number of Custom Nutrition's former employees and officers, including Custom Nutrition's former chief formulator.

However, as in *E-Quest*, because Nutrition Science did not expressly assume Custom Nutrition's liabilities, Nutrition Science is not a successor under Texas law despite its numerous connections to Custom Nutrition's former operations. Section 1.2 of the Asset Purchase Agreement, titled "No Assumption of Liabilities," states in part:

> Except as specifically provided in Section 1.3 herein below, Purchaser shall in no event assume or be responsible for any liabilities, security interests, claims, obligations, or encumbrances of Seller, contingent or otherwise, and the Assets shall be sold and conveyed to Purchaser free and clear of all liabilities, liens, security interests, claims, obligations, and encumbrances.

Section 1.3 then states that the "Purchaser shall assume and agree to discharge and perform when due, only those liabilities and obligations of Sellers specifically set forth and described in Schedule 1.3 . . . ." Schedule 1.3 lists all of the liabilities and obligations that Nutrition Science expressly assumed, including Custom Nutrition's debt to City Bank, various leases, and a number of manufacturing agreements.

Schedule 1.3 does not expressly list any of Custom Nutrition's obligations to Living Essentials. "When a matter is specifically addressed by the written terms of

27

a contract no terms will be implied concerning the matter." *Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 757-58 (Tex. App. 1986). Under the Asset Purchase Agreement, Nutrition Science excluded almost all of Custom Nutrition's obligations to Living Essentials. Because these obligations were not expressly adopted, Texas law precludes holding that Nutrition Science acquired successor liability concerning all of Custom Nutrition's obligations to Living Essentials.

### iii. The Fraudulent Conveyance Exception, if It Exists under Texas Law, Is Inapplicable.

Living Essentials also contends that Nutrition Science is Custom Nutrition's successor under the fraud exception. Some Texas courts have held that successor liability attaches not only where there is an express assumption of liabilities, but also if "the acquisition results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor." *Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.*, Civ. A. No. H-08-2911, 2010 WL 1417900, at *6 (S.D. Tex. Apr. 7, 2010) (citing *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 134-35 n.6 (Tex. App. 2000)); *see also Allied Home Mortg*, 830 F. Supp. 2d at 233. This exception has not yet been ruled upon by the Texas Supreme Court, however, and other courts have rejected the fraudulent conveyance exception and continued to hold that under Texas law, only an express assumption of liability can create successor liability. *See In re 1701 Commerce, LLC*, 511 B.R. 812, 825 (Bankr. N.D. Tex. 2014) ("This court, like other courts, has been unable to locate a Texas statute providing that a fraudulent transfer creates successor liability. Thus, only express assumption is

28

grounds for successor liability under Texas law."); *see also TFT Galveston Portfolio, Ltd. v. C.I.R.*, No. 1082-12, 2015 WL 795543, at *9 (T.C. Feb. 26, 2015) ("Thus, in Texas, an acquiring entity is not a successor in interest unless it expressly agrees to assume the liabilities of the other party in the transaction.")

It is unnecessary for the Court to opine on whether a fraudulent conveyance exception exists under Texas law because, whether such an exception exists or not, the Court finds no evidence of a fraudulent conveyance in Nutrition Science's acquisition of Custom Nutrition's assets. Living Essentials identifies several aspects of the transaction that it considers indicative of fraud, including: the alleged lack of consideration paid for Custom Nutrition's assets, the timing of the transaction, Custom Nutrition's insolvency following the transaction and the alleged concealment of the $1.85 million Custom Nutrition received under the Settlement Agreement.

Living Essentials' foremost contention is that the asset acquisition was fraudulent because Nutrition Science obtained Custom Nutrition's assets without paying any real consideration. Living Essentials argues that Nutrition Science paid no consideration because it was EDL Holdings, and not Nutrition Science, that paid $900,000 to City Bank to purchase City Bank's loans and liens. While Nutrition Science did not pay City Bank to acquire the debt, it did assume Custom Nutrition's debts—debts totaling $958,682.27. Nutrition Science's assumption of Custom Nutrition's debt constituted real consideration—it promised to pay Custom

Nutrition's considerable debt—whether that debt was owed to EDL Holdings or to City Bank.

Living Essentials also implies that Custom Nutrition fraudulently concealed the true nature of its assets during City Bank's May 28, 2009 appraisal in order to drive down their value. The appraisal valued Custom Nutrition's assets at $707,534, a figure that Custom Nutrition admitted was "[w]ay too low" because the appraiser did not see all of Custom Nutrition's assets. (Dkt. 201, Ex. 21, p. NSL 430.) But this statement provides no evidence that Custom Nutrition concealed assets or otherwise interfered with City Bank's appraisal.

Moreover, City Bank's recovery of a large proportion of Custom Nutrition's debt cuts against any suggestion that Custom Nutrition or Jones used the appraisal to defraud City Bank as part of the Asset Purchase Agreement. At the time of the Asset Purchase Agreement, Custom Nutrition was in a dire financial condition. As Custom Nutrition's main creditor, City Bank faced the risk of not recovering the $958,682.27 it had loaned to Custom Nutrition. Instead, City Bank chose to recoup a sizable portion of its funds by selling its loans and liens to EDL Holdings for $900,000.[29] Furthermore, the Court notes that City Bank has not alleged fraud against either Custom Nutrition or Nutrition Science. Thus, even if City Bank's appraisal fell short of capturing the full value of Custom Nutrition's assets, the

---

[29] City Bank's $900,000 recovery represents a 94% recovery on its loans.

Court cannot conclude that Custom Nutrition, Nutrition Science or EDL Holdings defrauded City Bank as a result.

The Court also fails to find any indicia of fraud in the timing of the Asset Purchase Agreement or in Custom Nutrition's subsequent dissolution. The record amply demonstrates that Custom Nutrition operated under significant financial distress over a considerable period of time. In February 2009, Custom Nutrition unsuccessfully attempted to improve its finances by obtaining new business from Lovelace and Lily of the Desert. In August 2009, it was near bankruptcy prior to signing the Settlement Agreement with Living Essentials. This financial distress drove Custom Nutrition to seek an asset sale with the understanding that Custom Nutrition would cease its operations following the transaction.

Living Essentials also alleges that Custom Nutrition and Jones fraudulently concealed the existence of the $1.85 million payment Custom Nutrition received under the Settlement Agreement when they negotiated Asset Purchase Agreement. The Asset Purchase Agreement involved the sale of substantially all of Custom Nutrition's assets, including its formulas, machinery, and know-how as listed in Schedule 1.1. It did not include the transfer of any bank accounts or cash assets. (Supplemental Declaration of Alan Jones, Mar. 5, 2015, Dkt. 204, Ex A, p. 2.) Thus, because Nutrition Science did not obtain Custom Nutrition's funds or cash assets, it is not entirely clear how the alleged failure to disclose the amount paid to Custom

31

Nutrition in the Settlement Agreement had any bearing on the bona fide nature of the Asset Purchase Agreement.

Consequently, for the reasons explained above, the Court holds that the fraudulent conveyance, if it exists under Texas law, is inapplicable.

### iv. Even under Michigan law, Nutrition Science Is Not a Successor of Custom Nutrition.

Although the Court has concluded that Texas law governs the Asset Purchase Agreement, it is worth noting briefly that Nutrition Science is not a successor to Custom Nutrition even if Michigan law applied.  "Michigan follows the traditional rule of successor liability, under which the successor in a merger ordinarily assumes all of its predecessor's liabilities, but a purchaser of assets for cash does not." *C.T. Charlton & Assocs., Inc. v. Thule, Inc.*, 541 Fed. App'x 549, 551 (6th Cir. 2013). "With respect to asset purchases, this general rule is subject to five narrow exceptions:  1) express or implied assumption of liability; 2) de facto consolidation or merger; 3) fraud; 4) transfer lacking good faith or consideration; and 5) mere continuation or reincarnation of the old corporation." *Id.*

Living Essentials claims that Nutrition Science is a successor under the following exceptions:  (1) express assumption of liability; (2) fraudulent conveyance; (3) de facto merger under the continuity of the enterprise doctrine; and (4) under the mere continuation exception.  As explained in detail above, the first two exceptions are inapplicable.  The Court will address the latter exceptions in turn.

32

*(a) The Continuity of the Enterprise Doctrine Does Not Apply to the Parties' General Commercial Dispute.*

The continuity of the enterprise doctrine "is best read as a relaxation of the de-facto merger doctrine in products-liability cases, not a redefinition of the mere continuity exception." *Id.* (internal quotation marks omitted). Under Michigan law, there are four traditional requirements for a de facto merger:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 879 (Mich. 1976) (citing *Shannon v. Samuel Langston Co.* 379 F. Supp. 797, 801 (W.D. Mich. 1974)).

Under the more relaxed requirements of the continuity of the enterprise doctrine, "successor liability is imposed if 1) there is continuity of management, personnel, location, assets, and operations; 2) the predecessor promptly ceases business operations; and 3) the purchaser assumes those liabilities necessary for

continuity in business operations." *C.T. Charlton*, 541 Fed. App'x at 551; *see also Turner*, 244 N.W.2d at 879.

Importantly, "[n]o matter how the continuity of the enterprise doctrine is characterized, a review of Michigan law and the policies underlying the doctrine makes clear that it is only meant to apply in products-liability cases . . . ." *C.T. Charlton*, 541 Fed. App'x at 551 (internal quotation marks omitted); *see also City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 252 (6th Cir. 1994) ("[I]t seems clear from the reasoning as well as the language and architecture of the court's opinion that the expanded *Turner* exception is limited to products liability cases."); *Starks v. Michigan Welding Specialists, Inc.*, 722 N.W.2d 888, 889 (declining to extend the continuity of the enterprise extension to provide redress to judgment creditors because the exception was "designed to protect injured victims of defective products . . . .").

Thus, the continuity of the enterprise exception is driven by product liability policies inapplicable to general breach of contract disputes.[30] Only a rare commercial dispute "would invoke the need-for-a-remedy policy (e.g. undiscovered

---

[30] A key principle of products liability law is that "the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than the consumer." *C.T. Charlton*, 541 Fed. App'x at 553 (citing *Turner*, 244 N.W.2d at 881). In contrast, general commercial contracts "are not governed by the same one-sided risk allocation" because "both sides are expected to negotiate the allocation of risk and receive the benefit of the bargain." *C.T. Charlton*, 541 Fed. App'x at 553. In conjunction with their inability to negotiate risk, victims of defective products face a high-probability of non-compensation for their injuries, injuries that can occur "long after the predecessor corporation has become defunct." *Id.* at 554. When a person is injured by a defective product produced by a defunct predecessor, the injured person "has no place to turn for relief except to the second corporation." *Turner*, 244 N.W.2d at 878. And even in product liability cases, if the predecessor corporation remains a "viable source for recourse," the continuation of enterprise doctrine is inapplicable. *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 511 (Mich. 1999).

34

fraud in an expired contract) . . . ." *C.T. Charlton*, 541 Fed. App'x at 554. Hence, in the general commercial context, "[t]he traditional exceptions, developed to protect the rights of creditors, are more appropriate . . . than *Turner's* tort-centric expansion." *Id.* (citing *Turner*, 244 N.W.2d at 878).

In *C.T. Charlton*, the Sixth Circuit refused to expand the continuity of the enterprise doctrine to run-of-the-mill commercial disputes. There the plaintiff corporation sued to recover unpaid fees for services the plaintiff had provided to TracRac, an alleged predecessor of the defendant corporation. 541 Fed. App'x at 550. Although the defendant acquired TracRac's assets, it expressly disclaimed TracRac's debts. *Id.* The defendant continued manufacturing TracRac's products under TracRac's name and sent letters to TracRac's former suppliers explaining that it had acquired TracRac's assets and that it would continue TracRac's former business operations. *Id.* The Sixth Circuit held that the defendant was not a successor under the continuity of the enterprise doctrine because the plaintiff failed to show "why the policy considerations that led *Turner* to expand the scope of successor liability are applicable to the general commercial context . . . ." *Id.* at 553.

Here, Living Essentials' claims involve Nutrition Science's alleged breach of the Settlement Agreement—a contract claim, not products liability. As in *C.T. Charlton*, there is no justification given here as to why the continuity of the enterprise doctrine should be expanded to include general commercial disputes. Instead, Living Essentials argues that this is the rare commercial case that invokes

"the need-for-a-remedy policy (e.g. undiscovered fraud in an expired contract)" described in *C.T. Charlton*.  But, as explained in detail above, there is no evidence of fraud in Nutrition Science's acquisition of Custom Nutrition's assets.  Further, Living Essentials has failed to distinguish how Nutrition Science's various links to Custom Nutrition are any different than the defendant's links to TracRac that the Sixth Circuit held to be insufficient to invoke the continuity of the enterprise doctrine in *C.T. Charlton*.  As such, the Court declines to apply the continuity of the enterprise doctrine to the parties' general commercial dispute.

> **(b) The Mere Continuation Exception Is Inapplicable because Custom Nutrition and Nutrition Science Lack Common Ownership.**

Under the "mere continuity" exception, courts will analyze the totality of the circumstances to determine if one corporation is the mere continuity of another "only if the 'indispensable' requirements of common ownership and a transfer of substantially all assets are met first."  *C.T. Charlton*, 541 Fed. App'x at 554 (citing *Stramaglia v. United States*, 377 Fed. App'x 472, 475 (6th Cir. 2010)).  Common ownership is required because the "mere continuity" exception is "targeted at limiting abuse of the corporate form," rather than the policy driven focus of the "continuity of the enterprise" doctrine.  *Id.*  Thus, this exception does not apply in the absence of a "commonality of ownership or suggestions of fraud."  *Id.* at 555.

Living Essentials asserts that Nutrition Science is a mere continuity of Custom Nutrition.  As described in detail above, the record demonstrates many

36

connections between Nutrition Science's operations and Custom Nutrition's former operations. While the Court notes Living Essentials' thorough documentation of these links, before the Court can consider these circumstances, the "indispensable requirements" of common ownership and a transfer of substantially all assets must be met.

Because there is no evidence showing that Custom Nutrition and Nutrition Science shared common ownership, this exception is inapplicable. First, regarding the ownership of Custom Nutrition, there is no evidence in the record that Lovelace or Nutrition Science held any ownership interest in Custom Nutrition. Custom Nutrition was the wholly-owned subsidiary of Nutritional Holdings. Nutritional Holdings was co-owned by various parties, including Jones and Paul Stewart. The co-owners of Nutritional Holdings did not include Lovelace, his family, or Nutrition Science. Consequently, neither Lovelace, his family, nor Nutrition Science held an ownership interest in Custom Nutrition.

As for Nutrition Science, the record shows that it has always been owned by Lovelace, along with (perhaps) his wife and son. Further, despite ample evidence that Jones worked for Nutrition Science, there is no evidence that Jones ever owned any part of Nutrition Science. Nor is there any evidence that Jones's co-owners at Nutritional Holdings, the company that owned Custom Nutrition, held any interest in Nutrition Science.

Consequently, in the absence of evidence of a commonality of ownership between Custom Nutrition and Nutrition Science, the "mere continuity" exception does not suffice to hold Nutrition Science liable as a successor under this exception.

For all of the reasons above, the Court concludes that Nutrition Science is not bound under the doctrine of successor liability to the terms of the Settlement Agreement between Custom Nutrition and Living Essentials.

### b. Nutrition Science Is Not Bound through an Agent with Imputed Knowledge.

Living Essentials counters that even if Nutrition Science is not a successor of Custom Nutrition, it is nonetheless bound through an agent with imputed knowledge. Under Restatement (Third) of Agency § 5.03:

> [N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal.

Living Essentials claims that Jones knew that Nutrition Science was bound to the Settlement Agreement as a successor and that Nutrition Science's products violated the Choline Family restrictions. Because Jones subsequently became Nutrition Science's agent, Living Essentials argues that this knowledge should be imputed to Nutrition Science.

This argument is not well-taken. During the arms-length negotiation of the Asset Purchase Agreement, Nutrition Science's interests were adverse to those of Custom Nutrition and Jones. Jones was not acting for Nutrition Science at the

38

time, and as a result, Jones's alleged knowledge[31] cannot be imputed to Nutrition Science. *See Martin Marrieta Corp. v. Gould Inc.*, 70 F.3d 768 (4th Cir. 1995) ("Gould asks us to reach the anomalous result that even though complete adversity existed at the time of the Acquisition Agreement, because an agency relationship was thereafter created, knowledge can be imputed to Martin Marietta for purposes of that prior arm's length and conflict-laden transaction.") (applying traditional agency law principles under Maryland law).

### c. *The Asset Purchase Agreement Incorporates the Choline Family Restrictions by Reference.*

Living Essentials next argues that Nutrition Science is bound to the Settlement Agreement because it was incorporated by reference into the Asset Purchase Agreement between Custom Nutrition and Nutrition Science. Under the doctrine of incorporation by reference, an exception to the Statute of Frauds, "[u]nsigned documents may be incorporated into the parties' contract by referring in the signed document to the unsigned document." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App. 2013) (citing *Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968)). "Documents incorporated into a contract by reference become part of that contract." *Id.* (citing *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010)). As such, "[w]hen a document is incorporated into another by reference, both instruments must be read and construed together." *Id.* (citing *In re*

---

[31] The Court notes that Jones's alleged knowledge consists of legal conclusions such as whether Nutrition Science was a successor of Custom Nutrition or whether Nutrition Science's products violated the Choline Family restrictions.

*C & H News*, 133 S.W.3d 642, 645-46 (Tex. App. 2003)).  "[W]hether material has been incorporated presents a question of law."  11 Williston on Contracts § 30:25 (4th ed.)

Incorporation by reference requires that the signed document "plainly refer" to the unsigned document. *Bob Montgomery*, 409 S.W.3d at 189.  Plainly referring to an unsigned document requires more than merely mentioning the unsigned document; the signed document's language "must show the parties intended for the other document to become part of the agreement." *Id.*  "The absence of such a reference within the signed document shows that the parties did not intend to contract with reference to the other instrument." *Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Servs., Inc.*, 73 S.W.3d 545, 549 (Tex. App. 2002) (internal quotation marks omitted).

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."  *In re C & H News Co.*, 133 S.W.3d at 645.  Contractual language evidences the parties' intent to be bound where the language states that the contours of its provisions shall be defined as provided by an outside document.  Thus, a one-page agreement that stated that the parties agreed to submit to binding arbitration "as provided in the Handbook" plainly referred to the unsigned handbook and incorporated its arbitration terms into the agreement.  *In re C & H News*, 133 S.W.3d at 646.[32]

---

[32] *But see Bob Montgomery,* 409 S.W.3d at 184-85, holding that a reference to an unsigned document for informational purposes does not incorporate the unsigned document.  In *Bob Montgomery*, the

With these principles in mind, the Court turns to the question of whether the Asset Purchase Agreement incorporates the Settlement Agreement's restrictions by reference.  Under § 1.1 of the Asset Purchase Agreement,[33] Nutrition Science acquired Custom Nutrition's assets, "[u]pon the terms and subject to the conditions set forth in this agreement . . . ."

Section 4.2(r) contains Custom Nutrition's representations and warranties regarding its ownership of its intellectual property.  In § 4.2(r), Custom Nutrition represented that it owned its proprietary rights free and clear of all liens and that it had not "entered into any consent, indemnification, forbearance to sue or settlement agreement with respect to Proprietary Rights [sic]."  Section 4.2(r) then qualifies this broad representation with an important caveat that states in relevant part:

> Notwithstanding the foregoing … (b) the formula for energy drinks manufactured by Sellers and certain related trademark and copyright matters[34] *are limited by the settlement agreement*

---

defendant filed an application to become a certified repair center under the plaintiff's dent repair program.  *Id.*  The application stated that "[a]dditional benefits, qualifications, and details" of the repair program were available on the plaintiff's website.  *Id.* at 185.  The website contained additional terms, including a Texas choice of law provision.  *Id.*  The court held that the language of the application did not incorporate the website's terms by reference because the language only indicated that the website contained "informative but noncontractual" information about the program.  *Id.* at 193.

[33] All numbered sections in the subsequent portion of this Order are from the Asset Purchase Agreement, unless otherwise identified.

[34] Although this language is vague, it appears to reference Consent Judgment's representation that Living Essentials possesses a valid trademarks and copyrights to 5-hour Energy contained in both the Settlement Agreement and the Consent Judgment.

> *between Seller and Living Essentials* and the related consent
> judgment[35] contained in Schedule 4.2(h).

(emphasis added).

This language plainly refers to the document unsigned by Nutrition
Science—the Settlement Agreement between Custom Nutrition and Living
Essentials.  Further, these words evidence the parties' intent to incorporate the
Settlement Agreement's Choline Family restrictions under § 5(c) because they state
that "the formula for energy drinks are . . . limited by the settlement agreement."
This language is similar to the terms used in *In re C & H News*, where the parties
agreed to arbitration "as provided in the Handbook," and hence incorporated the
handbook's arbitration terms by reference.  For the same reasons that applied in *In
re C & H News*, the Court holds that the Asset Purchase Agreement incorporates
the Choline Family restrictions by reference under § 4.2(r).

It should be pointed out, however, that the language in the Asset Purchase
Agreement only references two aspects of the Settlement Agreement, § 5(c)—the
part of the Settlement Agreement containing the Choline Family restrictions—and
the restrictions on certain related trademark and copyright matters.  Based on this
language, it appears that the parties intended only to incorporate these parts of the
Settlement Agreement. "[R]eference to a document for a particular purpose
incorporates that document only for the specified purpose." *Bob Montgomery*, 409

---

[35] The Consent Judgment also prohibits the CNL Parties from producing, manufacturing, selling or
offering to sell 5-hour Energy's current or former formula.  Although this restriction is also
incorporated by reference, this restriction is not in dispute.

S.W.3d at 189.  Section 4.2(r) simply states that Custom Nutrition's formulas for energy drinks are limited by the terms of the Settlement Agreement, namely § 5(c) and certain related trademark and copyright matters.  This language cannot be fairly construed to incorporate any other provisions of the Settlement Agreement.  In sum, the Court holds that Nutrition Science (and Jones) incorporated by reference into the Asset Purchase Agreement § 5(c)'s obligation in the Settlement Agreement not to use Choline Family ingredients in their energy liquids or to assist others in doing so.

Nutrition Science next argues that § 4.2(r) cannot be interpreted to incorporate the Choline Family restrictions by reference because Nutrition Science did not expressly assume these restrictions under §§ 1.2 and 1.3.  Under § 1.2, Nutrition Science disclaimed assuming all liabilities and obligations "except as specifically provided in Section 1.3 . . . ."  In § 1.3, Nutrition Science expressly assumed only the obligations and liabilities contained in Schedule 1.3.  Schedule 1.3 does not include the Choline Family restrictions.  Consequently, Nutrition Science claims that incorporation by reference cannot be used to impute additional obligations beyond those contained in Schedule 1.3.

When construing a contract, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."  *In re C & H News*, 133 S.W.3d at 645.  Nutrition Science insists that § 4.2(r) merely limits the "the broad scope of [Custom

Nutrition's] representation regarding intellectual property." This argument is not well-taken. Section 4.2(r)'s language is more than just a sterile disclosure of "informative but noncontractual information." *See Bob Montgomery*, 409 S.W.3d at 193. This language appears clearly to have been intended to ensure that Custom Nutrition's formulas were "limited by" the Settlement Agreement, and that agreement clearly places the Choline Family restrictions on Custom Nutrition's formulas.

This interpretation of § 4.2(r) co-exists harmoniously with §§ 1.2 and 1.3. Under § 1.1, Nutrition Science acquired Custom Nutrition's assets subject to the conditions in the Asset Purchase Agreement. This included § 4.2(r)'s representation that Custom Nutrition were "limited by" the Settlement Agreement's Choline Family restrictions. Since Custom Nutrition owned its formulas subject to the Choline Family restrictions, this was a condition on its ownership of the formulas and Nutrition Science acquired them, under § 1.1 subject to this condition. Any other reading of § 4.2(r) would render this provision meaningless.

Nutrition Science also contends that it should not be bound to the Settlement Agreement because it allegedly did not possess a copy of it when it executed the Asset Purchase Agreement. The Court rejects this contention. "A person who signs a contract is presumed to have read and understood the contract and to have fully comprehended its legal effect, unless he establishes fraud in the inducement or mental incapacity." *In re Raymond James & Associates, Inc.*, 196 S.W.3d 311, 318

44

(Tex. App. 2006).  Thus, in *In re Raymond James*, the Court held that the plaintiffs were bound by arbitration agreements incorporated by reference into their employment contracts because they had notice of them, regardless of whether the plaintiffs had actually read or received the arbitration agreements.  *Id.* at 319.

Here, § 4.2(r) of the Asset Purchase Agreement clearly indicates that the Settlement Agreement limits Custom Nutrition's formulas and that the Settlement Agreement is contained in Schedule 4.2(h).  Thus, as in *In re Raymond James*, Nutrition Science had notice of the effect and existence of the Settlement Agreement.  As such, Nutrition Science is bound by the Choline Family restrictions regardless of whether a copy of the Settlement Agreement was actually attached— as the Asset Purchase Agreement states—or whether Nutrition Science ever read the Settlement Agreement.[36]

Arguing that it was not legally bound under the Settlement Agreement, Nutrition Science has moved for summary judgment on Count I of the Amended Complaint, which alleges that Nutrition Science breached the Settlement Agreement's covenant not to use the Choline Family ingredients.  Because the

---

[36] The Court notes that same incorporation by reference rationale that binds Nutrition Science to the Choline Family restriction applies regarding Alan Jones.  Jones signed the Asset Purchase Agreement twice, once in his representative capacity for Custom Nutrition and a second time in his individual capacity.  Thus, there is no question that Jones's signature complies with the Statute of Frauds.  As explained above, § 4.2(r) incorporates the Settlement Agreement's Choline Family restrictions by reference.  According to the Asset Purchase Agreement, Section 4.2(r) was a representation made not only by CNL (the Seller) but also by its "Members."  Jones signed the agreement as a Member of CNL and consequently also made the representation in § 4.2(r).  As a result, Jones also incorporated the Choline Family restrictions by reference.  However, because the Courts finds below that Jones is personally bound under Settlement Agreement, the Court need not hold Jones liable under incorporation by reference.

Court has held that Nutrition Science is bound by the Choline Family restrictions, Nutrition Science's motion for summary judgment **IS DENIED** as to Count I. However, Nutrition Science also moves for summary judgment on Count IV of the Complaint. Count IV alleges that Nutrition Science violated a number of other provisions in the Settlement Agreement that were not clearly incorporated by reference in the Asset Purchase Agreement. Nutrition Science is not legally bound to those portions of the Settlement Agreement and consequently, Nutrition Science's motion for summary judgment **IS GRANTED** as to Count IV.[37]

### 2. Jones Is Bound to the Settlement Agreement.

We have previously discussed the fact that this agreement falls within the Statute of Frauds, and thus must be signed by the party to be charged in order to be enforceable. There is no dispute that Jones signed the Settlement Agreement, the question the Court must decide however, is whether this signature is sufficient to bind him in his personal capacity.[38]

---

[37] Under Count IV, Living Essentials alleges that Nutrition Science violated several provisions of the Settlement Agreement, including §§ 8 and 16, as well as the general restrictive covenants under § 5(a), including challenging: the validity and reasonableness of the restrictive covenants (§ 5(a)(i)); the applicability of the restrictive covenants to any successor (§§ 5(a)(iii), (iv) and (vi)); and the Court's jurisdiction over the Defendants (§ 5(a)(ix). As discussed above, the Asset Purchase Agreement states that the formula for energy liquids is "limited by" the Settlement Agreement. The Court construes this language as referencing the Choline Family restrictions under § 5(c) and not the general restrictive covenants under § 5(a). As such, Nutrition Science is not bound to these parts of the Settlement Agreement.

[38] This question was discussed in Judge Friedman's order denying Jones's motion to dismiss for lack of personal jurisdiction. In that Order, the Court held that Jones was subject to personal jurisdiction in Michigan because he was a party to the Settlement Agreement and thus consented to Michigan jurisdiction. (Dkt. 44, p. 2, n.1.) This ruling, however, was only a preliminary determination that Living Essentials sufficiently plead a prima facie case that Jones was subject to personal jurisdiction

To determine whether Jones signed the Settlement Agreement in his personal capacity, or only as a representative of Custom Nutrition, we begin by examining how the contract language described Jones's capacity in the place where he affixed his signature.  The signature block where Jones signed appears as follows:

**CUSTOM NUTRITION LABORATORIES, LLC**
        **FOR ITSELF AND ALL OF THE CNL PARTIES**

By: _[signature]_____

PRINTED NAME: _Alan Jones_____

ITS: _President v CEO_____

DATE: August _17th_, 2009

Based on this signature, Jones argues that he is not bound to the Settlement Agreement because he only signed the contract once.

"[A]s a general rule, an individual stockholder or officer is not liable for his corporation's engagements unless he signs individually and where individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual." *Livonia Bldg. Materials Co. v. Harrison Const. Co.*, 742 N.W.2d 140, 146 (Mich. Ct. App. 2007) (citing *Geresy v. Dommert*, No. 243468, 2004 WL 1222991, at *1 (Mich. Ct. App. June 3, 2004))

---

in Michigan and not an in-depth analysis of the question whether Jones's signature was made in his personal capacity.

(internal quotation marks and citations omitted); *see also Source One, USA, Inc. v. Challenge, Inc.*, No 09-12375, 2009 WL 3464707, at *7, (E.D. Mich. Oct. 22, 2009)

Where corporate officers comply with this "nearly universal" practice, they are conclusively liable in their personal capacities.  In *Lexon Ins. Co. v. Naser*, 781 F.3d 335, 340 (6th Cir. 2015), the Sixth Circuit held the defendant personally liable on an indemnity agreement because he signed the indemnity twice, once on behalf of the corporation and once as the owner of the corporation under his own name along with his social security number.

However, where corporate officers only sign once, and *only on behalf of their corporations*, then personal liability does not attach.  *See Source One*, 2009 WL 3464707, at *8 ("If Source One wanted to ensure Crosley would be personally liable . . . it should have insisted that Crosley sign the agreement in his individual capacity."); *Geresy v. Dommert* No. 243468, 2004 WL 1222991, at *1 (Mich. App. 2004 June 3, 2004) (holding individuals where not liable on individual guarantees when they only signed the contract in their official capacities).  In *Innovation Ventures, L.L.C. v. Liquid Mfg.*, *L.L.C.*, No. 315519, 2014 WL 5408963, at *6 (Mich. Ct. App. Oct. 23, 2014), also involving plaintiff Living Essentials, the court held that the defendant corporate officer was not personally liable on a settlement agreement he signed solely in his official capacity.  The defendant was the owner of Liquid Manufacturing, a company that had previously bottled 5-hour Energy for Living Essentials.  *Id.* at *1.  The parties ended their relationship through a

48

termination agreement which the defendant signed on behalf of Liquid Manufacturing. *Id.* Although the agreement purported to bind Liquid Manufacturing's employees, including the defendant, the Court held that he was not personally liable because he only signed the agreement "in his capacity as a corporate officer, and not as an individual." *Id.*

However, despite the "nearly universal" requirement of two signatures, courts nevertheless look beyond the signature line and consider the intent of the parties in determining whether a corporate officer signed in his individual capacity. For example in *Livonia Building Materials*, the court looked not only at the signature line but also at another paragraph within the agreement that purported to provide a guarantee on the corporation's debt. 742 N.W.2d at 146. The court noted that the identity of the guarantor was "left completely blank." *Id.* The court did not rely solely on the lack of two signatures, but examined the entire contract, saying (of the officer's signing the contract) that "the *document* is clear that he did so as president of Harrison Construction Company on behalf of Harrison Construction Company and not as an individual." *Id.* (emphasis added). Moreover, a closer examination of the precedent cited by the *Livonia Building Materials* court shows that it relied upon case law in which a court held corporate officers liable as individuals where they signed once but where their titles described them both as corporate officers and "members," and the contract clearly sought to bind both the company and its members. *See Salzman Sign Co. v. Beck*, 176 N.E.2d 74, 76 (N.Y.

1961) ("the only available evidence was that it was the explicit intent of the signature itself to create individual liability") (citing *Mencher v. Weiss*, 114 N.E.2d 177, 179 (N.Y. 1953)).

Similarly, in the *Lexon* case, the Sixth Circuit looked not just at the fact that the defendant signed twice, but also at the text of the indemnity agreement in order to determine whether the intention of the parties was to impose "liability in their individual capacities, not in their corporate capacities." 781 F.3d at 340.

This approach accords with the "primary goal" of contract construction—to "honor the intent of the parties." *Employees Only, Inc. v. Provenzano*, No. 296575, 2011 WL 1687626, at *3 (Mich. Ct. App. May 3, 2011) (citing *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29, n.28 (Mich. 1994)).

In this case, the Settlement Agreement is rife with language expressing an unmistakable intention by the parties to bind Jones in his personal capacity. The "CNL Parties"—defined to include Jones—agreed, among other things, that: they would not to produce, manufacture or distribute 5-hour Energy (§ 1); Living Essentials has always owned the formula for 5-hour Energy (§ 2); Living Essentials has valid trademarks and copyrights to 5-hour Energy (§ 3); they were bound to a number of restrictive covenants, including the Choline Family restrictions (§ 5); they would refrain from cooperating with adverse parties (§ 13); the provisions of the Settlement Agreement would survive any merger, acquisition or restructuring, including any sale of assets (§ 16). In addition, the agreement provides that Jones,

as an individual, admitted to wrongfully manufacturing 5-hour Energy (§ 1) and declared that 5-hour Energy provides at least 5 hours of energy and agreed to provide assistance in furtherance of this declaration upon Living Essentials' request (§ 6).

Moreover, the signature line at issue here is distinguishable from other cases where a corporate officer merely signs on behalf of her corporation.  Here, Jones signed for Custom Nutrition "for itself and the CNL Parties," which included Jones.  While this "hybrid" signature may be insufficient to bind CNL Parties other than Jones—for example Paul Stewart or all other CNL employees—given the clear purpose of the parties to bind Jones, the calculus is unquestionably different in construing whether the signature line embraces Jones personally.  In the Settlement Agreement, Jones clearly assumed multiple ongoing obligations *in his personal capacity*, and he signed the agreement with a signature block that clearly purports to bind him as a CNL Party.  The plain language of the signature block sets out two entities that Alan Jones is signing for:  Custom Nutrition and the CNL Parties (which include Alan Jones as a person).

 The "nearly universal practice" of requiring two signatures is designed to make it clear that the corporate officer signs with the understanding and intent to be bound personally.  Here, both the signature block and the text of the agreement demonstrate that the parties intended for Jones to be bound.  As in *Employees Only*, in this case there is "nothing unclear about the language . . . the parties intended

for [him] to be personally liable . . . ."  2011 WL 1687626, at *4.  Under these unique circumstances,[39] the Court holds that Jones's sole signature is sufficient to bind him to the Settlement Agreement because the contract as a whole demonstrates that the parties intended for him to be bound not only in his official capacity, but also in his individual capacity.  The Court therefore construes the signature block as containing Alan Jones's signature both in his representative capacity as an officer of CNL, and in his personal capacity as a CNL Party.

Therefore, for the reasons explained above, Jones's motion for summary judgment **IS DENIED** as to both Count I and Count IV.

### 3.  The Enforceability of the Choline Family Restrictions

Having determined that the Settlement Agreement's formula-based restrictions apply to Nutrition Science and Jones, the Court must now analyze whether these restrictions are legally enforceable.

Restrictive covenants, or non-compete agreements, are "disfavored as restraints on commerce . . . ."  *Coates v. Bastian Brothers, Inc.*, 741 N.W.2d 539, 545 (Mich. Ct. App. 2007).  The party seeking enforcement of a non-compete agreement has the burden of demonstrating that the agreement is valid.  *Certified Restoration*

---

[39] This holding does not seek to question the correctness of the nearly universal practice of requiring two signatures whenever a corporate officer is signing in both her representative and personal capacity.  Indeed, that practice should have been followed here, and the failure to do so made this decision an unnecessarily close question.  This holding is limited to the facts presented by the unique language contained in the contract before the Court:  it evinces a clear intention by the parties to bind Jones as an individual, and the signature block includes a description that is not limited to his position as a corporate officer.

*Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 545-46 n.2 (6th Cir. 2007).  Michigan law permits the enforcement of reasonable non-compete agreements.[40]

Although Mich. Comp. Laws § 445.774(a)(1) only refers to employer-employee agreements, "Michigan courts have clarified that § 445.774(a)(1) represents a codification of the common-law rule that the enforceability of noncompetition agreements depends on their reasonableness." *Certified Restoration*, 511 F.3d at 546 (internal citation and quotation marks omitted); *see also Innovation Ventures*, No. 315519, 2014 WL 5408963, at *5 (applying the statutory reasonableness factors to an arms-length termination agreement involving two corporations).  Thus, for a non-compete agreement to be enforceable, its provisions must be reasonable. [41] *Certified Restoration*, 511 F.3d at 546.  Where the relevant facts are undisputed, "the reasonableness of a noncompete provision is a question of law."  *Id.* (citing *Coates*, 741 N.W.2d at 544).

"In evaluating a non-competition clause for reasonableness, Michigan courts generally examine the clause's duration, geographic scope, and the type of

---

[40] Pursuant to Mich. Comp. Laws § 445.774(a)(1):  "An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business.  To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited."

[41] Contrary to Living Essential's assertion, the Court need not apply the 1873 common-law Rule of Reason test articulated in *Hubbard v. Miller*, 27 Mich. 15 (1873).  As explained by the Sixth Circuit in *Certified Restoration*, a non-compete agreement's enforceability rests on its reasonableness, regardless of whether it involves an employment contract or not.

employment prohibited . . . They also consider the reasonableness of the competitive business interests justifying the clause." *Id.* at 546.  Determining the reasonableness of a non-compete agreement is "inherently fact-specific."  *Id.* at 547 (internal quotation marks omitted).

As a threshold matter, the Court must address Living Essentials' estoppel argument.  Living Essentials argues that Nutrition Science has waived any arguments against the validity of the restrictive covenants pursuant to § 5(a)(i) of the Settlement Agreement.  This section states that the restrictive covenants are "valid and reasonable in any and all respects."

This argument fails for two reasons.  First, Nutrition Science is not bound by § 5(a)(i), as it did not incorporate this section by reference in the Asset Purchase Agreement.  Second, Living Essentials' estoppel argument fails as a matter of law because courts must independently analyze the reasonableness of non-compete agreements.  *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 34 n.32 (Mich. 2005) ("[T]he Legislature has *explicitly* assigned the responsibility of assessing the reasonableness of private contracts to the judiciary.  See, for example, MCL 445.774a, which governs noncompetition covenants between an employer and an employee.") (italics in original); *see also Teachout Sec. Servs., Inc. v. Thomas*, No. 293009, 2010 WL 4104685, at *5 (Mich. Ct. App. Oct. 19, 2010) (Stating that "judicial scrutiny of the agreement's reasonableness is required, despite that the parties contracted that the terms of the non-compete were reasonable."); *Innovation*

*Ventures*, No. 315519, 2014 WL 5408963, at *8 ("Our Supreme Court has recognized that courts, not parties to a contract, are to determine the reasonableness of a contract that contains a restraint on trade.").  As such the Court must independently assess the reasonableness of the Choline Family restrictions.

### a. Living Essentials Has a Legitimate Business Interest in the Choline Family Restrictions and the Scope and Geographic Limitations of the Restrictions Are Reasonable.

As Defendants concede in their reply, Living Essentials has a legitimate business interest in the Choline Family restrictions.  (Dkt. 204, p. 5) ("Defendants concede that goodwill is a protectable interest.").  Living Essentials negotiated these restrictions to protect its goodwill and prevent Custom Nutrition, Jones, or any potential successor from using their knowledge of its operations to unfairly compete against it, or suggesting that Custom Nutrition's products were equivalent to Living Essentials' products.  Preventing unfair competition through the misuse of a company's goodwill is a legitimate business interest.  *Certified Restoration*, 511 F.3d at 547-48; *see also Whirlpool Corp. v. Burns*, 457 F. Supp. 2d 806, 812 (W.D. Mich. 2006) ("Under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest.").  In this case, Living Essentials had perhaps a greater than normal concern to protect its goodwill from these parties because they had previously admitted to wrongfully manufacturing 5-hour Energy in the past.  Under these circumstances, Living Essentials had legitimate business

interests in protecting their goodwill by preventing the use of the Choline Family ingredients.

The Choline Family restrictions are also of reasonable scope.  Case law makes clear that a limited prohibition from engaging in a part of a market or industry is reasonable.  Thus, in *Lowry Computer Prods. Inc. v. Head*, 948 F. Supp. 1111, 1116 (E.D. Mich. 1997), the court held that it was reasonable to prohibit the defendant from selling barcode systems and related products because it only prevented the defendant from working in a small part of the computer software market.  Similarly, in *Certified Restoration*, the court upheld a restriction that barred a former franchisee from operating a restoration dry cleaning business because the former franchisee could still conduct other types of dry cleaning.  511 F.3d at 549.

Here, the restrictions merely prohibit Nutrition Science from using ingredients in the Choline Family.  Nutrition Science can continue to develop, market, and distribute energy liquids using all other types of ingredients.  Further, the fact that Custom Nutrition had several energy drinks but never produced any energy liquids containing citicoline demonstrates that Nutrition Science is not precluded from competing simply because it cannot produce energy liquids containing the Choline Family ingredients.  Considering its relatively narrow parameters, the Court holds that the scope of the prohibition is reasonable.

Moreover, the Choline Family's geographic limitations are not unreasonable. The Choline Family restrictions have a worldwide geographic limitation. Worldwide geographic limitations "can be reasonable if the employer actually has legitimate business interests throughout the world." *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994). Living Essentials has operations in a number of different continents, including North America, Africa and Europe. As such, a worldwide geographic restriction is reasonable here.

### b. The Choline Family Restrictions' Duration Is Unreasonable.

In contrast, the durational limitation of the Choline Family restrictions is unreasonable. Michigan law does not provide any "bright line rules" with respect to duration. *Id.* at 547. Hence, "courts have upheld time periods of six months to three years." *Lowry*, 984 F. Supp. at 1116; *see, e.g.*, *Radio One, Inc. v. Wooten*, 452 F. Supp. 2d 754, 759 (E.D. Mich. 2006) (upholding a six-month limitation); *Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 742 N.W.2d 409 (Mich. Ct. App. 2007) (upholding a two-year limitation); *Bristol Window*, 591 F. Supp. 2d at 498 (upholding a three-year limitation). One judge in this district has gone so far as to uphold a five-year limitation. *See In re Spradlin*, 284 B.R. 830, 836 (E.D. Mich. 2002).

Here, the duration for the Choline Family restrictive covenants is for the same length of time that a validly issued patent would provide protection, that is, for a period of 20 years. This 20-year duration was designed to not expire until

August 17, 2029, at the earliest.  The Court has not found a single case upholding a non-compete covenant whose restrictions run for 20 years.  In addition, Living Essentials has failed to provide a reasonable justification for a restriction of such length.  Living Essentials introduced citicoline into its 5-hour Energy formula in 2007.  At the time, according to Living Essentials, this ingredient represented the cutting edge of the energy drink market, and it was understandable that Living Essentials would seek to prevent Custom Nutrition from taking advantage of its discovery for a reasonable period of time.  However, to maintain that a 2007 innovation requires protection until 2029 stretches the bounds of reasonableness to the breaking point.

Nor does Living Essentials' interest in protecting its goodwill justify this decades-long duration.  Nutrition Science's potential to profit from Living Essential's goodwill derives from Custom Nutrition's three-year relationship with Living Essentials, from 2004 until 2007.  Even assuming that Custom Nutrition gained intimate knowledge of Living Essentials' operations during these three years, this knowledge would not justify a 20-year restriction, nearly seven times the length of the parties' business relationship.  "Michigan law commands the courts to narrowly construe restrictive covenants." *Whirlpool*, 457 F. Supp. 2d at 812.

Moreover, the Court finds that Living Essentials' stated goal—to utilize a contract to effectively create a "private patent"—is questionable rather than reasonable.  Obtaining a patent requires complying with a complicated set of rules,

58

statutes and case law to determine whether an invention is indeed patentable. For Living Essentials to attempt to achieve the protections of a patent vis-à-vis Custom Nutrition and the purchaser of its assets without having demonstrated that it was legally entitled to a patent is not a reasonable use of a non-compete provision. Accordingly, and because Living Essentials has failed to justify its need such an extensive duration, the Court holds that the durational limitation of 20 years is unreasonable.

### c. *Reformation of the Settlement Agreement's Choline Family Restrictions.*

"Courts may reform a noncompetition agreement if it is found to be unreasonable." *Innovation Ventures,* No. 315519, 2014 WL 5408963, at *8 (citing *Hopkins v. Crantz*, 54 N.W.2d 671 (Mich. 1952). However, Courts are not obligated to reform unreasonable non-compete provisions. *Id.* ("[W]e have found no authority stating that a court *must* reform an unreasonable non-compete provision.") (italics in original). During the hearing, the Court inquired of the parties to determine their positions as to potential reasonable reformations of the duration.

Having considered the parties' positions, and their reasons given on the record, the Court finds that a three-year time period is a reasonable duration to protect Living Essential's legitimate business interests in protecting its goodwill by preventing Nutrition Science and Jones from using Choline Family ingredients. In *Certified Restoration*, the Sixth Circuit held that a two-year non-compete involving a franchisee and a franchisor was reasonable. 511 F.3d at 549. There, the

franchisee acquired great insight into the franchisor's proprietary system and client lists as the parties worked together for over four years.  *Id.*

Here, Custom Nutrition allegedly acquired in-depth knowledge of Living Essential's operations during their three-year business relationship.  Accordingly, a three-year limitation would adequately protect Living Essentials' goodwill.  A three-year term would also protect Living Essentials' citicoline innovation since after three years, this ingredient could no longer be considered innovative.  Furthermore, a three-year restriction lies at the outer bounds of time periods that courts have found to be permissible for the duration of non-compete agreements.

Thus reformed, Nutrition Science and Jones were bound to not use any Choline Family ingredients during the three year period following the execution of the Asset Purchase Agreement on October 14, 2009.

### 4.  Counts VI, VII, and VIII:  Living Essentials' Alternative Theories of Liability

Living Essentials advances three additional alternative theories of liability against Nutrition Science for (1) violating Living Essentials' third-party rights under the Asset Purchase Agreement (Count VI); (2) tortiously interfering with the Settlement Agreement, (Count VII); and (3) tortiously interfering with its business expectancy, (Count VIII).  The Court will address each in turn.

60

### a. *Living Essentials is not a Third-Party Beneficiary under the Asset Purchase Agreement.*

As previously explained, Texas law governs the Asset Purchase Agreement. Under Texas law, there is a "presumption against third-party beneficiary agreements." *Tawes v. Barnes*, 430 S.W.3d 419, 425 (Tex. 2011). Texas courts will not grant third-party beneficiary status "in the absence of a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party . . . ." *Id.* Thus, "[a] court will not create a third-party beneficiary contract by implication." *MCI Telecomm. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). "If there is any reasonable doubt as to the contracting parties' intent to confer a direct benefit on the third party by way of the contract, the third-party beneficiary claim must fail." *Ortega v. City Nat. Bank*, 97 S.W.3d 765, 773 (Tex. App. 2003)

The Asset Purchase Agreement does not contain a clear and unequivocal expression granting Living Essentials any third-party rights. Section 1.4 of the Asset Purchase Agreement states that the agreement does not expand any pre-existing third-party rights and that the "assumption by Purchaser of the Assumed Obligations shall not create any third party beneficiary rights." Thus, by its own terms, the Asset Purchase Agreement does not clearly and unequivocally create any third-party rights.[42] As such, Nutrition Science is entitled to summary judgment as

---

[42] As explained above, § 4.2(r) incorporates the Settlement Agreement's Choline Family restrictions by reference. "[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation

to Count VI because Living Essentials is not a third-party beneficiary of the Asset Purchase Agreement.

### b. Living Essentials' Tortious Interference Claims.

Living Essentials next alleges that Nutrition Science tortiously interfered with its contract or "in the event the SA is somehow [not] deemed a valid contract," it alleges that Nutrition Science tortiously interfered with its business expectancy. As reformed, the Settlement Agreement's Choline Family restrictions incorporated within the Asset Purchase Agreement constitute a valid contract. Consequently, there is no ground for tortious interference with a business expectancy rather a contract. It would therefore appear that this claim has become moot in light of the Court's determination that the Settlement Agreement is a valid contract as reformed, and that certain of its provisions were incorporated by reference in the Asset Purchase Agreement. Because Count VIII, plead in the alternative, no longer appears to raise a viable claim, the Court will allow Plaintiff to indicate whether or not it intends to pursue it. For now, Defendant's motion for summary judgment on Living Essentials' claim for tortious interference with a business expectancy (Count VIII) is **DENIED WITHOUT PREJUDICE**. Should Plaintiff choose to maintain this claim, Defendants are not prejudiced from challenging it anew.

---

by reference, third-party beneficiary theories, waiver and estoppel." *Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 580 (W.D. Tex. 2014) (citing *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (internal quotation marks omitted). Thus, while Living Essentials cannot enforce the Choline Family restrictions as a third-party beneficiary, it can enforce them through incorporation by reference.

As for Count VII, which alleges tortious interference with a contract, the Court holds that this claim survives Nutrition Science's summary judgment challenge. "The elements of tortious interference with a contract are (1) the existence of a [valid] contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848-49 (Mich. Ct. App. 2005).

Nutrition Science only argues that there is no evidence of a breach of the Settlement Agreement by either Jones or Custom Nutrition. Based on the record before the Court, it is clear that, at the very least, there is a question of material fact as to whether Custom Nutrition and/or Jones breached the Settlement Agreement. Examples include that Custom Nutrition sold its assets to Nutrition Science without ensuring that Nutrition Science would be bound as a successor as required under § 16 of the Settlement Agreement; further there is at least a question of fact as to whether Custom Nutrition breached § 5(c)'s prohibition against assisting others in manufacturing energy liquids that contain Choline Family ingredients when it sold its assets to Nutrition Science. Moreover, having determined that Jones is bound to the Settlement Agreement, there are numerous questions of fact as to whether Jones himself breached the Settlement Agreement.

Based on the foregoing the Court holds that there are genuine issues of material fact as to whether a breach of the Settlement Agreement occurred and as a

result, Nutrition Science's motion for summary judgment **IS DENIED** as to Count VII.

## V.   CONCLUSION

For the reasons explained above, Nutrition Science's motion for summary judgment is **GRANTED** as to Counts IV, VI, VIII and **DENIED** as to Counts I, and VII.  Jones's motion for summary judgment is **DENIED** as to Counts I and IV.

For clarity, the Court's ruling is reiterated as follows:

As to Count I, for breach of contract concerning the covenants not to use prohibited ingredients, the motion for summary judgment by Defendants Nutrition Science and Alan Jones is **DENIED.**

As to Count IV, for breach of other provisions of the Settlement Agreement, the motion for summary judgment by Defendant Nutrition Science is **GRANTED**, but Defendant Alan Jones's motion for summary judgment is **DENIED.**

As to Count VI, for breach of contract of the Asset Purchase Agreement by Nutrition Science (Living Essentials' Third Party Rights), the motion for summary judgment by Defendant Nutrition Science is **GRANTED.**

As to Count VII, for tortious interference with contract, the motion for summary judgment by Defendant Nutrition Science is **DENIED.**

64

As to Count VIII, for tortious interference with business expectancy,

Defendant Nutrition Science's motion for summary judgment is **DENIED**

**WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.


Dated:  September 28, 2015                    s/Terrence G. Berg
                                              TERRENCE G. BERG
                                              UNITED STATES DISTRICT JUDGE



<u>Certificate of Service</u>

I hereby certify that this Order was electronically submitted on September 28, 2015, using the CM/ECF system, which will send notification to all parties.

                                              s/A. Chubb
                                              Case Manager