| | |
|---|---|
| **INNOVATION VENTURES, L.L.C. f/d/b/a LIVING ESSENTIALS,** | 4:12-CV-13850-TGB |
| Plaintiff, | **ORDER** |
| | **DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 406);** |
| vs. | |
| | **DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 400);** |
| **CUSTOM NUTRITION LABORATORIES, L.L.C., NUTRITION SCIENCE LABORATORIES, L.L.C., ALAN JONES,** | **GRANTING IN PART PLAINTIFF'S MOTION TO CONSOLIDATE CASES (ECF NO. 403);** |
| Defendants. | **AND DISMISSING ALAN JONES AS A DEFENDANT WITH PREJUDICE** |

This matter is before the Court on the parties' third round of cross-motions for summary judgment. ECF Nos. 400, 406. Also before the Court is Plaintiff's motion to consolidate cases and for clarification of Alan Jones' status as a defendant. ECF No. 403. For the reasons stated herein, the Court will **DENY** Plaintiff's motion for summary judgment, **DENY** Defendants' motion for summary judgment, **GRANT IN PART**

Plaintiff's motion to consolidate, and find that Alan Jones is not personally liable under the Settlement Agreement, as held by the Sixth Circuit.

## I. Facts and Procedural History

The facts of this case are set out in detail in this court's prior opinions (ECF Nos. 219, 343) and in the Sixth Circuit's opinion (ECF No. 392), but a brief overview follows.

Some sixteen years ago, Plaintiff Innovation Ventures, L.L.C., f/d/b/a Living Essentials ("Living Essentials"), the manufacturer of the two-ounce energy shot 5-Hour Energy, contracted with now-defunct Custom Nutrition Laboratories ("Custom Nutrition") to manufacture and package 5-Hour Energy. *Innovation Ventures, LLC v. Custom Nutrition Labs.*, 912 F.3d 316, 324 (6th Cir. 2018). The relationship soured and litigation ensued. In August 2009, the parties reached a settlement agreement ("Settlement Agreement" or "noncompete agreement") when, according to Alan Jones, a Custom Nutrition's officer, Custom Nutrition was on the verge of bankruptcy. Under the Settlement Agreement, in exchange for a $1.85 million payment to Custom Nutrition, the "CNL Parties"—defined to include Custom Nutrition and its CEO Alan Jones—agreed to a number of restrictive covenants. As relevant here, the noncompete agreement prohibited the CNL Parties from using any ingredients in the "Choline Family." Living Essentials had recently introduced a new choline-based ingredient, citicoline, into 5-Hour

Energy, which according to Living Essentials was a "critical innovation" that it wanted to keep the CNL Parties from using. *Id.*

In October 2009, Custom Nutrition was failing financially, and Jones spoke with Don Lovelace, owner of a company called Lily of the Desert, about acquiring Custom Nutrition. Instead of acquiring Custom Nutrition, Lovelace agreed to purchase its assets and formed a new corporation, Defendant Nutrition Science Laboratories ("NSL") to do so. NSL and Custom Nutrition entered into an Asset Purchase Agreement to complete the sale. After the Asset Purchase Agreement was executed, NSL began selling energy shots. Jones became an employee of Lily of the Desert and represented himself as President of NSL. Over the next few years, NSL sold energy shots containing Choline Family ingredients and substances that Living Essentials contended were chemical equivalents to choline prohibited under the restrictive covenant's catch-all clause. Living Essentials sued, naming Custom Nutrition, NSL, and Alan Jones as Defendants. *Id.* at 324-25.

On an initial round of summary judgment motions in 2015, this Court granted partial summary judgment in favor of Living Essentials, concluding that NSL violated the Choline Family restrictions because the Defendants admitted to producing energy shots containing two ingredients listed in the Choline Family definition in the Settlement Agreement. A jury later concluded in the first phase of a bifurcated jury trial that two other ingredients admittedly used by Defendants were also

3

included in the catch-all clause in the Choline Family definition of the Settlement Agreement (Betaine and Alpha-glycerolphosphorylcholine or "Alpha-GPC"). Regarding liability, this Court concluded first that NSL was bound by the Choline Family restrictions in the Settlement Agreement by virtue of its incorporation into the Asset Purchase Agreement. Second, it concluded that Jones was bound by the Settlement Agreement because he signed it. And third, the Court concluded that the twenty-year duration of the Settlement Agreement was unreasonable under Michigan Law (M.C.L. § 445.774(a)(1)). The Court reformed the duration of the noncompete agreement to three years, as authorized by § 445.774(a)(1). *See Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 2015 WL 5679879, at \*16-25 (E.D. Mich. Sept. 28, 2015); *see also* ECF No. 219.

On a second round of summary judgment motions in 2017, this Court concluded that Plaintiff was not entitled to summary judgment as to liability on its primary breach of contract claim because NSL's affirmative defense of latches raised factual disputes. Second, it concluded that Plaintiff's three proposed methodologies for calculating damages were impermissible but Living Essentials could "still recover lost profits under a non-patent infringement specific method of calculation." *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 256 F. Supp. 3d 696, 704, 710-12 & n.8 (E.D. Mich. 2017).

Living Essentials disagreed with the Court's ruling on damages and wanted to find a way to appeal. Living Essentials believed the order left it "without any theory of actual damages to present to the jury, leaving only the theory of nominal damages" to recover on its primary breach of contract claim. 912 F.3d at 326. To expedite appeal of the prior orders and judgment, the parties submitted a proposed judgment awarding nominal damages to Living Essentials, which this court entered.

While the case against Custom Nutrition, Jones, and NSL ("Lead Case") was proceeding, Living Essentials had sought to add Lily of the Desert as another defendant, but the Court did not permit the complaint to be amended. In order to get around the Court's ruling, Living Essentials brought a new lawsuit against NSL ("Secondary Case"), adding Lily of the Desert and including many of the same claims that the Court had dismissed in the Lead Case. The new complaint alleged that discovery in the Lead Case revealed that Lily of the Desert was also liable under the Settlement Agreement because of its relationship to NSL. Because the parties agreed that judgment in the Lead Case rendered the claims in the Secondary Case "effectively moot," this Court also entered Judgment in favor of Defendants. *Innovation Ventures, LLC v. Nutrition Science Labs., LLC*, No. 16-11179, 2017 WL 4553429, at *1-2 (E.D. Mich. July 17, 2017); *see also* ECF No. 343. The cases were consolidated on appeal.

## A. Sixth Circuit Opinion

On appeal, the Sixth Circuit Court of Appeals affirmed in part and reversed in part. First, the court concluded it had appellate jurisdiction over the claims because the parties sought formal dismissal only to expedite appeal of an order which in effect dismissed Living Essentials' claims. 912 F.3d at 327-32. NSL also sought conditional review of this Court's personal jurisdiction; the Sixth Circuit determined that this objection was waived in both the Lead and Secondary Cases. *Id.* at 332-33. Second, the court concluded that this Court appropriately dismissed Defendants' antitrust counterclaim because it did not relate back to the original complaint. *Id.* at 333-34. Third, it concluded that Jones was not bound by the Settlement Agreement in his individual capacity because he did not sign the document twice as a corporate officer and as an individual, but agreed with this Court that NSL was bound by the Choline Family restrictions of the Settlement Agreement (§5.c.1) by virtue of its incorporation into the Asset Purchase Agreement. *Id.* at 335-39. The Sixth Circuit also agreed with this Court that that whether Betaine and Alpha-GPC are covered by the catch-all clause in the Choline Family definition was ambiguous as a matter of law. *Id.* at 339.

Citing a Michigan Supreme Court decision that had not yet been decided at the time of this Court's prior order, *Innovation Ventures v. Liquid Manufacturing*, 499 Mich. 491, 885 N.W.2d 861 (Mich. 2016)), the Sixth Circuit determined that when this Court found the 20-year

duration of the Settlement Agreement to be unreasonable and reformed the contract, it applied the incorrect standard. It should have evaluated the noncompete agreement under the "rule-of-reason test," 912 F.3d at 340, rather than analogizing the parties' business-to-business noncompete agreement to employer-employee noncompete agreements under M.C.L. § 445.771a(1). The court of appeals also held that the burden of showing the existence of an unreasonable restraint on trade lies with the Defendants (i.e., the party alleging the restraint on trade)." 912 F.3d at 341-42. Because the Sixth Circuit determined that neither party had fully briefed the application of the rule-of-reason test, and that this "fact intensive determination" fell within this Court's area of expertise, it remanded the Lead Case "so that the parties may provide the detailed record information necessary for the court to apply the rule-of-reason framework." *Id.* at 342. With respect to the Secondary Case, the Sixth Circuit determined that because it was reversing and remanding the Lead Case, it would likewise remand the Secondary Case. *Id.*

Additionally, the Sixth Circuit affirmed this Court's conclusion that disputes of material fact existed relating to the issue of latches. *Id.* at 343. And finally, with respect to Living Essentials' proposed damages calculation methodologies, the Sixth Circuit concluded (1) that the "market-share based calculation of lost profits" is a theory of relief available for Living Essentials to pursue, *id.* at 345, (2) "[a]n estimated reasonable royalty is not an appropriate theory of proof for damages" in

a breach of contract case such as this, *id.* at 347, and (3) disgorgement of Defendants' proceeds from selling energy shots that violated the Choline Family restrictions is not appropriate here, *id.* at 348.

On remand, the Court permitted the parties to file motions for summary judgment on the application of the rule of reason test. Before the Court are the parties' cross motions for summary judgment (ECF Nos. 400, 406), as well as Plaintiff's motion to consolidate the Lead and Secondary cases and to seek clarification of Alan Jones' status as a defendant (ECF No. 403). The motions are fully briefed, and the Court heard oral argument on December 16, 2019.

## II. Standards of Review

### A. Motions for Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## B. Covenants Not to Compete

"Reasonableness of a noncompete agreement is inherently fact-specific, *see, e.g.*, *Woodward v. Cadillac Overall Supply Co.*, 396 Mich. 379, 391, 240 N.W.2d 710 (1976), but '[t]he reasonableness of a noncompetition provision is a question of law when the relevant facts are undisputed.'" *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 870-

71 (Mich. 2016) (quoting *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 544 (Mich. Ct. App. 2007)); *see also Follmer, Rudzwicz & Co., PC v. Kosco*, 362 N.W.2d 676, 683 (Mich. Ct. App. 1984) ("The courts thus must scrutinize such agreements and enforce them only to the extent they are reasonable."). Where the parties dispute material facts regarding what the covenants convey, the district court is permitted to allow the jury to decide the reasonableness of the contract's competition-limiting effect. *Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*, 662 Fed.Appx. 400, 410 (6th Cir. 2016) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007)).

## C. Motions to Consolidate

Consolidation is governed by Federal Rule of Civil Procedure 42(a):

> If actions before the court involve a common question of law or fact, the court may:
> (1) join for hearing or trial any or all matters at issue in the actions;
> (2) consolidate the actions; or
> (3) issue any other orders to avoid unnecessary cost or delay.

"Whether cases involving the same factual and legal questions should be consolidated for trial is a matter within the discretion of the trial court." *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993) (citing *Stemler v. Burke*, 344 F.2d 393, 396 (6th Cir. 1965)). "A court may issue an order of consolidation on its own motion, and despite the protestations of the

parties." *Id.* (citing *In re Air Crash Disaster at Detroit Metro. Airport*, 737 F. Supp. 391, 394 (E.D. Mich. 1989)).

## III. Analysis

### A. Texas Law Does Not Apply to the Noncompete Clause (5.c.i)

Defendants argue for the first time in response to Plaintiff's motion for summary judgment that Texas law, rather than Michigan law, now applies to interpretation of the Choline Family restrictions (§ 5.c.i of the Settlement Agreement) because this Court's prior application of Michigan law to the restrictions was based the Settlement Agreement's choice of law provision (§ 22). Because this Court determined—and the Sixth Circuit affirmed—that NSL is only bound to § 5.c.i, NSL argues that it stands to reason that it is not bound by § 22. As NSL is only bound to § 5.c.i because it was incorporated by reference into the Asset Purchase Agreement, the Court should apply the *Asset Purchase Agreement*'s choice of law provision, rather than the *Settlement Agreement*'s choice of law provision. And because this Court has already determined that Texas law governs the Asset Purchase Agreement, NSL avers that Texas law ought to govern § 5.c.i and this Court's application of it. ECF No. 415, PageID.26015-18. NSL argues this distinction is important, asserting that Texas applies the same three-part analysis as MCL § 445.774(a)(1) rather than a more general rule of reason analysis, or the more stringent Sherman Act formulation proposed by Plaintiff. ECF No. 415, PageID.26017 n.3 (citing Tex. Bus. & Com. Code Ann. § 15.50(a)).

Living Essentials argues that application of Texas law here would violate the Sixth Circuit's express mandate to apply Michigan law, which requires courts to apply the federal common law rule of reason to business to business noncompete agreements. Because the Sixth Circuit rejected the application of MCL § 445.774(a)(1) to the Settlement Agreement, and clearly directed this Court to apply the federal common law rule of reason, its decision necessarily excluded the application of some other state law regime which is arguably "the same" as §445.774(a)(1), such as § 15.50(a) of the Texas Code. ECF No. 417, PageID.26045.

Having considered both sides of the argument, the Court concludes that it should apply Michigan law to §5.c.i. First, to do otherwise would violate the mandate rule. Under the mandate rule, "the trial court must proceed in accordance with the mandate of the law of the case as established on appeal" and "implement both the letter and the spirit of the mandate." *Mason v. Mitchell*, 729 F.3d 545, 550 (6th Cir. 2013). The Sixth Circuit was already implicitly faced with the question of whether to apply Texas law to § 5.c.i and *expressly* stated this Court should apply the rule of reason test as mandated by the Michigan Supreme Court. In its opinion, the Sixth Circuit affirmed this Court's decision that only § 5.c.i of the Settlement Agreement applied to NSL through the doctrine of incorporation by reference; that § 4.2(r) of the Asset Purchase Agreement incorporated the Choline Family restrictions in § 5.c.i "specifically." 912

F.3d at 338. Indeed, when analyzing § 4.2(r) of the Asset Purchase Agreement to determine whether it "plainly referred to" or "merely mentioned" the Settlement Agreement, the Sixth Circuit stated that § 4.2(r) was an "acknowledgement in the Asset Purchase Agreement that "NSL's rights to the formula were limited by the settlement agreement." *Id.*

In so holding, the Sixth Circuit applied *Michigan* law when interpreting § 5.c.i. It did not divorce § 5.c.i from the Settlement Agreement's choice of law provision in § 22 and apply Texas law to determine what standard should govern the noncompete agreement in § 5.c.i. *See* 912 F.3d at 340. In other words, the Sixth Circuit considered which law to apply to interpret § 5.c.i, and it expressly mandated this Court to apply Michigan law, it did not adopt the analysis suggested by Defendant here—to apply Texas law.

Second, Defendants have not provided the Court with any authority that it should—or could—divorce the noncompete clause of the Settlement Agreement from that agreement's choice of law clause requiring that the Settlement Agreement be interpreted by Michigan law. Defendants cite to no comparable cases where a court has ruled in the manner they ask this court to rule, that is, where a court has held that a provision from Contract A has been incorporated by reference into Contract B, but that when interpreting the meaning of that provision from Contract A, the court must apply the choice of law provision from

Contract B. Ultimately, Defendants are challenging a provision of the Settlement Agreement, not a provision of the Asset Purchase Agreement.

In sum, the Court will apply Michigan law to § 5.c.i of the Settlement Agreement because not doing so would violate the letter and the spirit of the Sixth Circuit's mandate and because Defendants have offered no persuasive authority in support of their position that Texas law should apply.

## B. Breach of Covenant Not to Compete under the Rule of Reason

The Sixth Circuit instructed this Court to apply the "rule of reason" test to evaluate the reasonableness of the Settlement Agreement's business-to-business noncompete clause. 912 F.3d at 341-42. Unfortunately, however, the court of appeals did not define the specific contours of what is meant by the rule of reason test, and the parties are at odds over the question. Plaintiff asserts that an effective challenge under the rule of reason test would require Defendants to show that the noncompete clause would violate § 1 of the Sherman Act—which has its own five-factor burden-shifting rule of reason test. Defendants meanwhile contend that the common law rule of reason test requires no more than showing a violation of M.C.L. § 445.774a(1), so that the Court may simply reaffirm its prior holding. Given the lack of clarity in this area, the Court will do its best to discern the meaning of the "rule of reason" test by analyzing its historical roots and development in the relevant Michigan cases.

### i. Historical Framework

In 1873, the Michigan Supreme Court considered when a business-to-business noncompete clause would be held valid:

> [I]f, considered with reference to the situation, business and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them and not specially injurious to the public.

*Hubbard v. Miller*, 27 Mich. 15, 19, 15 Am.Rep. 153 (1873). The court went on to state:

> whether [a contract with a noncompete clause] can be supported or not, depends upon matters outside of and beyond the abstract fact of the contract or the pecuniary consideration; it will depend upon the situation of the parties, the nature of their business, the interests to be protected by the restriction, its effect upon the public; in short upon all the surrounding circumstances; and the weight or effect to be given to these circumstances is not to be affected by any presumption for or against the validity of the restriction; if reasonable and just, the restriction will be sustained, if not, it will be held void.

*Id.* at 19-20. Over time, the *Hubbard* standard evolved into a four-factor test in Michigan courts and was recognized as the "common law rule of reason." *See Cardiology Assocs. of Southwestern Michigan, P.C. v. Zencka*, 400 N.W.2d 606, 607-08 (Mich. Ct. App. 1985). "First, the covenant must be for a just and honest purpose. Second, it must be established for the protection of the legitimate interest of the party in whose favor it is imposed. Third, it must be reasonable as between the

parties to the contract. Finally, it must not be specially injurious to the public." *Id.*; *see also Woodward v. Cadillac Overall Supply Co.*, 240 N.W.2d 710, 714 (Mich. 1976) ("It has long been established in English and Michigan common law that a balancing test is used to test the reasonableness or unreasonableness of a contractual restraint of trade," citing *Hubbard*).

Just as Michigan courts adopted the rule of reason in the context of covenants not to compete, the United States Supreme Court followed a similar course in interpreting the federal Sherman Act. In *Standard Oil Co. of New Jersey v. United States*, the Court interpreted the Sherman Act's prohibition against restraints of trade to outlaw only *unreasonable* restraints. 221 U.S. 1, 66-67 (1911). One of the best-known explanations of the rule of reason in the Sherman Act context is found in *Board of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918):

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but

because knowledge of intent may help the court to interpret facts and to predict consequences.[1]

The Michigan Supreme Court's application of a common-law rule of reason in *Hubbard* thus predated the federal courts' adoption of it in Sherman Act jurisprudence. *See Bristol Window & Door, Inc. v. Hoogenstyn*, 650 N.W.2d 670, 676 (Mich. Ct. App. 2002). Michigan's judicially developed approach to restraints on trade was soon accompanied by state statutory law. In 1905, the Michigan Legislature enacted MCL § 445.761, which provided that:

> All agreements and contracts by which any person, copartnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited are hereby declared to be against public policy and illegal and void.

This broad proscription against any kind of noncompete agreements was limited by exceptions found in M.C.L. § 445.766.[2] Interestingly, even

---

[1] As discussed in greater detail below, this test continued to evolve in the Sherman Act context to the point where in the Sixth Circuit, plaintiffs bringing § 1 Sherman Act claims must prove that a defendant's conduct unreasonably restrains trade under a rigid "rule of reason" burden-shifting framework that includes a five-part test. *See Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005).

[2] MCL § 445.766 provided:

> This act shall not apply to any contract mentioned in this act, nor in restraint of trade where the only object of restraint imposed by the contract is to protect the vendee, or transferee, of a trade pursuit, avocation, profession or business, or the good will thereof, sold and transferred for a valuable consideration in good faith, and without any intent to create, build up, establish or maintain a monopoly; nor to any contract of employment under which the employer furnishes or discloses to the employe[e] a list of customers or patrons, commonly called a route list, within certain territory in which such employe[e] is to work, in

17

though these statutes did not expressly refer to a reasonableness standard, the Michigan Supreme Court continued to apply the rule of reason in addressing the validity of noncompete agreements. *Bristol Window*, 650 N.W.2d at 677 (citing *Staebler-Kempf Oil Co. v. Mac's Auto Mart, Inc.*, 45 N.W.2d 316 (Mich. 1951)). As *Bristol Window* points out, in the Michigan Supreme Court's 1951 *Staebler-Kempf* decision, the court quoted and applied the *Hubbard* rule of reason test to an agreement between a gasoline retailer and an oil company where the retailer agreed to exclusively sell the oil company's gasoline and at the same price as that charged by other gasoline retailers that the oil company supplied. 650 N.W.2d at 677; 45 N.W.2d at 318-19; *see also ARA Chuckwagon of Detroit, Inc. v. Lobert*, 244 N.W.2d 393, 398 (Mich. Ct. App. 1976) ("Covenants not to compete have always been governed by the rule of reason.").

However, Michigan law took another turn in 1984, when the state legislature enacted the Michigan Antitrust Reform Act ("MARA"), repealing former § 445.761. Under MARA, "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." M.C.L. § 445.772 (also known as § 2 of MARA). This provision tracks its sister provision in the Uniform State Antitrust Act ("USAA") and was patterned after the

---

which contract the employe[e] agrees not to perform similar services in such territory for himself or another engaged in a like or competing line of business for a period of 90 days after the termination of such contract or services.

Sherman Antitrust Act. *See* USAA Comment to § 2 ("This section gathers together and proscribes all concerted or collusive conduct in unreasonable restraint of trade, as under the common law and section 1 of the Sherman Act, and to monopolize trade, as under section 2 of the Sherman Act. . . . The adoption of Sherman Act language establishes its general standards of legality, provides needed flexibility, *and makes available to state courts the relevant body of federal precedent*.") (emphasis added).

When initially enacted, MARA "contained no sections specifically addressing competition agreements," so the Michigan Supreme Court, as explained in *Compton v. Joseph Lepak DDS, PC*, 397 N.W.2d 311 (Mich. Ct. App. 1986), stated that MARA's general provision—§ 2—and the common law rule of reason would govern the enforceability of all covenants restraining trade. *See Bristol Window*, 650 N.W.2d at 678. As the Court explained in *Bristol Window*:

> Although the noncompetition agreement at issue in *Compton* contained no limitation of its duration, [the Michigan Court of Appeals], citing the weight of authority from other jurisdictions, federal precedent, and Michigan law*, concluded that the agreement should be enforced to the extent reasonable according to 'the developed common law.'* [The court] reiterate[d] that [it] reached its conclusion despite that § 2 of the MARA makes no explicit reference to a standard of reasonableness.

*Id.* (internal citations omitted) (emphasis added). *Compton* also explained that MARA was broader than its predecessor, because unlike

§ 445.761 "which declared void any agreement not to compete, whether reasonable or unreasonable, § 2 of MARA only makes unlawful any contract which is an unreasonable restraint of trade, as under the common law or § 1 of the Sherman Act or monopolized trade under § 2 of the Sherman Act." *Compton*, 397 N.W.2d at 314. As Michigan courts have stated, the legislature's repeal of § 445.761, and codification of § 2 of MARA "clearly demonstrates the Legislature's intent to revive the common-law rule set forth in *Hubbard*, that the enforceability of noncompetition agreements depends on their reasonableness." *Bristol Window*, 650 N.W.2d at 679 (internal citations omitted).

In 1987, the Michigan Legislature enacted § 4a of MARA, which codified a test to determine the enforceability of a noncompetition agreement in the employer-employee context. M.C.L. § 445.774a(1) states:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Therefore, in the employer-employee context, § 445.774a(1), rather than the common law rule of reason, governs. Under § 445.774a(1), an

employer-employee covenant not to compete must protect a party's reasonable competitive business interests, and its protection must be reasonable with respect to: (1) duration; (2) geographical scope; and (3) the line of business restricted. *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 919 (Mich. Ct. App. 2006). In support of the consideration of these factors, the court in *St. Clair* looked to *Hubbard* and *Bristol Window* and stated that "§4a(1) represents a codification of the common-law rule 'that the enforceability of noncompetition agreements depends on their reasonableness.'" *St. Clair*, 715 N.W.2d at 918.

In considering the challenge to the 20-year noncompete agreement between Living Essentials and CNL in the absence of any conflicting authority from the Michigan Supreme Court, this Court applied § 445.774a(1) to the parties' covenant not to compete, noting that it did not need to apply a different common law the rule of reason test because "a non-compete agreement's enforceability rests on its reasonableness, regardless of whether it involves an employment contract or not." ECF No. 219, PageID.9230 & n.41. This Court then concluded that Settlement Agreement's 20-year noncompete agreement was reasonable in scope and geographic area but was unreasonable as to duration. Consequently, the Court reformed the duration of the covenant to three years. *Id.* at PageID.9232-37. In applying that remedy, the Court relied upon § 445.774a(1), which empowers a Court to "limit the agreement to render it reasonable in light of the circumstances."

### ii. The *Liquid Manufacturing* Decision

After this Court's decision, however, the Michigan Supreme Court decided *Innovation Ventures, LLC v. Liquid Manufacturing, LLC*, in which it expressly held that the common law rule of reason, rather than the statutory authority of § 445.774a(1), should be applied to business-to-business noncompete agreements, recognizing that § 2 of MARA was actually a codification of the rule of reason. 885 N.W.2d at 874 & n.18 (citing *Bristol Window*, 650 N.W.2d 670). In light of *Liquid Manufacturing*, the Sixth Circuit reversed this Court's decision to apply § 445.774a(1) to § 5.c.1 of the Settlement Agreement, explaining that *Liquid Manufacturing* "makes clear that business-to-business noncompete agreements like the one at issue here must be 'evaluated by the rule of reason,' not by analogy to employment noncompete agreements that do not 'address the proper framework.'" 912 F.3d 316, 340 (6th Cir. 2018).

Nonetheless, Defendants assert that § 445.774a(1), which this Court previously applied, is merely a codification of the rule of reason and consequently the Court should again conclude that § 5.c.(1) of the Settlement Agreement is an unreasonable restraint on trade because its duration is unreasonably long.[3] Conversely, Plaintiff suggests that

---

[3] Defendants cite *Bristol Window* for the proposition that § 445.774a(1) is a codification of the rule of reason, ECF No. 400, PageID.24279, but that is not what *Bristol Window* nor *Liquid Manufacturing* stated. Rather, as the Michigan Court of Appeals made clear in *St. Clair:* "§4a(1) represents a codification of the common-law

because MARA was patterned after §§ 1-2 of the Sherman Antitrust Act, and Sherman Act jurisprudence has developed to include a rigid "rule of reason" burden-shifting framework, Defendants should be required to establish all the elements of a § 1 Sherman Act claim to demonstrate that the covenant not to compete is an unreasonable restraint on trade.

Unfortunately, neither the Michigan Supreme Court in *Liquid Manufacturing* nor the Sixth Circuit in its opinion in this case delineated clear standards under the rule of reason test for this Court to apply. And the parties here have capitalized on that ambiguity to advocate for a formulation of the rule of reason that most favors their interests. But in holding that the common law rule of reason—and not § 445.774a(1)—was the proper standard by which to judge business to business noncompete agreements, *Liquid Manufacturing* strongly suggested that the requirements of the two standards are not identical.

So what did the Michigan Supreme Court mean when it said that the rule of reason applies? In *Liquid Manufacturing*, it stated that when analyzing business-to-business noncompete agreements, MCL 445.784(2) requires that courts look to *federal* interpretation of *comparable statutes*. The *Liquid Manufacturing* court then cited to a decision from the Sixth Circuit, *Perceptron, Inc. v. Sensor Adaptive Machines, Inc.*, 221 F.3d 913 (6th Cir. 2000), and a decision from the

---

rule 'that the enforceability of noncompetition agreements depends on their reasonableness.'" *St. Clair*, 715 N.W.2d at 918.

Seventh Circuit, *County Materials Corp. v. Allan Block Corp.*, 502 F.3d 730, 735 (7th Cir. 2007), for the proposition that "federal courts have assessed noncompete agreements between two commercial entities under the rule of reason." *Liquid Mfg.*, 885 N.W.2d at 874.

*Perceptron* involved a plaintiff bringing a breach of contract action alleging the defendant violated a covenant not to compete and a defendant asserting a counterclaim that the noncompete agreement violated antitrust law. 221 F.3d at 917. The jury found for the plaintiff, concluding that the covenant "was reasonable, enforceable (including permitted under the antitrust laws[])," that the defendant had breached the covenant, and that the defendant had failed to prove that the noncompete agreement constituted an unreasonable restraint of trade in violation of federal antitrust laws. *Id.* at 917-18. Post-trial, the defendant moved for judgment as a matter of law, or in the alternative, for a new trial on both the plaintiff's breach of contract claim and its counterclaims. *Id.* at 918. The trial court denied the defendant's motion. *Id.* On appeal, the defendant contested the jury's finding that the noncompete agreement was a valid and reasonable restraint on competition under federal and state antitrust laws. *Id.* The Sixth Circuit analyzed the legality of the noncompete agreement "under the rule of reason test," citing a Seventh Circuit case, *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981). *Perceptron*'s formulation of the rule reason states:

> [C]ovenants not to compete are valid if (1) ancillary to the main business purpose of a lawful contract, and (2) necessary to protect the covenantee's legitimate property interests, which require that the covenants be as limited as is reasonable to protect the covenantee's interests. *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281-82 (6th Cir. 1898); *aff'd as modified*, 175 U.S. 211, 20 S. Ct. 96, 44 L.Ed. 136[ ] (1899).

221 F.3d at 919 (quoting *Lektro-Vend*, 660 F.2d at 265).

Interestingly, the Sixth Circuit's formulation is not the traditional five-factor burden shifting framework commonly applied in pure § 1 Sherman Act claims and proposed by Plaintiff to be applied here. *See Care Heating*, 427 F.3d at 1014 (citing *Int'l Logistics Grp. Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)). Rather, when analyzing whether there was any basis for the jury to conclude that the noncompete agreement was a valid and reasonable restraint on competition, the Sixth Circuit considered the evidence the jury heard regarding several factors: (1) whether the aggrieved party continued to develop products that did not compete, (2) the need for the noncompete agreement, (3) the value of the goodwill acquired to determine whether the noncompete agreement was ancillary to the purpose of contract, (4) the reasonableness of the duration, geographic reach, and product scope of the noncompete agreement, and (5) that motivation to escape competition, alone, does not make a noncompete agreement an unreasonable restraint on competition. *Id.* at 919-20. In weighing all of these factors, the Sixth Circuit concluded that "reasonable minds could differ about whether the

non-compete agreement was ancillary to the transaction and a *reasonable restraint on competition*" affirming the district court's denial of the defendant's motion for judgment as a matter of law. *Id.* at 919 (emphasis added). Of note, the Sixth Circuit concluded that the jury heard evidence that the plaintiff purchased goodwill and a customer base—not just an escape from competition, and that reasonable minds could differ about whether five years was a reasonable duration for the plaintiff to protect its ability to realize the benefit of the transaction. *Id.* at 919-20.

The other federal appellate decision cited by the Michigan Supreme Court as an example of a "rule of reason" case, *County Materials,* did not concern an antitrust claim. 502 F.3d 730, 735 (7th Cir. 2007). Rather, a manufacturer brought an action seeking a declaration that a covenant not to compete in a patent licensing agreement was unenforceable. *Id.* In the patent misuse context, "[u]nder the rule of reason, the finder of fact must decide whether the questioned practices imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *County Materials*, 502 F.3d at 735 (quoting *Virginia Panel Corp. v. MAC Panel Co.*, 133F.3d 860, 869 (Fed. Cir. 1997)). *County Materials* also clarified that "[a]nticompetitive effects . . . are a critical element of any patent misuse case that is evaluated under a rule of

reason approach." *Id.* at 736. And, of particular relevance to this case, the court stated that it would assume that it was "not necessary for a plaintiff to plead a case that would suffice to show that the antitrust laws have been violated. *But, at the summary judgment stage, some evidence tending to show an adverse effect in an economically sound relevant market is essential for any claim governed by the rule of reason.*" *Id.* (emphasis added).

Specifically, the Seventh Circuit considered whether the noncompete agreement: (1) showed signs of one-sidedness or abuse of power, (2) permitted the aggrieved party to continue selling or producing similar competing products in the market, had temporal and geographic limits, and (3) whether the aggrieved party had shown that the noncompete had a broader effect on the market, as opposed to an effect only on the aggrieved party. *Id.* at 736-37. The court concluded that the covenant not to compete was not "particularly onerous" because it allowed County Materials to continue to manufacture and sell two competing products, was temporally limited because it lasted for only 18 months, and was geographically limited because it applied only to County Materials' exclusive production territory (a section of Wisconsin). Further, because there was no evidence in the record that the restrictive covenant had any effect on the broader market (as opposed to an effect only on County Materials) the defense that the covenant was unreasonable under the rule of reason could not succeed. *Id.* at 737

*Liquid Manufacturing* also cited the Supreme Court's decisions in *State Oil Co. v. Khan*, 522 U.S. 3 (1997) and *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918), two seminal cases applying the rule of reason test in the context of Sherman Act claims.[4] More recent jurisprudence under the Sherman Act has evolved to a specific five-part rule of reason test that plaintiffs must meet in order to pass muster.

Consequently, to make out a valid claim under § 1 of Sherman Act, the
> [r]ule of reason analysis requires the plaintiff to prove (1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) within relevant product and geographic markets; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of the plaintiff's injury.

*Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005). This five-factor test aids the Court in discerning whether a plaintiff as overcome the first of a three-part burden-shifting framework:

> First, the plaintiff must establish that the restraint produces significant anticompetitive effects within the relevant product and geographic markets. [Then,] [i]f the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitve injuries. [Finally,] [i]f the defendant is able to demonstrate procompetitive effects, the plaintiff then must show that the legitimate objectives can be achieved in a substantially less restrictive manner.

---

[4] The *Board of Trade of Chicago* excerpt quoted by *Liquid Manufacturing* is quoted above at page 16.

*Id.* at 1012 (quoting *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)) (alterations in original).

Plaintiff argues that because the Michigan Supreme Court cited these early Sherman Act cases, it intended to require that any successful challenges to business noncompete clauses must likewise make out a prima facie case of a § 1 Sherman Act claim. Put differently, because the Sherman Act rule of reason test developed from the formulation in *Board of Trade of Chicago* to this five-factor test, and because *Liquid Manufacturing* and *Innovation Ventures* make reference to the Sherman Act, Plaintiff argues NSL should be required to meet all five elements of the test set out in *Care Heating* to prove that the covenant not to compete in the Settlement Agreement is an unreasonable restraint on trade.

There is some appeal to Plaintiff's argument. Indeed, why else would the courts in *Liquid Manufacturing* and *Innovation Ventures* cite to Sherman Act cases—where the modern case law has developed its own carefully articulated "rule of reason" test—if they intended to apply some less exacting standard? And both Sixth Circuit and Michigan courts agree that § 2 of MARA "adopted language from and is interpreted consistent with the Sherman Act." *Perceptron*, 221 F.3d at 919 n.6 (citing *Compton v. Joseph Lepak, DDS, PC*, 397 N.W.2d 311 (Mich. Ct. App. 1986)).

But it is also the case that the Michigan Supreme Court did not quote *Care Heating* or any number of other governing Sherman Act cases applying this five-factor test. Rather, it quoted a rule of reason test developed in a 1918 Supreme Court Sherman Act case which requires courts to weigh a number of factors, under the framework that "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of City of Chicago*, 246 U.S. at 238. Those factors are: "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Id.* Additionally, "[t]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained." *Id.* Also telling, when the Michigan Supreme Court declared that the rule of reason should be applied, it cited *Perceptron* (which involved antitrust claims, but did *not* apply the five-factor test), and *County Materials* and *Bristol Window* (both of which did not involve antitrust claims).

In reviewing the various factors articulated in *Board of Trade, Perceptron,* and *County Materials,* the cases cited in *Liquid Manufacturing*, the Court finds they are more in line with the venerable old *Hubbard* factors from 1873 than they are with the 21st Century five-

factor test set out in *Care Heating*.[5] And while "MARA was enacted in order to create uniform state laws and to draw upon federal antitrust decisions," *Compton v. Joseph Lepak, D.D.S., P.C.*, 397 N.W.2d 311, 316 (Mich. Ct. App. 1986), this Court can discern no reason why a defendant seeking to defend against the breach of a covenant not to compete should have to prove all the strict elements of a § 1 Sherman Act claim to meet its burden. The Court may "draw upon federal antitrust decisions" and take guidance from decisions such as *Board of Trade* without necessarily imposing all the requirements of a § 1 Sherman Act claim.[6]

This Court also finds that a common theme among each of these formulations of the rule of reason is that the party challenging the restrictive covenant must demonstrate that it causes some harm to competition in the greater product market. This effect on the greater market appears to be the most substantial difference between the showing that must be made under § 445.774a(1) and that which would

---

[5] Plaintiffs rely on *Little Caesar Enters., Inc. v. Creative Rest. Inc.*, No. 16-14263, 2017 WL 4778721 (E.D. Mich. Oct. 23, 2017), to argue that a full Sherman Act analysis should be applied when analyzing the breach of a business-to-business restrictive covenant. But that case involved trademark infringement, unfair competition, and trade dress infringement claims, not just a breach of contract action. And it neither applied all five Sherman Act factors nor did it clearly hold that all the Sherman Act factors must be met in a breach of contract action.

[6] The Court appreciates that both the Sixth Circuit and the Michigan Supreme Court in *Liquid Manufacturing* considered the Sherman Act concepts of per se violations and horizontal restraints on trade. *See* 912 F.3d at 340-41; 885 N.W.2d at 874. But while the Sixth Circuit and Michigan Supreme Court discussed these Sherman Act concepts, they did not expressly require that defendants challenging a noncompete agreement would necessarily need to prove all the elements of a § 1 Sherman Act claim.

be required under the rule of reason framework. Indeed, as outlined above, *Perceptron*, *County Materials*, and *Board of Trade* consider duration, geographical scope, and reasonableness between the parties under the rule of reason, but they also consider the restrictive covenant's impact on competition in the wider market. Even *Hubbard* required consideration of the covenant's "effect upon the public." 27 Mich. at 19-20. In other words, it is not enough—as Defendants contend—for the Court to examine the covenant's duration, geographic scope, type of conduct prohibited, and business interests justifying the restriction—as it did in its prior order. Based on this Court's understanding of the Michigan Supreme Court's reasoning in *Liquid Manufacturing*, the Court concludes that the following factors should be considered when applying the rule of reason test to evaluate challenges to noncompete agreements in the business-to-business context under Michigan law: (1) whether the restraint is ancillary to the main business purpose of an otherwise lawful contract; (2) whether the restraint protects legitimate property interests, for example, goodwill; (3) whether the restraint's duration, geographic reach, and scope are reasonable considering the nature of the property interest being protected; and (4) whether the restraint suppresses or destroys competition in the relevant market. The Court must take into account each of these factors to determine whether the restraint is reasonable or void. *Hubbard*, 27 Mich. at 20 ("[I]f

reasonable and just, the restriction will be sustained, if not, it will be held void.").

### iii. Application of the "rule of reason" test

In attempting to apply the rule of reason, the Court first acknowledges the relevance of many of the Court's prior findings. This Court has already found that Plaintiff has a legitimate business interest in the Choline Family restrictions and that the scope and geographic locations of the restrictions are reasonable. ECF No. 219, PageID.9232. Further, as in *Perceptron*, here the Court has already concluded that the noncompete agreement was ancillary to the main purpose of the Settlement Agreement. 221 F.3d at 919. Defendants previously conceded that Living Essentials' desire to protect its goodwill was a legitimate business purpose. ECF No. 219, PageID.9232. And this Court held that the restrictive covenant "had perhaps a greater than normal concern to protect its goodwill from these parties because they had previously admitted to wrongfully manufacturing [5-Hour Energy] in the past." ECF No. 219, PageID.9232.

But this Court also originally held that § 5.c.i's 20-year duration was unreasonable. ECF No. 219, PageID.9234 (stating that "courts have upheld time periods of six months to three years") (quoting *Lowry Computer Prods. Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997)). However, *Lowry* involved an employer-employee noncompete agreement, as did *Radio One, Inc. v. Wooten*, 452 F. Supp. 2d 754, 759 (E.D. Mich.

2006), and *Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 742 N.W.2d 409, 418 (Mich. Ct. App. 2007). The only cases cited by the Court outside of the employer-employee context were *Bristol Window*, 650 N.W.2d at 679, and *In re Spradlin*, 284 B.R. 830, 836 (E.D. Mich. 2002). *In re Spradlin* held that five years was reasonable, 284 B.R. at 836, while *Bristol Window* considered a three-year limitation and remanded for the trial court to determine whether the length was reasonable, 650 N.W.2d at 498.

The Court's additional review of Michigan cases involving business-to-business noncompete agreements has discovered several other cases, one finding a 5-year noncompete clause reasonable, another allowing a duration of 20 years, and a third holding that a never-ending noncompete agreement would be categorically unreasonable. For example, in *Brillhart v. Danneffel*, the Michigan Court of Appeals analyzed a covenant not to compete between the buyer and seller of a restaurant under a reasonableness standard. 194 N.W.2d 63, 65 (Mich. Ct. App. 1971). It held that the business-to-business noncompete agreement was reasonable because the defendant understood they were signing a 5-year, 10-mile restriction, the defendant's agent wrote the agreement, and they voluntarily signed the contract. 194 N.W.2d 63, 65 (Mich. Ct. App. 1971). *Brillhart* distinguished a case in which the court found a covenant to be unreasonable because it required the seller to "never" re-engage in the relevant business. *Id.* at 65-66 (citing *Wolverine Sign Works v. Powers*,

227 N.W. 669, 670, 674 (Mich. 1929) ("Never is a long time. It is a longer time than necessary to enable the purchaser of a business to convert the good will into a good will personal to himself.")).

And more recently, in the unreported decision of *Lieghio v. Loveland Invs.*, the Michigan Court of Appeals held that a 12-mile, 20-year covenant not to compete in a hotel business was not unreasonable because "the parties' agreement is similar to those upheld in a long line of cases, like *Brillhart*, that have sanctioned covenants not to compete where they are merely a reasonable restraint on a seller's competitive efforts in order to promote the buyer's realization of goodwill in the purchased business." Nos. 285393-94, 2009 WL 3491620, at *1, 5 (Mich. Ct. App. Oct. 29, 2009) (citing *Hubbard*, 27 Mich. at 19, 21). These decisions do not provide the Court with much comfort that a business-to-business noncompete agreement lasting 20 years would necessarily be found reasonable under the rule of reason test, but nor do they clearly indicate that a 20-year noncompete agreement with otherwise reasonable terms would automatically be voided under the rule of reason. Particularly where, as here, the record indicates that Jones testified he knew the covenant's duration was 20 years when he signed the document, and that NSL was free during this time to manufacture energy shots— though not using Choline Family ingredients. That said, the Court has also already found that Living Essentials "has failed to provide a reasonable justification for a [20-year] restriction" and that its interest

in protecting its goodwill does not justify this decades-long restriction. ECF No. 219, PageID.9235. And it has articulated its skepticism that Living Essential's "attempt to achieve the protections of a patent vis-à-vis Custom Nutrition [and NSL] without having demonstrated that it was legally entitled to a patent is not a reasonable use of a non-compete agreement." *Id.* at PageID.9263.

But as explained above, the key feature that makes the rule of reason different from the test the Court already applied in its prior Order is the requirement that a defendant show—in addition to these other factors—a reasonable likelihood that enforcing the restrictive covenant will cause anticompetitive effects. In order to make this showing, the Court concludes a defendant may present the kind of evidence that would tend to support a § 1 Sherman Act claim under the five-factor burden-shifting rule of reason framework because such evidence is probative of the anticompetitive nature of the alleged restraint.[7] But at the same time, it is not necessary that the defendant present evidence sufficient to prove all of the elements required to make out a Sherman Act antitrust violation.

---

[7] As detailed above, the Seventh Circuit took a similar approach in *County Materials* for patent misuse cases. 502 F.3d at 736 (stating that it is "not necessary for a plaintiff to plead a case that would suffice to show that the antitrust laws have been violated. *But, at the summary judgment stage, some evidence tending to show an adverse effect in an economically sound relevant market is essential for any claim governed by the rule of reason*") (emphasis added).

Defendants rely on the report provided by Living Essentials' damages expert to show that Plaintiff's product holds a significant percentage of the energy shot market and therefore has market power.[8] Given this market power, Defendants assert there is a potential for anticompetitive effects under the rule of reason. ECF No. 415, PageID.26022-24. But NSL has not argued how *the restrictive covenant* causes anticompetitive effects. The case Defendants rely on, *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815 (6th Cir. 2011), requires such a showing.[9] *Realcomp II* holds that: "[m]arket power and *the anticompetitive nature of the restraint* are sufficient to show the potential for anticompetitive effects under a rule-of-reason analysis, and once this showing has been made, [the proponent of the restraint] must offer procompetitive justifications. *Id.* at 827. Here, NSL emphasizes the market power element but entirely ignores the "anticompetitive nature of the restraint" element.

---

[8] The details of this report are under seal. Further, this expert testified he was defining the relevant product markets strictly for purposes of damages calculations, which was a different consideration than defining product markets for purposes of an antitrust analysis.

[9] Notably, *Realcomp II* is a Sherman Act case, and it applies that rigid five-factor burden-shifting test developed in the Sixth Circuit under the Sherman Act. As explained above, in *Liquid Manufacturing*, the Michigan Supreme Court did not hold that the application of the rule of reason test would necessarily require proof of all the elements of a §1 Sherman Act claim, but it did cite to antitrust cases that have applied the rule of reason, indicating that the kinds of proof offered in such cases would be useful to parties attempting to show anticompetitive effects.

In other words, at this stage, Defendants have not created a genuine issue of material fact that the restrictive covenant has anticompetitive effects on the energy shot market. Regardless of whether Plaintiff has market dominance, Defendants must be able to show a jury that the 20-year restrictive covenant between Plaintiff and Defendants had anticompetitive effects on the market. NSL's reliance on Plaintiff's alleged market dominance alone does not show, or raise a genuine issue of fact, that the restrictions between NSL and Living Essentials "narrows consumer choice" or "hinder[s] the competitive process." *Id.* at 829. *See also Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679, 692 (1978) (requiring an analysis of "the competitive significance of the restraint"). Put differently, NSL must create a genuine issue of material fact that the restrictive covenant not only harmed NSL, but that it also harmed competition in the greater energy shot market (whether because an NSL free of the restrictive covenant would have been such a significant market competitor that their elimination for 20 years harmed the market as a whole, or for some other reason). That Plaintiff may have captured a large percentage of *NSL's sales* because NSL was unable to produce a competing product containing Choline Family ingredients would  be relevant if NSL could show that its lost sales would have been large enough to impact the energy shot market. A subsidiary issue may also be, for example, whether the Choline Family ingredients are influential in determining a product's success in the energy shot market. At this

point, Defendants have not made anything like this kind of showing, and the report of Plaintiff's damage expert does not do it for them.[10]

Moreover, this Court has already found that the covenant does not prevent Defendants from competing in the energy shot market. Rather, it prevents Defendants from using one family of ingredients. ECF No. 219, PageID.9233. NSL "can continue to develop, market, and distribute energy liquids using all other types of ingredients." *Id.* Defendants' assertion that Plaintiff's alleged market power is a sufficient showing under *Realcomp* ignores this Court's finding that the noncompete agreement does not prevent Defendants from competing in the energy shot market. It also fails to explain how this market share is *caused* by the restrictive covenant—or indeed how the covenant impacts energy shot manufacturers other than Defendants.

Further, at trial, Jones testified that of the 17 energy shots Custom Nutrition produced at the time it entered into the Settlement Agreement, only 2 were affected by the restrictive covenant, or so he could recall. ECF No. 305, PageID.13854. While NSL denies that it produced any of the other 17 energy shots, ECF No. 415, PageID.26014, the question is not

---

[10] For the same reasons, the Court will not conduct a "quick look rule of reason" analysis under the Sherman Act as NSL suggests. *See* ECF No. 415, PageID.26024. Not only is that a Sherman Act concept not applicable here, it is reserved for the situation where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n. v. FTC*, 526 U.S. 756, 770 (1999). NSL has not shown this degree of anticompetitive effect to warrant any "abbreviated" rule of reason analysis.

whether NSL is harmed by the restriction, but whether the greater energy shot market is. That these other energy shots compete successfully in the marketplace without Choline Family ingredients may be telling. *See Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981) ("Legitimate reasons exist to uphold noncompetition covenants even though by nature they necessarily restrain trade to some degree. The recognized benefits of reasonably enforced noncompetition covenants are by now beyond question."). In sum, while market power may be inferred from evidence of significant market share, Defendants still must show "the anticompetitive nature *of the restraint*," which Defendants have not shown, or raised a genuine issue of material fact from which a jury could conclude as such. *Realcomp II*, 635 F.3d at 827.

### iv. NSL is entitled to discovery on anticompetitive effects

The Sixth Circuit's remand order on the rule of reason issue acknowledged that this "fact-intensive determination" falls appropriately with the district court and it tasked the parties with providing "the detailed record information necessary" to enable this Court to apply the rule of reason test. 912 F.3d at 342. On its own, the Sixth Circuit did not apply the rule of reason or find as a matter of law that NSL had or had not met the test.

In light of the new test articulated by the Michigan Supreme Court and identified by the Sixth Circuit—and as it must now be applied by this Court—NSL could not have known that it would be required to develop

evidence regarding the potential anticompetitive effects of the restrictive covenant to defeat Plaintiff's breach of contract claim when it was initially engaged in discovery with Plaintiff. Neither the parties nor the Court were operating with the understanding that the rule of reason test as outlined by *Liquid Manufacturing,* required by the Sixth Circuit's decision in this case, and now fleshed out by this Court would govern the interpretation of the restrictive covenant and consequently determine the boundaries of relevant evidence affecting the question of its reasonableness. The Court believes this weighs in favor of permitting NSL additional limited discovery on the question of whether § 5.c.i of the Settlement Agreement has anticompetitive effects. *C.f. Grant v. Metro. Gov't. of Nashville & Davidson Cty.*, 646 Fed.Appx. 465, 467-68 (6th Cir. 2016) (where additional discovery on remand of disparate impact claim was not allowed because Sixth Circuit found *as a matter of law* that plaintiffs failed to establish a *prima facie* case of disparate-impact discrimination).

This course of action also makes sense because, as explained in greater detail below, the Lead Case is no longer operating on a static record. Living Essentials has moved to consolidate the Lead and Secondary Cases and has requested the Court to allow additional, narrowly tailored discovery on a number of subjects related to the claims of the Secondary Case against Lily of the Desert. Because the Court will grant Plaintiff's motion later in this Order, it will be necessary for

discovery to be re-opened in any event. In the interests of justice, both NSL and Lily of the Desert should also be given the opportunity to develop evidence on the issue of anticompetitive effects under the rule of reason.[11]

Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment (ECF No. 420) and **DENIES** Defendants motion for summary judgment (ECF No. 200), as Defendants should have the opportunity to conduct additional, targeted and limited discovery on whether there is a reasonable likelihood that enforcing the restrictive covenant will cause anticompetitive effects. The Court makes no finding at this time as to whether the restrictive covenant violates the rule of reason. As such, the Court also need not resolve the question at this time as to whether reformation is an appropriate remedy if a business-to-business noncompete agreement is found to violate the rule of reason. *Liquid Mfg.*, 885 N.W.2d at 870-71 & n.21.

---

[11] Plaintiff contends that additional discovery is not appropriate because NSL initially brought an antitrust counterclaim and therefore had the opportunity to conduct such discovery. *See* Second Amended Counterclaim, ECF No. 188. First, that claim was dismissed because it was time barred. ECF No. 337. And more importantly, in light of this Court's decision to consolidate the Lead and Secondary Cases on *Plaintiff*'s motion, and to reopen discovery once consolidation is complete, NSL and Lily should have the opportunity to conduct discovery on anticompetitive effects under the rule of reason.

## C. Consolidation of the Lead and Secondary Cases

### i. Consolidation is warranted

In addition to the parties' cross motions for summary judgment on the application of the rule of reason, Plaintiff also moves to consolidate the Lead Case with the Secondary Case involving Lily of the Desert. *See* ECF No. 403. Plaintiff alleges that while litigating the Lead Case, it learned that NSL was actually the nutrition division of L.D.O.C. Group, Ltd. ("LD Operating"), which in turn was owned by L.D.O.C., Inc. ("LD Inc."). Secondary Case, 16-11179, ECF No. 1, PageID.7. Plaintiff brought suit against LD Operating and LD Inc. (together "Lily"), asserting that they are alter egos of NSL. In the complaint, Plaintiff alleges Lily should be liable for NSL's breaches of § 5.c.i of the Settlement Agreement as uncovered in the Lead Case (if it is found that NSL is insolvent and unable to pay any judgment against it), as well as for additional breaches occurring after discovery concluded in the Lead Case. *Id.* at PageID.36-37.[12] Further, the complaint alleges that Lily, as an alter ego of NSL, produced energy liquids containing Alpha-GPC and Betaine, which a jury has already concluded are prohibited ingredients under the Choline Family restrictions. Jury Verdict Form, ECF No. 296. However, the

---

[12] Paragraphs 141 and 142 of the Complaint allege that "[i]n April 2014, the NSL division ceased operations and all assets, including at least four of the accounts or agreements to produce the Secret Products, were transferred to LD Operating or LD Inc. and LD Operating began to produce and sell at least four of the Secret Products. . . . Such transfer occurred without any agreement or consideration." No. 16-11179, ECF No. 1, PageID.31.

complaint also alleges that Lily and NSL may have produced energy liquids containing other, unspecified Choline Family ingredients (that presumably could be discovered during the discovery process). No. 16-11179, ECF No. 1, PageID.19, 34.

Alternatively, if LD Operating and LD Inc. are not alter egos of NSL, Plaintiff alleges in the complaint that LD Operating and LD Inc. (as separate and distinct entities) induced Jones, CNL and/or NSL to breach § 5.c.i[13] by assisting them in producing energy liquids containing Choline Family ingredients, resulting in tortious interference with contract and business expectancy. *Id.* at PageID.44-48. Additionally, Plaintiff contends they are liable under the Texas or Michigan Uniform Fraudulent Transfer Act for receiving substantially all of NSL's assets without adequate consideration and Plaintiff seeks an order avoiding those transfers and awarding Plaintiff monetary recovery "in whatever amount Plaintiff is found to be entitled."[14] *Id.* at PageID.48-50. Plaintiff also alleges a civil conspiracy claim against NSL and Lily. *Id.* at 50-51.

---

[13] The Complaint also alleges violations of other provisions of the Settlement Agreement. However, because this Court has already held—and the Sixth Circuit affirmed—that NSL is only bound by § 5.c of the Settlement Agreement by virtue of its incorporation into the Asset Purchase Agreement, the Court will only discuss those counts in the 16-11179 Complaint that assert violations relating to § 5.c. *See* 912 F.3d at 338-39; ECF No. 343 (Order on Motions for Summary Judgment disposing of counts II, IV, V, VII and VII in Lead Case).

[14] It is unclear from Plaintiff's Complaint in Case No. 16-11179 whether Plaintiff is arguing that under the Michigan/Texas Fraudulent Transfer Act, it is able to recover for "new" breaches by Lily of the Desert (i.e., breaches that were not specifically made by NSL during the time frame that the parties' damages experts analyzed).

With this summary of the Secondary Case in mind, Plaintiff argues that the Lead and Secondary Cases involve multiple common issues of law and fact which should persuade this Court to exercise its discretion and consolidate the cases for trial. ECF No. 403. Living Essentials contends that because a jury trial has already concluded that Alpha-GPC and Betaine are Choline Family ingredients, consolidation will ensure swifter recovery against NSL and Lily for their alleged violations. NSL argues that consolidation is not appropriate because (1) transfer of the Secondary Case to the Eastern District of Texas pursuant to 28 U.S.C. § 1404(a) is appropriate, (2) Plaintiff did not appeal the Court's order denying Plaintiff's motion to amend its complaint to add the Lily defendants and associated claims and therefore this holding is the law of the case,[15] and (3) the cases do not involve multiple issues of law and fact justifying consolidation. ECF No. 409.

Pursuant to Federal Rule of Civil Procedure 42(a)(2), "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions." The party seeking consolidation, here Plaintiff, bears the burden of proving that consolidation should be

---

[15] However, just because the Court at one time denied a plaintiff's motion to amend its complaint does not preclude a party from later moving to consolidate by invoking the Court's discretionary power to do so under Federal Rule of Civil Procedure 42(a)(2). This is not barred by the mandate rule because the district court is free on remand to consider issues remanded, issues arising for the first time after remand, and "issues that were timely raised before the district and/or appellate courts but which remain undecided." Wright & Miller Fed. Prac. & Proc. § 4478.3 (quoting *United Sates v. Morris*, 259 F.3d 894, 898-99 (7th Cir. 2001)).

granted. *Invest-Import v. Seaboard Surety Co.*, 18 F.R.D. 499, 500 (S.D.N.Y 1955). And the essential test "is whether there are common questions of law or fact." *Hasman v. G.D. Searle & Co.*, 106 F.R.D. 459, 460 (E.D. Mich. 1985) (citing *Brewer v. Republic Steel Corp.*, 513 F.2d 1222 (6th Cir. 1975)). "Consolidation is in the sound discretion of the court." *Id.* (citing *Stemler v. Burke*, 344 F.2d 393 (6th Cir. 1965)).

A trial court making a decision to consolidate must consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993) (quoting *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985)). "Thus, the decision to consolidate is one that must be made thoughtfully, with specific reference to the factors identified above." *Id.* "Care must be taken that consolidation does not result in unavoidable prejudice or unfair advantage. Conservation of judicial resources is a laudable goal. However, if the savings to the judicial system are slight, the risk of prejudice to a party must be viewed with even greater scrutiny." *Id.* "When cases involve some common issues but *individual issues* predominate, consolidation should be denied. Consolidation is not

justified or required simply because actions *include* a common question of fact or law." *Hasman*, 106 F.R.D. at 461 (internal citations omitted) (emphasis in original). "Consolidation is improper when the introduction of 'voluminous' evidence, relevant to one of the consolidated actions but irrelevant to another, impairs the conduct of trial." *Id.* (citing *Flintkote Co. v. Allis-Chalmers Corp.*, 73 F.R.D. 463, 465 (S.D.N.Y. 1977).

Applying the *Cantrell* factors here, the Court finds that consolidation is appropriate. First, any risks of prejudice and confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues. In order for Plaintiff to win a judgment from Lily for any of its alleged violations of the Settlement Agreement (pre and post April 2014) in the Secondary Case, Plaintiff would have to prove both that Lily was an alter ego and that Alpha-GPC and Betaine are Choline Family ingredients. Although a jury has already established this in the Lead Case, ECF No. 296, if the Secondary Case is not consolidated, it is at least possible that a second jury might disagree and conclude that Lily's production of energy liquids containing these ingredients does not violate the Choline Family restrictions. In such circumstances, Plaintiff would be unable to recover a judgment from Lily even if it proved that Lily and NSL were alter egos.

Further, special jury verdict forms could be created to avoid juror confusion. In a consolidated trial, the jury could be instructed to first consider whether Lily is NSL's alter ego. If yes, the jury could determine

what damages Plaintiff is entitled to for Lily and NSL's usage of the Choline Family ingredients, as litigated in the first trial. If the jury does not conclude that Lily is NSL's alter ego, the jury would be instructed to consider whether, as a discrete and separate entity, Lily violated the Michigan Uniform Fraudulent Transfer Act and engaged in tortious interference with business expectancy and contract. To be sure, Plaintiff's claims against Lily as an alter ego rely, in part, on the speculation that NSL is insolvent and would be unable to pay any judgment against it in the Lead Case. But even if Lily is not found to be NSL's alter ego, Plaintiff's tortious interference and fraudulent transfer claims would still be closely related to the Lead Case. This is because Plaintiff argues they arise from Lily's interference with Plaintiff's rights under § 5.c.1 "and its improper efforts—*during the course of the* [*Lead Case*]—to assist NSL in avoiding ultimate judgment collection." Secondary Case, No. 16-11179, ECF No. 16, PageID.643. Indeed, as the Sixth Circuit acknowledged when it consolidated the Lead and Secondary Cases on appeal, "[a]ll claims in the Secondary Case relate to the same nucleus of fact as in the Lead Case, and [Living Essentials] concedes that the claims in the Secondary Case 'rise or fall with the rulings in the lead case.'" 912 F.3d at 326.

Second, any risk of prejudice or confusion is overcome by the burden on the parties, witnesses and available judicial resources posed by multiple lawsuits, including the time and expense of trying multiple suits

rather than a single one. While limited discovery would be required to determine whether an alter ego relationship exists, whether Lily tortiously interfered with NSL's obligations under the Settlement Agreement, and to investigate and calculate additional damages for any alleged violations by Lily after April 2014, such limited discovery would be a comparatively minor inconvenience compared to the amount of judicial resources saved by not duplicating discovery in the Lead Case for the Secondary Case. Indeed, Plaintiff has cited to discovery from the Lead Case that it intends to use to prove an alter ego relationship and underlying facts for the remaining Lily claims. This weighs in favor of consolidation. *See White v. Baxter Healthcare Corp.*, No. 05-71201, 2008 WL 5273661, at *3 (E.D. Mich. Dec. 17, 2008) (concluding that the burden to the parties, witnesses, and the Court would be significant if separate trials were conducted where the trials would be conducted in close proximity and one case required only limited discovery, which could be conducted in an expedited manner). Plaintiff has stated it needs only an additional 120 days of discovery on the limited issues of alter ego relationship, Lily's tortious interference, existence of a fraudulent transfer and additional production and sales of energy liquids by Lily that violate § 5.c.i. Unlike when Plaintiff filed its motion to amend the complaint, the case is not on the eve of trial, so there is less concern for prejudice to NSL.

### ii. Transfer to the Eastern District of Texas is not appropriate

In arguing that consolidation is not appropriate, NSL incorporates by reference the arguments it made in its motion to transfer venue, filed in the Secondary Case. Likewise, Plaintiff incorporates the arguments it made in its response to NSL's motion. The parties dispute whether, under 28 U.S.C. § 1404(a), it would be in the interests of justice to transfer the Secondary Case to the United States District Court for the Eastern District of Texas.

Section 1404(a) of Title 28 of the United States Code provides that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." District courts have wide discretion to transfer an action pursuant to § 1404(a). *Audi AG v. D'Amato*, 341 F. Supp. 2d 734, 749 (E.D. Mich. 2004). The Court must weigh several factors: "(1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative ease of access to sources of proof; (4) the availability of processes to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interest of justice." *Id.* (quoting *MCNIC Oil & Gas Co. v. IBEX Resources Co.*, 23 F. Supp. 2d 729, 738-39 (E.D. Mich. 1998)). "The party

who brings a motion to transfer venue bears the burden of proving by a preponderance of the evidence that 'fairness and practicality *strongly favor* the forum to which transfer is sought.'" *Weather Underground, Inc. v. Navigation Catalyst Syst., Inc.*, 688 F. Supp. 2d 693, 696 (E.D. Mich. 2009) (emphasis added) (quoting *Amphion, Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d 943, 946 (E.D. Mich. 2003). The defendant must show that the plaintiff's chosen forum is "unnecessarily burdensome." *Boling v. Prospect Funding Holdings, LLC*. 771 Fed.Appx. 562, 568 (6th Cir. 2019). "Merely shifting the inconvenience from one party to another does not meet [the] [d]efendant's burden. If the court determines that the balance between the plaintiff's choice of forum and the defendant's desired forum is even, the plaintiff's choice . . . should prevail." *Choon's Design, LLC v. Larose Industries, LLC*, No. 13-13569, 2013 WL 5913691, at *2 (E.D. Mich. Nov. 1, 2013) (internal citations and quotations omitted).

In considering all of these factors, the Court finds that "fairness and practicality" do not "strongly favor" Texas as the forum. *Weather Underground*, 688 F. Supp. 2d at 696. As discussed above, any purported inconvenience to NSL is overcome by the significant common issues of law and fact between the Lead and Secondary Cases. Judicial economy is served by having the same district court try cases involving the same contracts. *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) (transfer on inconvenience grounds where district court could try two cases involving the same patents).

While the Secondary Case will involve the additional issues of alter ego and fraudulent transfer, the court adjudicating the Secondary Case will be tasked with determining several issues that are already before this Court—just for a new timeline with respect to damages. Namely, whether post-April 2014 conduct by Lily (as an alter ego for NSL) was a violation of the Settlement Agreement. While the Court appreciates that the fraudulent transfer claim would involve an alleged transfer of assets between two Texas corporations, an ultimate question for the Court to consider in the Secondary Case is whether Lily, as a potential alter ego of NSL, violated §5.c.i of the Settlement Agreement through conduct that was not at issue in the Lead Case (post-April 2014 sales). Whether Lily manufactured products that contained Choline Family ingredients and therefore violated the Settlement Agreement, and how damages should be calculated for any determined violation are precisely the same issues the Court has been considering and will further determine in the Lead case for violations by Custom Nutrition and NSL up through April 2014. Additionally, in the Secondary Case Plaintiff alleges that NSL concealed documents that would have shown an alter ego relationship *during the litigation of the Lead Case*, further linking the two cases. This Court is already all-too-familiar with the parties, witnesses, and legal issues at play, the relevant provisions of the Settlement Agreement, and the Choline Family ingredients. And many of the witnesses and parties have already testified before this Court.

Therefore, while "these cases may not involve precisely the same issues, there will be significant overlap and a familiarity with the [Settlement Agreement that] could preserve time and resources. . . . [J]udicial economy is served by having the same district court try the cases involving the same [Settlement Agreement]." *In re Volkswagen of America, Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009). Accordingly, in determining that consolidation is appropriate here, the Court also concludes that transfer of the Secondary Case to the United States District Court for the Eastern District of Michigan under 28 U.S.C. § 1404(a) is not appropriate.

## D. Clarification of Jones as a Defendant

Finally, Plaintiff has moved for clarification of whether Alan Jones may still be considered a defendant in this matter. *See* ECF No. 403. This issue was explicitly addressed by the Sixth Circuit in ruling on whether Jones was bound by the Settlement Agreement in his personal capacity and therefore whether he would remain a defendant in the case. The Sixth Circuit explicitly held: "the Settlement Agreement does not bind Jones in his personal capacity." 912 F.3d at 337. While this holding would seem to resolve the issue by indicating that Jones is no longer a defendant, the Sixth Circuit also affirmed this Court's holding that NSL is bound by § 5.c.i because it was incorporated by reference into the Asset Purchase Agreement, which NSL signed—and so did Jones. *Id.* at 338-39.

Living Essentials asserts that as a result of these holdings, Jones should still be a defendant in the case because he signed the Custom Nutrition-NSL Asset Purchase Agreement in his personal capacity as a "member of CNL," binding himself to that agreement and (like NSL) incorporating by reference the obligations of § 5.c.i of the Settlement Agreement. This argument is exactly the one made by the Court in dicta in its 2015 Order on the parties' motions for summary judgment. ECF No. 219. In a footnote, this Court stated:

> The Court notes that the same incorporation by reference rationale that binds Nutrition Science to the Choline Family restriction applies regarding Alan Jones. Jones signed the Asset Purchase Agreement twice, once in his representative capacity for Custom Nutrition and a second time in his individual capacity. Thus, there is no question that Jones's signature complies with the Statute of Frauds. As explained above, § 4.2(r) incorporates the Settlement Agreement's Choline Family restrictions by reference. According to the Asset Purchase Agreement, Section 4.2(r) was a representation made not only by CNL (the Seller) but also by its "Members." Jones signed the agreement as a Member of CNL and consequently also made the representation in § 4.2(r). As a result, Jones also incorporated the Choline Family restrictions by reference. However, because the Court finds below that Jones is personally bound under Settlement Agreement, the Court need not hold Jones liable under incorporation by reference.

ECF No. 219, PageID.9222.

The question is whether the Sixth Circuit's holding that "the Settlement Agreement does not bind Jones in his personal capacity,"

precludes Plaintiff from arguing on remand that under the logic of the Court's dicta, Jones is still bound to the Settlement Agreement because he also signed the Asset Purchase Agreement as a member of CNL, and that agreement incorporated by reference part of the Settlement Agreement. This presents an interesting question under the "law of the case" doctrine because it concerns an appellee seeking to revisit an issue on remand that was previously decided by the district court and explicitly reversed (but on other grounds) by the court of appeals. Living Essentials was both appellee and cross-appellant before the court of appeals. Jones and NSL appealed this Court's ruling that Jones was bound personally to the Settlement Agreement. On appeal, Living Essentials had every incentive to defend the district court's ruling—and was fully aware that the district court had expressed in dicta an alternative legal basis for finding that Jones was bound to the Settlement Agreement. Living Essentials chose not to raise this alternative ground in defending the district court's ruling on appeal, but has swiftly resurrected it on remand knowing that the court of appeals was not given the chance to consider it.

Generally, the "law of the case" doctrine is applied differently to appellees because "[f]orcing an appellee to raise all possible defenses on a first appeal 'might increase the complexity and scope of appeals more than it would streamline the progress of the litigation.' '[F]ull application of the waiver rule to an appellee puts it in a dilemma between procedural

disadvantage and improper use of the cross-appeal,' justifying 'a degree of leniency in applying the waiver rule to issues that could have been raised by appellees on previous appeals.' Wright & Miller Fed. Prac. & Proc., § 4478.6 Law of the Case—Related Doctrines (quoting Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 738–741 (D.C. Cir. 1995)). Applying such a degree of leniency may not be appropriate here, however, because raising the district court's alternative basis for binding Jones would not have unduly complicated the appeal and would have added clarity to the Sixth Circuit's decision. While that general rule may not preclude Living Essentials from  arguing on remand that Jones is personally liable under the Settlement Agreement through incorporation by reference, even though it failed to raise the issue with the Sixth Circuit when it had the chance, there is an element of "lying in wait" about Plaintiff's tactics that gives the Court pause in considering whether justice would be served by allowing Jones to be brought back into the case after the Sixth Circuit has ruled he is out.

Regardless, however, in looking closely at the Sixth Circuit's holding, it is clear that the issue of Jones' status as a defendant has been conclusively decided by the Sixth Circuit and was not remanded to permit further consideration by this Court. The Sixth Circuit determined that Jones was not individually liable because under Michigan law "he signed the Agreement in his capacity as a corporate officer." 912 F.3d at 337 (quoting *Liquid Mfg., LLC*, 885 N.W.2d 861, 867 n.6 (Mich. 2016)). To

permit Plaintiff to now resurrect the logic in this Court's prior footnote would go against "both the letter and the spirit of the mandate." *Mason v. Mitchell*, 729 F.3d 545, 550 (6th Cir. 2013).

Accordingly, the Court holds that because the Sixth Circuit concluded "the Settlement Agreement does not bind Jones in his personal capacity," he is no longer a party to the Lead Case. Jones is **DISMISSED WITH PREJUDICE** in his personal capacity.

### IV. Conclusion

For the reasons stated above the Court **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 420), **DENIES** Defendants' Motion for Summary Judgment (ECF No. 400), **GRANTS IN PART** Plaintiff's Motion to Consolidate the Lead Case and the Secondary Case (ECF No. 403), and **DISMISSES WITH PREJUDICE** Alan Jones as a defendant from the Lead Case.

**IT IS FURTHER ORDERED** that the parties shall meet and confer to develop and propose a stipulated scheduling order within 21 days of the date of this Order, and shall file the same with Court.

**IT IS SO ORDERED**.

DATED: March 31, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge