UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **INNOVATION VENTURES, L.L.C. f/d/b/a LIVING ESSENTIALS**, | 4:12-cv-13850-TGB |
| Plaintiff, | **ORDER** |
| v. | **DENYING PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF CHRISTOPHER C. PFLAUM (ECF NO. 423)** |
| **CUSTOM NUTRITION LABORATORIES, L.L.C., NUTRITION SCIENCE LABORATORIES, L.L.C., ALAN JONES**, | **DENYING DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF RODNEY CRAWFORD (ECF NO. 425)** |
| Defendants. | |

Opinion testimony by a qualified expert may be admitted in court if it is helpful to the trier of fact in understanding the evidence or determining the facts in issue, based on sufficient facts or data, and the product of reliable principles and methods that have been reliably applied to the facts of the case. Fed. R. Evid. 702.

In this longstanding breach of contract case, the parties offer opposing experts to opine on the question of what damages, if any, Defendants owe to Plaintiff Innovation Ventures for breach of contract. Plaintiff's expert offers testimony about how to calculate lost profits based on Plaintiff's market share. In rebuttal, Defendants offer their expert's opinion as to the weaknesses in Plaintiff's expert's calculations.

1

Each party has moved to exclude the other's expert witness under *Daubert* and the Federal Rules of Evidence. These cross-motions (ECF Nos. 423 and 425) are now before the Court for decision.

## I.    Background

On appeal, the Sixth Circuit held that Plaintiff "may introduce testimony that uses market share to quantify its lost profits." *Innovation Ventures, LLC v. Custom Nutrition Laboratories, LLC*, 912 F.3d 316, 345 (6th Cir. 2018). The Court of Appeals added, "Defendants may then submit rebuttal evidence concerning the weaknesses of this specific calculation." *Id*.

In accordance with that ruling, Plaintiff offers Rodney Crawford as its damages expert witness to testify concerning Plaintiff's lost profits. In rebuttal, Defendants seek to present Dr. Christopher Pflaum as their damages expert who will testify as to the weaknesses in Plaintiff's calculations and opinions on damages.

Each party seeks to exclude the expert testimony of the opposing party. Before the Court are the following motions: (1) Defendant's *Daubert* motion to exclude the expert testimony of Rodney Crawford, *See* ECF No. 425, and (2) Plaintiff's *Daubert* motion to exclude the expert testimony of Dr. Christopher Pflaum and Eric C. Frye. *See* ECF No. 423. These matters are fully briefed, and a hearing was held on January 22, 2021. At that hearing, Defendants disclosed that they do not plan to offer

2

Frye's opinions at trial. Plaintiff responded that it would no longer maintain its challenge to Frye so long as Defendants do not offer him as a witness of any kind, whether lay or expert. As Defendants have stated that they will not present his testimony, the issue of whether Frye should be excluded as an expert witness is moot.

The Court also learned that although in the present motion Defendant moves to exclude Crawford's 2017 expert report and opinion, Crawford's 2017 expert report has been superseded by an October 2020 expert report, which will be the operative document for the purposes of trial. Accordingly, Defendants' motion to exclude Crawford's 2017 expert report is moot. But Plaintiff further indicated that Crawford' analysis in his October 2020 expert report relies on the same methodologies and principles at issue in the present motion and that the substance of the changes in the October 2020 expert report merely relate to the data. As such, the Court's analysis and conclusions here about whether, under *Daubert*, the opinions offered by Crawford and Pflaum could be admitted remains applicable. For the following reasons, the Court will **DENY** both motions.

## II.   Legal Standard

In determining whether to admit expert testimony, district courts serve a "gatekeeping role" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v.*

3

*Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). This gatekeeping function applies to scientific expert testimony and other expert testimony involving technical or specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S., 137, 147 (1999). The Federal Rules of Evidence later codified these court-made requirements by adopting Fed. R. Evid. 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   The testimony is based on sufficient facts or data;
> (c)   The testimony is the product of reliable principles and methods; and
> (d)   The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In evaluating the reliability of expert testimony, *Daubert* provided a non-exclusive list of factors, which include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94)). A district court "has 'considerable leeway in deciding…how to go about determining whether particular expert testimony is reliable.'" *United States v.*

*Sanders*, 59 Fed. App'x 765, 767 (6th Cir. 2003) (quoting *Kumho*, 526 U.S. at 152). *Daubert*'s factors are not dispositive in every case and should be applied only "'where they are reasonable measures of reliability of expert testimony.'" *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008). "[R]ejection of expert testimony is the exception, rather than the rule." *Id.* at 530. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III.   Discussion

The parties have each filed motions to exclude the testimony of their opponent's damages expert. ECF Nos. 423, 425. Specifically, Defendants move to exclude the lost profits testimony of Plaintiff's expert, Rodney Crawford, on the ground that he is not qualified, he did not perform certain underlying market analyses, and he failed to consider certain evidence in his analysis. ECF No. 25, PageID.26933. On the other side, Plaintiff moves to exclude Defendants' expert, Dr. Christopher C. Pflaum, offered to rebut Crawford's testimony, because it contends that his opinions were based primarily on insufficient evidence, he did not prepare his report, his report does not reflect his views, and his opinions relied on inadmissible evidence. ECF No. 424, PageID.26427.

5

### A. Defendants' motion to exclude Plaintiff's Expert Testimony by Mr. Crawford.

Crawford concludes in his Expert Report and Supplemental Report that Plaintiff has suffered lost profits from Defendants' sales of energy shots containing Choline Family ingredients, which was conduct in violation of their Settlement Agreement. ECF No. 429, PageID.28146. To calculate lost profits, Crawford used a "category share methodology." *Id*. at PageID.28147 (citing ECF No. 426-3, PageID.27143-46). As a way to show the methodology behind the analysis, Plaintiff explains that Crawford:

> (1) determined the total Choline Family-containing bottles NSL sold; (2) computed [Plaintiff's] lost sales by multiplying the violative sales by [Plaintiff's] five-year average, 85% product-category…; and (3) multiplied [Plaintiff's] lost sales by its average per-bottle profit.

> ECF No. 429, PageID.28147 (citing ECF No. 429-2).

Plaintiff adds that this methodology "thus accounts for other factors that might affect sales, such as consumer preferences and price elasticity." ECF No. 429, PageID.28147 (citing ECF No. 429-5).

6

i.   **Crawford's background establishes "knowledge, skill, experience, training, or education" in the relevant field.**

Defendants assert that Crawford is not qualified because his report is "mere arithmetic" and because he assumes Plaintiff's market share "without performing any of the necessary analysis to support the conclusions." ECF No. 425, PageID.26943. Defendants misunderstand the first prong under Federal Rule of Evidence 702, which only requires that the expert witness "be qualified by 'knowledge, skill, experience, training or education.'" *Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702).

As to his qualifications, Crawford has been licensed in Michigan as a Certified Public Accountant since 1979. ECF No. 429-2, PageID.28176. He founded Crawford & Winiarski, a firm engaged in "economic damages analysis, financial consulting and investigative accounting in the context of commercial disputes." *Id*. Prior to starting his own economic consulting firm, for over twenty-five years Crawford was a partner with Arthur Andersen LLP, now defunct but formerly a large accounting firm. *Id*. In addition, Crawford holds numerous licenses and certifications relating to fraud, financial forensics, and business valuation. *Id*. He has served as a "consultant or expert in several hundred matters involving forensic accounting investigations and claims of economic damages in connection with commercial disputes." *Id*. at PageID.28176. These qualifications demonstrate knowledge, skill, experience, training or education in the

7

relevant field. *See* Fed. R. Evid. 702. Therefore, Crawford qualifies as an expert witness. *See Scrap Metal*, 527 F.3d at 529.

### ii. Crawford's testimony is relevant and will assist the trier of fact to understand the evidence or determine a fact in issue.

The method for proving damages is a key issue that was addressed on appeal by the Sixth Circuit. Plaintiff prevailed in that appeal in that the Court of Appeals held that it could try to prove its damages resulting from Defendants' breach of their contract by using its market share to prove its lost profits. *Innovation Ventures*, 912 F.3d at 344. The Sixth Circuit opined that under Michigan law, "'lost profits resulting from a breach of contract may be considered by a jury in determining damages.'" *Id.* (citing *Eastland Partners LP v. Village Green Mgmt. Co. (In re Brown)*, 342 F.3d 620, 632 (6th Cir. 2003) (citations omitted)). The court reasoned that "forbidding the submission of market-share based estimates to a jury as a matter of law runs afoul of [Michigan law] and impermissibly limits the scope of the jury's inquiry." *Id.* at 345. As such, on remand, Plaintiff is permitted to present market-share based calculations of lost profits as a theory of damages, while Defendants may offer "rebuttal evidence concerning the weaknesses of this specific calculation." *Id.*

Under *Daubert,* the expert testimony must assist the trier of fact to "understand the evidence or to determine a fact in issue," a test which is met when the testimony is relevant and relates to an issue in the case.

8

509 U.S. at 591. Furthermore, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id*. at 592.

Here, Plaintiff offers Crawford as a damages expert to determine its lost profits and to testify as to his calculations and methodology. ECF No. 429. Crawford's testimony will help the trier of fact understand the issue of damages, and specifically, how Defendants' violative conduct in breaching their restrictive covenant affected Plaintiff's profits. For instance, Crawford's calculations considered "that Defendants' products were formulated and marketed to usurp" Plaintiff's sales, *Id*. at PageID.28146, and "the fact that the product was sold in some cases side by side with 5-Hour Energy." ECF No. 426-3, PageID.27155. Crawford further stated that his conclusions "rely on the facts that are established in terms of the actions of the parties." *Id*. Crawford's testimony relates to market-share based calculations of lost profits, which the Sixth Circuit has already ruled to be a valid methodology applicable to the facts of this case. Such testimony will be helpful—whether ultimately accepted or not—to the trier of fact in understanding the issue of damages. Crawford's testimony therefore satisfies the relevant and helpful prong under *Daubert*. *See* 509 U.S. at 591-92.

### iii. Crawford's expert testimony is sufficiently reliable under the *Daubert* factors.

The thrust of Defendants' motion to exclude Crawford's expert testimony is whether his opinions have "reliable factual support." ECF No. 425, PageID.26952-53. Many of Defendants' contentions can be characterized as attacks on what Crawford failed to consider in his lost profits analysis. For example, Defendants attack Crawford's assumption that, "if [Defendants] had never entered the market, the Plaintiff would have otherwise realized 85% (or any other share) of [Defendants'] sales." *Id.* at PageID.26953. Defendants further argue that Crawford "must first show that [Plaintiff] and the products produced by [Defendants] are substitutes for each other in the same market segment." *Id.*

Defendants' position, however, is premised upon a reading of the threshold for reliability under *Daubert* that is much stricter than what Sixth Circuit case law requires. Expert testimony may be deemed reliable so long as the witness's premises have a reliable foundation, rather than being based on unsupported speculation. For example, *Scrap Metal* considered whether an expert witness's testimony is reliable even when the expert witness used an inaccurate database and therefore necessarily reached "erroneous conclusions." 527 F.3d at 529. There, a jury found a defendant liable for antitrust violations and awarded plaintiffs damages exceeding $20 million. *Id.* at 523.

The main issue on appeal in *Scrap Metal* was whether plaintiffs' damages expert was reliable and whether the district court had erred in

10

admitting his testimony. Defendant did not challenge the expert witness's qualifications, the relevancy of his testimony, or the general reliability of the method he used to determine damages. *Id*. at 529. Rather, defendant's challenge was limited to the expert witness's use of an inaccurate price index and alterations to the index's prices. In other words, defendant argued that the expert witness "used erroneous data and necessarily produced an erroneous conclusion." *Id*. As a result, defendant contended that the district court should have excluded the expert witness's testimony as insufficiently reliable under Federal Rule of Evidence 702. *Id*. The Court of Appeals rejected this argument because "it fundamentally confuses the *credibility and accuracy* of [expert witness's] opinions with *reliability*." *Id*. (emphasis in original). Instead, "a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *Id*.

*Scrap Metal* ruled that reliability requires that the expert's testimony "be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id*. (citing *Daubert*, 509 U.S. at 590). In a *Daubert* motion, district courts are merely required to assess whether the expert testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id*. at 529-30. Although *Scrap Metal* cautioned that a significant error in application may still render expert testimony

11

inadmissible, "we will generally permit testimony based on allegedly erroneous facts when there is *some* support for those facts in the record." *Id*. at 530. (italics added). Because the expert witness offered a foundation for how and why he analyzed the data the way he did, that was enough to establish that he performed his analysis according to a reliable method and reliably applied that method to the facts of the case. *Id*. The court concluded that the district court did not err in admitting the expert's testimony because defendant's contentions went to the weight of the evidence, not its admissibility. *Id*. The weight of the evidence is a question for the trier of fact at trial, not for courts considering a *Daubert* motion.

The Sixth Circuit similarly considered the question of an expert's reliability in *Dilts v. United Group Services, LLC*, where the district court granted a defendant's motion to exclude plaintiff's proposed expert witness testimony. 500 Fed. App'x 440, 445 (6th Cir. 2012). There, the district court excluded the expert witness's testimony because the expert "failed to use valid and reliable principles" that explained how a piece of machinery malfunctioned and caused injuries to several workers. *Id*. The district court also noted how the expert witness "failed to explain his conclusion in his report." *Id*.

The Sixth Circuit reversed the lower court, reasoning that the expert witness performed "the necessary calculations and sufficiently

relied on the laws of physics and mathematics generally employed." *Id*. at 446. Although defendant asserted that the expert witness did not have the relevant experience with the specific concepts at issue, the appellate court found that "[a]n expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact." *Id*. (citing *Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 293-94 (6th Cir. 2007)). *Daubert* and Federal Rule of Evidence 702 "require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand." *Id*. There is no requirement that an expert witness "know the answer to all the questions a case presents—even to the most fundamental questions." *Id*. (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)).

Here, as did those of the defendants in *Scrap Metal* and *Dilts*, Defendants' arguments miss the mark. In the Sixth Circuit, the threshold for indicia of reliability in a *Daubert* motion is a liberal one. The proper question for Defendants' motion to exclude expert testimony because it is unreliable is whether the record shows that Crawford performed his analysis "according to a reliable method and then reliably applied that method to the facts of this case," *Scrap Metal*, 527 F.3d at 531, and whether his opinions rest "upon a reliable foundation, as opposed to, say, unsupported speculation." *See id*.

13

In its opinion remanding the case to this Court, the court of appeals made it clear that the method for quantifying lost profits using market-share based estimates was an acceptable method for proving damages in this case. *Innovation Ventures*, 912 F.3d at 345. The record shows that Crawford's expert testimony meets that burden because he performed an analysis that used "market share to quantify its lost profits." *See id*. In order to mount a successful *Daubert* motion to exclude, Defendants need to attack the reliability of Crawford's method and whether he reliably applied his method to the facts of the case. Instead, Defendants insist that Crawford's expert testimony is not reliable because there are arguably better methods available, such as the "trend analysis". ECF No. 426-3, PageID.27103-05. But *Daubert* does not require nor can this Court find support for the proposition that an expert testimony's chosen methodology must be the most appropriate in order to be found reliable. *See Scrap Metal*, 527 F.3d at 529 ("[A] determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion."). Instead, Sixth Circuit case law allows for experts to have reasonable differences in their choice in methodology. *See Dilts*, 500 Fed. App'x at 445 ("Rule 702 does not require an expert to have absolute certainty in formulating his opinion.").

The only argument of Defendants that approaches the proper inquiry is their attack on Crawford's reliance in conducting his lost

14

profits analysis on the principles articulated in *State Indus. v. Mor-Flo Indus*. ECF No. 426-1, PageID.26977 (citing 883 F.2d 1573 (Fed. Cir. 1989)). Defendants assert that Crawford relies on *State Indus.* to make the assumption that, "if the offending products were not on the market, the Plaintiff would capture its market share of [Defendants'] sales." Defendants insist that, because he relies upon that case, Crawford must adhere to the exact principles used in that case in order for his methodology to be considered reliable. The thrust of Defendants' position is that Crawford's testimony is subject to attack if it does not prove but-for causation, as the infringed patent owner was required to do in *State Indus*. But the holding of that case was that the *party with the burden of proof* is responsible for proving but-for causation, not that any single witness, such as the plaintiff's expert, must meet that test before being allowed to testify.

In *State Indus.*, the Federal Circuit Court of Appeals considered whether a district court erred in awarding an infringed patent owner damages based on the market share of the defendant's infringing product. 883 F.2d at 1576. The court stated that in order to calculate lost profits, "the patent owner must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales."[1] Id. at 1577. In a two-competitor market, it is

---

[1] The standard method for proving lost profits requires that the patent owner prove "(1) demand for the patented product, (2) absence of

reasonable to assume, provided that the patent owner can meet the manufacturing and marketing demand, "that it would have made the infringer's sales." But where, as in *State Indus.*, there are multiple competitors, it was appropriate for the district court to credit "all the other competitors with their market shares as [plaintiff] requested." *Id.* at 1578. In doing so, the question becomes "whether an established market share combined with the other *Panduit* factors is sufficient to show [plaintiff's] loss to a reasonable probability." *Id.* The Federal Circuit Court of Appeals concluded yes, finding that in addition to plaintiff's ability to "meet its market share of the demand," plaintiff produced specific evidence that it had lost sales to [defendant's] infringing products in various regional markets. For example, plaintiff offered testimony from several retailers stating how plaintiff's products lost sales to defendant's products. *Id.* at 1579. Stated another way, at trial the plaintiff used multiple witnesses and pieces of evidence to prove its theory that, but-for the patent infringer's violative conduct, it would have made those sales. Based on such testimony, the Federal Circuit Court of Appeals held that it was "eminently reasonable for the district court to

---

acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).

infer that [plaintiff] could have sold its market share of [defendant's] infringing sales wherever the opportunity occurred." *Id.*

The Federal Circuit Court of Appeals revisited the issues raised in *State Indus.* in *BIC Leisure Products, Inc. v. Windsurfing Intern., Inc.*, 1 F.3d 1214 (Fed. Cir. 1993). There, the court also considered whether the evidence supported the district court's award for lost profits in a patent infringement case. *Id.* at 1216. The court opined that the market-share methodology is inappropriate where the products are fundamentally different and therefore do not compete in the same market. To establish that products compete in the same market in the context of a patent infringement claim, the infringed patent owner must show that consumers would have bought its products if the infringer had not been in the market. *Id.* at 1218. In other words, but-for the infringer, the infringed patent owner would have increased its sales. *See id.* In ruling that patent owners must prove a causal relation between the infringement and its lost profits, the court concluded that "the district court clearly erred by failing to apply the 'but for' causation test before awarding lost profits." *Id.*

Relying on these cases, Defendants insist that in order for Crawford's methodology to be found reliable, it must include proof of but-for causation—as stated in *State Indus.* and clarified in *BIC*. If Crawford's methodology does not prove but-for causation as required by

Federal Circuit precedent, Defendants argue that Crawford's opinions must be excluded. But such a result is not compelled by those cases.

*State Indus.* sets the bar for what *the plaintiff* must prove in order for the district court to award lost profits using a patent infringing product's market share. There, the court found that testimony from multiple retailers attesting to how plaintiff's products lost sales to defendant's violative products was sufficient for a district court to infer that in a multi-competitor market, plaintiff "could have sold its market share of [defendant's] infringing sales wherever the opportunity occurred." *See State Indus.*, 883 F.3d at 1579. *State Indus.* says nothing about whether a single expert witness's opinion is made less reliable when such proofs are absent from his expert report. Rather, *State Indus.* makes clear that it is the responsibility of the litigant offering a lost profits theory of damages to show but-for causation as part of meeting its burden of proof, not that any single witness must do so. For example, it was the litigant in that case that offered testimony from multiple retailers to establish "but-for" causation. *See id.* at 1579. The court did not even consider any challenge to a party's expert testimony discussing lost profits based on market share, let alone require that such an expert's methodology include proof of but-for causation.

Furthermore, *BIC* stands for the proposition that the district court erred by "failing to apply the 'but for' test before awarding lost profits."

*Id.* at 1218. There, the evidence as a whole was insufficient to support damages based on lost profits because the party propounding the theory did not prove but-for causation. But the Federal Circuit said nothing about whether an expert's testimony on damages should be rejected as unreliable because the testimony failed to prove the "but-for causation" required as an element at issue in the case. Litigants, not expert witnesses, bear the burden of proving each element at issue.

In addition, *BIC* fails to control here because its procedural posture is different. Here, the question is whether Crawford's expert testimony should be admitted after considering Rule 702 and the *Daubert* factors. In *BIC*, the Federal Circuit Court of Appeals reversed the district court's decision because the district court itself committed reversible error when it failed to consider the but-for causation standard when it determined the damage award. 1 F.3d at 1219. The district court had the benefit of reviewing the entirety of the record that was developed in the course of a trial before calculating damages based on a theory of lost profits. *See id.* Here, Crawford's testimony does not represent Plaintiff's only opportunity to prove the element of but-for causation. Indeed, at the January 22, 2021 hearing, Plaintiff stated that it would be offering additional evidence tending to establish but-for causation. It would therefore be premature to exclude Crawford's testimony for the reasons Defendants suggest.

19

In addition, at the same hearing, Defendants argued that while expert witnesses are permitted to make assumptions, it is unreasonable to assume that if Defendants were not in the market, several "club retailers" (such as Sam's Club or Costco) would not have proceeded to bring other private-label generic energy shots to the market. This assumption, Defendants contend, constitutes an analytical gap too great "between the data and the opinion offered." *See Everlight Electronics Co., Ltd. v. Nichia Corp.*, 2014 WL 4707053 at *2 (E.D. Mich. 2014) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In this argument, Defendants effectively insist that but-for causation must be proven before market-share evidence may even be used, and rely on the Federal Circuit's decision in *Grain Processing Corp. v. America Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999) for support.

But a review of *Grain Processing* reveals Defendants' reliance to be misplaced. In that case, the Federal Circuit Court of Appeals considered whether the existence of noninfringing substitutes in the market—that is, products that could be sold and that would cut into a patent-holder's market without infringing on his rights—would be enough to preclude an award of lost profits. *Id*. at 1341. It is presumed that the availability of noninfringing substitutes may defeat an award of lost profits because "a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than

leave the market altogether." *Id*. at 1351. The rationale is that, even if a patent infringer were selling products in violation of a patent, the patent owner should not be awarded damages based on a theory of lost profits if the patent infringer could have produced a similar but noninfringing product anyway. However, the court also held that patent owners have "significant latitude to prove and recover lost profits for a wide variety of foreseeable economic effects of the infringement." *Id*. at 1350. The court further opined that "[t]o recover lost profits, *the patent owner* must show 'causation in fact.'" *Id*. at 1349. (emphasis added). The closest statements approximating Defendants' position is that when a patent owner raises a theory of lost profits on lost sales, "*the patent owner* has an *initial burden* to show a reasonable probability that he would have made the asserted sales 'but for' the infringement." *Id*. (emphasis added). Once that is established, the burden shifts to the accused infringer to show that the but-for causation claims are unreasonable. *Id*.

But again, as with the other cases cited by Defendants, *Grain Processing* says nothing about an expert witness's need to make a preliminary finding establishing but-for causation for his opinion to be deemed reliable. *See id*. Accordingly, this argument fails. As previously stated, the burden of proving but-for causation rests with litigants seeking to prove they are entitled to lost profit damages, not with their individual expert witnesses. Plaintiff's ability to meet its burden of proof

in establishing but-for causation of the kind illustrated in *Grain Processing* is a question for the jury at trial, not a matter of pre-trial qualification of an expert under *Daubert*.[2] *See id*.

Next, Defendants contend that because Crawford cites to *State Indus.* as the basis for his calculations, his expert report is unreliable unless it adheres to the exact reasoning of that case. ECF No. 425, PageID.26943. But the Sixth Circuit did not require following the principles in *State Indus.*, *BIC*, or any other case.[3] *See Innovation Ventures,* 912 F.3d at 345. It simply held that Plaintiff shall be allowed to "introduce testimony that uses market share to quantify its lost profits." *Id*.

Furthermore, both the Sixth Circuit's reasoning and the expert report of Defendants' witness Pflaum show that there are multiple methodologies using market share to quantify lost profits. For instance, Pflaum's declaration admits that "there are many approaches to

---

[2] At the January 22, 2021 hearing, Defendants also cited the cases *Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434 (D.N.J. 2003) and *Stryker Sales Corp. v. Siroonian*, 2017 U.S. Dist. LEXIS 225268 (W.D. Mich. 2017). These cases also support the rule that Plaintiff bears the burden of proving but-for causation as to its lost profits. But they do not address the issue of whether an expert witness's reliability under *Daubert* can be called into question for failing to establish an element that the party must prove.

[3] Indeed, neither *State Indus.* nor *BIC* were contemplated by the Sixth Circuit, let alone held out as containing the model methodology for determining lost profits by market share.

computing" lost profits. *See* ECF No. 427-7, PageID.23038. And as an example, the Sixth Circuit states "[a]t least one Michigan court has determined that testimony related to market share can help quantify lost profits with sufficient certainty." *Innovation Ventures*, 912 F.3d at 345. (citing *Fabbrini Family Foods, Inc. v. United Canning Corp.*, 90 Mich. App. 80 (1979) (per curiam)). The court went on to cite several other cases using some variation of the lost profits theory of damages. *See id*. Therefore, Defendants' argument that Crawford's analysis is unreliable because it did not adhere to the principles stated in either *State Indus.* or *BIC* is without merit.

The remainder of Defendants' arguments attack the weight, not the admissibility, of Crawford's testimony. Such alleged deficiencies are better tested under the rigors of cross-examination at trial and resolved by the trier of fact. *See Daubert*, 509 U.S. at 596. For instance, even though at the January 22, 2021 hearing both parties admitted that neither of their own expert witnesses performed such calculations, Defendants assert that Crawford performed no market studies or cross-elasticity studies, and offered no way to "know if the market for Plaintiff's products is elastic or not." ECF No. 425, PageID.26947. Defendants also contend that Crawford has not "considered the number of energy shots that otherwise compete with the Plaintiff's product" or "the potential that another private label manufacturer, unburdened by [the Settlement

Agreement], would step in and manufacture the private label energy shots at issue in this case." *Id*. at PageID.26947-48. Finally, Defendants insist that Crawford's reliance on the Mintel Reports (showing energy shot sales) render his opinion unreliable because the data establishing market-share is based on retail sales dollars rather than units. *Id*. at PageID.26949.

But Sixth Circuit case law does not require that Crawford know certain facts or conduct certain analyses in order for his testimony to be considered reliable. *See Dilts*, 500 Fed. App'x at 445. There is no requirement that an expert witness "know the answer to all the questions a case presents—even to the most fundamental questions." *See id*. While Defendants stress that Crawford performed neither market studies nor cross-elasticity studies, Crawford testified that his analysis "is the mechanism for taking these variables into account." ECF No. 429, PageID.28153.

Putting aside that Defendants' argument is contradicted by Crawford's testimony, the problem with it is that it merely attacks the factual sufficiency of Crawford's expert testimony by disputing the variables underlying his analysis. *See Scrap Metal*, 527 F.3d at 531; *see also Everlight Electronics*, 2014 WL 4707053, at *2 ("[Defendant's] complaints that [Plaintiff's expert witness] only analyzed a subset of the Accused Products are appropriate for cross-examination on accuracy and

24

the weight."). Furthermore, such attacks on "'weaknesses in the factual basis of an expert witness' opinion…bear on the weight of the evidence rather than on its admissibility.'" *See Scrap Metal*, 527 F.3d at 531. (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citations omitted)). Similarly, Defendants argue that Crawford's opinions are unreliable because he relies on erroneous data in the Mintel Reports. This is the exact argument that the Sixth Circuit considered and rejected in *Scrap Metal*. *Id*. at 530 ("[W]e will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record.").

The remaining arguments about what Crawford failed to consider in his calculations, such as the number of energy shots that otherwise compete with the Plaintiff's product and whether another manufacturer would have made energy shots for the retailers anyway, are unavailing for the same reasons. ECF No. 425, PageID.26947-48; *See Scrap Metal*, 527 F.3d at 531; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking *shaky but admissible evidence*.") (emphasis added). All of these purported weaknesses in Crawford's analysis and conclusions can be considered by the jury in deciding how much weight to give his testimony, and whether it chooses to accept it or not.

For the reasons stated above, Defendants have failed to establish that Plaintiff's expert witness on damages should be excluded under Federal Rule of Evidence 702 and the *Daubert* factors.

### B. Plaintiff's motion to exclude Defendants' expert testimony of Dr. Christopher Pflaum.

Defendants' expert, Dr. Christopher Pflaum, concludes in his deposition testimony and in his Expert Report that Plaintiff's 5-Hour Energy product and Defendants' generic energy shots—manufactured for retailers as "house brands"—do not actually compete with one another in the same economic market. ECF No. 424-2, PageID.26452-53. Pflaum reaches this conclusion in part based on an analysis of "the law of one price."[4] ECF No. 424-4, PageID.26540. Because the two products do not

---

[4] In his deposition testimony, Pflaum refers to a case, cited in Defendant's motion as *United States v. Archer-Daniels-Midland Co.*, for the proposition that although two products are functionally identical, they do not compete in the same market when one product is 10-30% more expensive than the other. ECF No. 424-4, PageID.26540; ECF No. 431, PageID.28570; *see also* 866 F.2d 242, 246 (8th Cir. 1988). This proposition, however, is not what the case says. In *Archer-Daniels-Midland*, the Eighth Circuit outlined the factors relevant in determining reasonable interchangeability, which in turn is used to determine "competition, or the lack of competition, to the extent such exists." *Id.* at 246. The court found that "a price differential, even a substantial one, is *irrelevant* for purposes of determining reasonable interchangeability." *Id.* (emphasis added). However, "a large price differential as a result of a government price support raising the price of one product, but not the other…is a relevant factor." *Id.* The court then held that sugar and high-fructose corn syrup were not in the same relevant product market because the government was subsidizing the price of sugar, but not high-fructose corn syrup. The government subsidies prevented sugar from

compete in the same market, Defendants' theory is that Plaintiff incurred no damages from the breach of the restrictive covenant. ECF No. 431, PageID.28562; *see also* ECF No. 424-4, PageID.26540.

Plaintiff asserts that the expert testimony of Pflaum should be excluded for three main reasons. *See* ECF No. 424. First, his opinions are based on data collected by "unscientific and unreliable" means. *Id*. at PageID.26430. Second, Pflaum did not sufficiently participate in the preparation of his own report. *Id*. at PageID.26437. Finally, Pflaum's opinions rely on inadmissible evidence. *Id*. at PageID.26435.

Defendants respond that the expert testimony of Pflaum is admissible because his report relies on objective and verifiable facts. *See* ECF No. 431. They also counter that certain data collected for the expert report that Plaintiff questions as unreliable and unscientific are in fact not essential to Pflaum's opinions and were disclosed in the interest of transparency. *Id*. at PageID.28567-68.

_____

competing in the same market as high-fructose corn syrup because the latter's producers could always price below the government's pre-determined floor for the price of sugar. In other words, there must be artificially high prices in one product for differences in price between functionally comparable products to be a relevant factor for determining whether products compete in the same market. In contrast, this case involves neither government subsidies of energy shots nor artificially high prices of any sort. As such, the facts and reasoning of *Archer-Daniels-Midland* are out of place here.

As the Court best understands Plaintiff's position, it does not dispute the first two *Daubert* factors relating to the witness's expertise and the relevancy of his testimony to an issue in the case. Plaintiff does not dispute that Pflaum has sufficient background and expertise. The record shows that Pflaum holds a Ph.D. in Finance and Operations Management and a Master of Business Administration in Finance. ECF No. 424-2, PageID.26475. Pflaum is the president of an economics analysis firm and has consulted and testified in civil cases involving antitrust, breach of contract, business valuation, and lost profits. These are qualifications and experience sufficient to qualify as an expert witness in this case. *Id.*

As such, the remaining question before the Court is whether Pflaum's expert testimony has sufficient reliability under *Daubert* and the Federal Rule of Evidence 702.

### i. Pflaum's expert testimony is sufficiently reliable under the *Daubert* factors.

The main thrust of Plaintiff's arguments focuses on Appendix 3 of Pflaum's expert report. ECF No. 424, PageID.26430; *see also* ECF No. 424-2, PageID.26495-506. Appendix 3 consists of Pflaum's product research and bases of comparison among the different energy shots in market. It also serves as Pflaum's basis for making conclusions about consumer behavior, the comparative prices and ingredients of energy shots, and ultimately, whether Plaintiff incurred any damages. ECF No.

28

424-4, PageID.26607. But at the January 22, 2021 *Daubert* hearing, the parties admitted that neither of them will offer their respective expert witness's expert report to the jury at trial. In light of such clarification, the appropriate question here is whether the opinions and conclusions of the expert witnesses themselves are admissible, not the expert reports. As such, Plaintiff's arguments to exclude Pflaum's testimony because of the contents of his expert report are misplaced.

First, Plaintiff asserts that Appendix 3 is unscientific and unreliable because of how the data was gathered. According to Pflaum's deposition testimony, an intern at Pflaum's firm was instructed to "go forth to the Internet and find everything you can in terms of customer reviews of any energy shots" and "she just mucked about in the Internet." ECF No. 424-4, PageID.26607. Plaintiff alleges that the intern merely perused the internet, employed no known criteria, and cherry-picked certain information. ECF No. 424, PageID.26433. Plaintiff further alleges that because Appendix 3 is not based on a controlled, scientific study or objective criteria, Pflaum's expert testimony is inadmissible under *Daubert*. *Id*. at PageID.26432.

Plaintiff relies on *McClain v. Metabolife Intern., Inc.* for the proposition that expert testimony that relies on uncontrolled anecdotal information which is not based on sufficient data is inadmissible under *Daubert*. 401 F.3d 1233 (11th Cir. 2005). In *McClain*, the Eleventh

29

Circuit considered whether experts' testimonies used reliable methodology to prove that the use of an herbal weight-loss supplement causes strokes or heart attacks. *Id*. at 1240. As to one of the expert witnesses, the court determined that he "failed to rely upon reliable sources and data and that his overall methodology falls short." *Id*. at 1255. The court of appeals concluded that the medical literature did not support their opinions and that the experts "took leaps of faith and substituted their own *ipse dixit* for scientific proof on essential points." *Id*. (italics in original).

Here, *McClain* neither controls nor persuades. First, as an out-of-circuit case, *McClain*'s holding does not completely align with Sixth Circuit case law. The Eleventh Circuit appears to impose a stricter requirement on its expert witnesses for establishing indicia of reliability by permitting district courts broader latitude to assess the factual accuracy underpinning an expert's analysis. In contrast, Sixth Circuit has expressly held that testimony based on allegedly erroneous facts is generally admissible "when there is some support for those facts in the record." *Scrap Metal*, 527 F.3d at 530. In other words, so long as the expert witness testimony is not based on speculation, the methodology may be deemed reliable. Moreover, the Sixth Circuit has stressed the distinction that reliability "does not indicate, in any way, the correctness or truthfulness of such an opinion." *Id*. at 529. As such, Plaintiff's

assertion that Pflaum's expert testimony is inadmissible because he fails to meet a more demanding standard under non-controlling case law must fail.

Second, Plaintiff's argument addresses the wrong question. The appropriate inquiry is not whether Pflaum's expert report relied on factual assertions and survey results that were collected accurately and in accordance with scientific principles. Rather, the inquiry under *Daubert* and Sixth Circuit case law is whether Pflaum "performed his analysis according to a reliable method…and reliably applied that method to the facts of this case." *See Scrap Metal*, 527 F.3d at 531. Here, the record shows that Pflaum's analysis hinged on the "law of one price."[5] ECF No. 424-4, PageID.26540. An example of a credible attack would cite to case law, academic literature, or both, discussing the law of one price and its principles and formulas. Then, such expositions would be followed by arguments about how the expert witness's opinions are the result of a misunderstanding of said principles, how his application of the analysis falls short, or is inappropriately applied to the facts of the case. Stated

---

[5] According to Pflaum's testimony, the law of one price means "You cannot have the same good—or you cannot have two identical goods, two identical products, selling for different prices in the same geographical market because all the demand would go to the lower-priced product." ECF No. 424-4, PageID.26540.

another way, Plaintiff needed to address Pflaum's application of the law of one price analysis to the facts of this case.

But Plaintiff did not do that. Instead, much of Plaintiff's argument focuses on the factual sufficiency of Pflaum's analysis, which, again, goes to its weight, not admissibility. *See Scrap Metal*, 527 F.3d at 530. The most glaring example is Plaintiff's emphasis on how Appendix 3's data was researched and assembled by an intern. Plaintiff takes issue with how Pflaum was unable to provide a methodology or explanation as to why the intern ignored some reviews of energy shots, or why her selection criteria for the database appeared to lack an objective basis. ECF No. 424, PageID.26434. And Plaintiff relies on *Recreational Devs. of Phx., Inc. v. Phoenix* for the proposition that anecdotal evidence derived from random interviews is non-systematic and non-generalizable. Thus, methodologies that rely upon them are rendered unreliable. *Id*. at PageID.26436 (citing 220 F. Supp.2d 1054, 1061 (D. Ariz. 2002) (citations omitted)). Plaintiff insists that Pflaum's expert testimony as to Appendix 3 is similarly unreliable because he drew conclusions "based on anecdotal evidence," e.g., online customer reviews of various energy shots, and which was collected in a manner that appears to be non-systematic and non-generalizable. ECF No. 424, PageID.26435.

But as previously discussed, Sixth Circuit case law states that expert testimony is reliable for the purposes of assessing admissibility

even if the analysis relies on factually erroneous premises so long as the principles of the analysis itself were correctly applied. *See Scrap Metal*, 527 F.3d at 530. While the soundness of such data collection methodologies appears to warrant closer scrutiny, ultimately, the issues Plaintiff raises here are best clarified under cross-examination and resolved by the trier of fact.

Next, Plaintiff argues that Pflaum is merely acting "as a conduit for an improper narrative of otherwise inadmissible hearsay from anonymous sources." ECF No. 424, PageID.26436. Furthermore, Pflaum's use of customer reviews of energy shots is an attempt to "put his imprimatur on what is essentially nothing more than unreliable information and inadmissible hearsay." *Id.* at PageID.26437. Plaintiff cites *SEC v. Tourre* for the proposition that expert witnesses are prohibited from acting as a vehicle for factual narrative and from repeating facts without any expert analysis. 950 F. Supp.2d 666, 675 (S.D.N.Y. 2013).

But the record contradicts Plaintiff's characterization that Pflaum contributed little to the expert report and that he is merely repeating facts without expert analysis in order to act as a vehicle for presenting otherwise inadmissible factual narrative. As the named author of the expert report, Pflaum testified that he "[w]rote the final, and I reviewed the final." ECF No. 424-4, PageID.26529. Furthermore, he would "shoot

emails to people and go, what does this mean, what does that mean, why don't you cite something here, that sort of thing." *Id*. In terms of process, "I outlined it, [Frye] wrote the first draft, and then it bounced back and forth between us." *Id*. at PageID.26528. When asked whether Pflaum merely adopted the opinions of others in his report, he replied "No." *Id*. at PageID.26529. This testimony leads to the conclusion that Plfaum is an expert who is not acting as a mere conduit for factual narrative and certainly offers more than the mere repetition of facts without expert analysis. *See Tourre*, 906 F. Supp.2d at 675; *see also In re Prempro Prods. Liabl. Litig.*, 554 F. Supp.2d 871, 888 (E.D. Ark. 2008) (citations omitted); *Law v. Nat'l Collegiate Athletics Ass'n*, 185 F.R.D. 324, 341 (D. Kan. 1999).

In a related argument, Plaintiff contends that Pflaum's admissions and his apparent lack of knowledge regarding his expert report lead to the conclusion that the expert report and supplement were not prepared by him, but by others. ECF No. 424, PageID.26441. Plaintiff characterizes certain admissions, such as Pflaum stating that he delegated certain sections of his report to specialists, as evidence that Pflaum "had very little involvement in preparing the Report and forming the opinions he adopted." *Id*. at PageID.26439.

Plaintiff points to *Numatics, Inc. v. Balluff, Inc.* for the proposition that an expert must substantially participate in the preparation of his

report. *Id.* at PageID.26439 (citing 66 F. Supp.3d 934, 942 (E.D. Mich. 2014)). There, the court granted the plaintiff's motion to exclude certain testimony of a damage expert witness. *Id.* It was undisputed that the damage expert witness merely reviewed the draft "for only a couple of hours before signing it." *Id.* at 941. The court held that because it was defense counsel, not the damage expert witness, who had written the expert report, such expert witness testimony must be excluded. *Id.*

But the facts in *Numatics* are a far-cry from the facts here. As stated above, the record shows that Pflaum significantly contributed to the preparation of the expert report as the named author and supervisor of the various analysts. It is understandable that in such a lengthy report detailing complicated matters involving economics and business valuation, an expert witness would delegate sections of the report to various specialists. But ultimately, the record shows that in preparing the expert report, Pflaum created the outline of the report, helped generate concepts, and provided meaningful feedback to his assistants. *See* ECF No. 424-4. Plaintiff offers no evidence, nor even alleges that the expert report was actually prepared by defense counsel and that Pflaum merely reviewed the draft "for only a couple of hours before signing it." *See Numatics*, 66 F. Supp.2d at 941. As such, *Numatics* is not on all fours and this contention also fails.

Plaintiff's next argument is that Pflaum is unreliable because he lacks certain knowledge and was unable to answer specific questions about the contents of his expert report. ECF No. 424, PageID.26435. Plaintiff also assails the fact that Pflaum did no further independent study to confirm his assumption that if Defendants had not entered the energy shots market, another manufacturer would have done so. *Id.* at PageID.26436-37. For instance, as proof that Pflaum did not review the data he uses for his analysis, Plaintiff points to Pflaum's inability to answer questions about Figure 1 of the expert report or about the third-party industry sales data from Figure 2. *Id.* at PageID.26438.

Plaintiff cites to *Gen. Elec. Co. v. Joiner* for the rule that a damages expert witness must be able to "show his work" in order to meet the burden of demonstrating a sound methodology. ECF No. 424, PageID.26438-39 (citing 522 U.S. 136, 144 (1997)). There, the Supreme Court considered whether the district court abused its discretion in excluding the testimony of an expert witness because it believed that the "testimony of respondent's experts…did not rise above 'subjective belief or unsupported speculation.'" *Joiner*, 522 U.S. at 140. After reviewing the animal studies on which the experts relied and determining that "the studies were so dissimilar to the facts presented" in their case, the Court affirmed the district court's ruling. The Court also determined that the various epidemiological studies on which the experts relied were not a

sufficient basis for the experts' opinions, and that even some of the findings in the studies contradicted the experts' conclusions. *Joiner* reasoned that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Id*. at 146.

*Joiner's* requirement that an expert's opinions must be supported by the data is satisfied here because Defendants have sufficiently established how the underlying data supports Pflaum's expert report and opinions. *See* 522 U.S. at 140.   Indeed, the record shows a reliable connection between the existing data underlying Figures 1 and 2 in Pflaum's expert report because they are taken from the Mintel Reports, ECF No. 426-6, which is the same factual basis upon which Plaintiff's expert witness, Crawford, relies. For example, when asked whether the products included in the Mintel Reports are included in Figure 1 of the expert report, Pflaum replied, "correct." ECF No. 424-4, PageID.26542. Here, unlike in *Joiner* where the studies relied upon did not support the experts' conclusions, the relevance of the Mintel Reports to the opinion evidence is substantiated through its use by both parties' expert witnesses. *See* ECF No. 426-6 PageID.27655. Moreover, the Mintel Reports' stated objective is to quantify the market of energy shots and energy drinks, which are at issue here. *Id*. The other data points, such as those found in Appendix 3, were assembled for the purpose of addressing

the issue of Plaintiff's lost profits. Thus, the nature of such data connects to Pflaum's expert opinions by more than mere "ipse dixit." *See Joiner*, 522 U.S. at 146.

Finally, Plaintiff argues that Pflaum's reliance on the fact that Plaintiff was under FDA investigation between 2011 and 2013 constitutes inadmissible evidence for concluding that Defendants' "sales of violative products did not impact [Plaintiff's] sales." ECF No. 424, PageID.26441. Plaintiff asserts that the "citation of a 2012 newspaper article, a 2012 television news story, and a 2013 journal article" should be excluded for three reasons. First, it is not relevant because the safety of Plaintiff's energy shots has no bearing on the contract at issue and because Plaintiff's expert witness's lost profits damages model is based on Defendants' sales, not Plaintiff's. *Id.* at 26441. Second, it would be unfairly prejudicial because the FDA investigation corresponds to only a portion of the timeframe of the breaches and would therefore mislead the trier of fact because the investigation did not lead to a conclusion that Plaintiff's products were unsafe. *Id.* Third, the news of the investigation is hearsay. *Id.*

As to the first argument, news articles about the FDA investigation against Plaintiff are relevant in addressing whether there were confounding variables that affected Plaintiff's sales of energy shots, and therefore its market-share. Moreover, evidence that the safety of

38

Plaintiff's energy shots was under investigation relates to both witness's analysis regarding consumer behavior. ECF No. 424-4, PageID.26607. For example, in opining about what variables factor into a market-share analysis, Plaintiff's witness Crawford said, "Based on my knowledge of this industry, everything is ultimately driven by the sale to the consumer. And consumers are all out there making choices on what product they buy." ECF No. 426-3, PageID.27121-22. And in discussing what factors go into a consumer's preference for certain energy shots, Crawford stated, "It's brand recognition, a desire for the product itself, and…somewhere in that list of factors price comes into play." *Id*. at PageID.27310-11. As such, evidence about news articles regarding the FDA investigation is relevant to the issues of consumer preference and market-share.

Plaintiff's second argument relies on *Park West Galleries, Inc. v. Global Fine Art Reg., LLC* as an example of when a district court excluded evidence about a television news report about the plaintiff because it was unfairly prejudicial. 732 F. Supp.2d 727 (E.D. Mich. 2010). But again, Plaintiff's reading of the case is not applicable to the facts here. In *Park West Galleries*, the district court granted plaintiff's motion in limine to exclude questions about a television news story relating to plaintiff. *Id*. at 737. During cross-examination of a witness, defense counsel violated the district court's in limine orders by asking about the television news story. *Id*. The district court found that the questioning, by itself, was not

39

prejudicial. *Id*. Rather, it was the totality of the sequence of events during the cross-examination, including the line of questioning, the misconduct attributable to defense counsel, and plaintiff's need to make repeated objections, that "gave the appearance that [plaintiff] was trying to hide information from the jury." *Id*. The district court then held that it was unfairly prejudicial for plaintiff "to have to repeatedly object to attempts to introduce such information." *Id*. So, the case does not stand for the proposition that the mere admission of a news article detailing unfavorable information about a party is per se unfairly prejudicial. Even less does the case hold that an expert may not rely on such media reports in forming his opinion. The district judge clearly stated that such evidence, by itself, is permissible. *See id*.

In short, *Park West* does not support Plaintiff's argument. In that case the district court was considering a motion for a new trial, whereas here the Court is reviewing expert testimony under a *Daubert* motion. More critically, the district court stated that it was not the substance of the television news story that rendered it unfairly prejudicial. Rather, it was the totality of the sequence of events during the line of questioning that led the district court to conclude that plaintiff had suffered unfair prejudice. *Park West*, 732 F. Supp.2d at 737. Here, there has been no trial, and in any trial a proper jury instruction could guard against any possible prejudice by cautioning the jury not to consider such news

articles as relevant to the actual safety of Defendant's product but only as information that was available to consumers during the relevant time period. So, *Park West* neither controls nor persuades the Court.

Plaintiff's third argument about the news articles being inadmissible hearsay relies upon Federal Rule of Evidence 801, which defines what hearsay statements are excludable. However, Federal Rule of Evidence 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted*. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

(emphasis added). It is reasonable for experts in the field of economics and business valuation to ascertain confounding variables affecting a product's market-share, such as whether the fact that a product is under investigation for its safety influences consumer behavior and preferences for that product. As such, evidence like the news articles about an FDA investigation fall within Federal Rule of Evidence 703.  In any event, Plaintiff's proposition that experts may not rely on hearsay statements to form their opinions is inconsistent with the text and rationale of the Rule. The Federal Rules of Evidence relax the hearsay rule on opinion

41

testimony for experts and allows an expert to base an opinion on "facts or data in the case that the expert has been made aware of," rather than just what the witness has "personally observed." *See* Fed. R. Evid. 703. Prohibiting expert witnesses from relying on hearsay statements, such as academic studies and publications, defeats the purpose of the rule. Accordingly, this argument fails.

## CONCLUSION

For the reasons stated above, Defendants' motion to exclude the expert witness testimony of Crawford is **DENIED**. Likewise, Plaintiff's motion to exclude the expert witness testimony of Pflaum is **DENIED**.

**IT IS SO ORDERED.**

Dated: February 16, 2021           s/Terrence G. Berg
                                   _____
                                   TERRENCE G. BERG
                                   UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on February 16, 2021.

                         s/A. Chubb
                         _____
                         Case Manager